## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF PHYSICS TEACHERS, INC., <br> 1 Physics Ellipse, 5th Floor AAPT, College, Park, MD 20740 <br><br> AMERICAN ASSOCIATION OF COLLEGES AND UNIVERSITIES, <br> 1818 R Street NW, Washington, DC 20009 <br><br> AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br> 555 New Jersey Ave NW, Suite 600, Washington, DC 20001 <br><br> AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, <br> 1430 K Street NW, Suite 1200, Washington, DC 20005 <br><br> INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, <br> 8000 East Jefferson Avenue, Detroit, Michigan 48214 <br><br> WOMEN IN ENGINEERING PROACTIVE NETWORK, <br> 2001 L St. NW, Suite 500-50176, Washington, DC 20036 <br><br>         Plaintiffs, <br>    v. <br><br> NATIONAL SCIENCE FOUNDATION and, BRIAN STONE, in his official capacity, performing the duties of Director of the National Science Foundation, <br> 2415 Eisenhower Ave, Alexandria, VA 22314 <br><br>         Defendants. | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs—the American Association of Physics Teachers; the American Association of Colleges and Universities; the American Association of University Professors; the American Educational Research Association; the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America; and the Women in Engineering ProActive Network—allege as follows.

**INTRODUCTION**

1.     For over seven decades, since Congress passed and President Truman signed the National Science Foundation Act in 1950, the National Science Foundation ("NSF") has provided critical support to the development and advancement of science, and to America's global scientific, research, and economic preeminence.

2.     NSF-funded research and researchers have contributed to breakthroughs that improve the lives of Americans and others around the world every day. These include the Internet, nanotechnology, fiber optics, artificial intelligence, cloud computing, and MRI and fMRI technology. To date, NSF has supported 268 Nobel laureates during—and in some cases throughout—their careers.

3.     Education of young people in the sciences, and support of early-career scientists, is necessary to the United States' continued world leadership and competitiveness. Accordingly, Congress has also recognized the importance of NSF supporting education in science, technology, engineering, and mathematics ("STEM").

4.     Part of NSF's congressional mandate is to expand the participation of underrepresented persons in STEM fields, including women, minorities, and persons with disabilities. Congress recognized that "historically, underrepresented populations are the largest

untapped STEM talent pools in the United States." 42 U.S.C. § 1862s-5(b)(3). Congress

therefore declared "that the highest quality science and engineering over the long-term requires

substantial support … for increased participation in science and engineering by women,

minorities, and persons with disabilities." *Id.* § 1885(b). Consistent with this declaration,

Congress expressly mandated by law that the NSF Director "shall" award grants on a

competitive, merit-reviewed basis, "to eligible entities to increase the participation of

underrepresented populations in STEM fields," including women and people with disabilities.

*Id.* § 1862s-5(d)(1). Congress also mandated by law that the NSF Director "shall continue to

support programs designed to broaden participation of underrepresented populations in STEM

fields." *Id.* § 1862s-5(c).[1]

     5.     Consistent with these statutory mandates, NSF has long been a major source of

federal funding for scientific research and STEM education, including for projects to broaden

participation of underrepresented populations in STEM.[2]

     6.     But NSF is now violating these clear statutory commands. It is doing so consistent

with apparent direction from the White House but inconsistent with the law.

     7.     On January 20, 2025, President Trump issued Executive Order 14151, titled

"Ending Radical and Wasteful Government DEI Programs and Preferencing," which purports to

---

[1] *See also* 42 U.S.C. § 1862s-5(e)(1) (mandating that NSF Director "shall" make awards to
"institutions of higher education (or consortia thereof) for the development and assessment of
innovative reform efforts designed to increase the recruitment, retention, and advancement of
individuals from underrepresented minority groups in academic STEM careers"); *id.* § 1862s-
5(f)(1) (mandating that NSF Director "shall" make awards to "institutions of higher education
(or a consortium of such institutions) to implement or expand research-based reforms in
undergraduate STEM education for the purpose of recruiting and retaining students from
minority groups who are underrepresented in STEM fields").
[2] Laurie Harris, Cong. Rsch. Serv., R46753, The National Science Foundation: An Overview
(Apr. 9, 2021).

end "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion.'" And on April 18, 2025, three members of the so-called "Department of Government Efficiency" or "DOGE" arrived at NSF, and two were given complete access to NSF's grants-management systems.[3]

8.　　The day DOGE staff came to NSF, the agency announced it had "updated" its priorities for funding research—and in essence, that it would ignore Congress's legal directives to promote STEM education and a STEM workforce that takes full advantage of America's human resources, including women and underrepresented populations. In particular, the NSF Director announced in a "Statement of NSF Priorities" that "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities."[4] And NSF announced on its website that awards "that are not aligned with program goals or agency priorities have been terminated, including but not limited to those on diversity, equity, and inclusion (DEI), environmental justice, and misinformation/disinformation."

9.　　Beginning on April 18, pursuant to this change in priorities and at the direction of DOGE employees, NSF has terminated over $1 billion of previously awarded scientific grants, cooperative agreements, and other financial awards. On April 24, NSF's Senate-confirmed Director, Sethuraman Panchanathan, resigned. He was appointed by President Trump and confirmed by the Senate in 2019.

---

[3] Dan Garisto, *Hundreds more NSF grants terminated after agency director resigns*, Nature (Apr. 25, 2025), https://www.nature.com/articles/d41586-025-01312-8 [https://perma.cc/36D3-4TN8].
[4] NSF, *Statement of NSF Priorities* (Apr. 18, 2025), https://www.nsf.gov/updates-on-priorities [https://perma.cc/Z68M-CMKK].

10.     Consistent with the NSF's new statement of priorities, but contrary to Congress's mandate for the NSF, NSF terminated numerous active grants for projects that seek to expand participation of women and underrepresented groups in STEM as mandated by Congress, along with other basic research projects. NSF does not claim that grant recipients have failed to comply with any award requirements or that the awards were inconsistent with NSF policy or priorities when the awards were made. Rather, NSF has purported to justify its mass terminations with the boilerplate assertion that the grants "no longer effectuate the program goals or agency priorities." NSF afforded recipients of terminated grants no advance notice, and indeed no process whatsoever, before the terminations.

11.     Since April 2025, NSF has also withheld awards of new NSF grants, including for programs mandated by law. NSF instructed staff to halt award of all grants, then permitted some awards while still ordering staff to halt all grants to colleges, universities, and other institutions of higher education. As a result, American scientists wait for word on whether meritorious projects that should be funded under the law will be funded and NSF is refusing to spend the funds that Congress appropriated. Funding of new NSF grants has been slashed by about half this year compared to last, though Congress appropriated the same amount.

12.     NSF's "change in priorities" decision and the resulting mass termination of grants and freeze of new awards threaten American innovation, scientific leadership, and economic strength. They threaten the careers of countless scientists and educators and, as a result, our national security and global competitiveness. And they have caused and are causing real, irreparable harm to Plaintiffs and those they represent.

13.     Plaintiffs and their members are educators, professors, researchers, graduate students, and organizations who have applied for and received NSF awards for their projects, or

worked on NSF-awarded projects, and recently seen those awards terminated by the NSF. They continue to believe in the mission of NSF: to promote the progress of science; advance the national health, prosperity and welfare; and secure the national defense.

14.     NSF's "change in priorities" decision, its mass termination of grants, and its refusal to award new grants violate the statutes governing NSF, the Administrative Procedure Act ("APA"), and the Constitution. Plaintiffs therefore respectfully ask this Court to order NSF to fulfill its statutory obligations and to preliminarily and permanently enjoin NSF's mass termination of grants and the unexplained "change in priorities" decision on which those terminations are based, declare them unlawful, and set them aside.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law.

16.     The Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. The APA further authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–706. These sources of authority allow the Court to issue the relief sought in this complaint, which does not include money damages.

17.     Venue is proper in this district because at least one Plaintiff resides in this district. 28 U.S.C. § 1391(e)(1).

## PARTIES

I.    **Plaintiffs**

18.    The American Association of Physics Teachers, Inc. ("AAPT") is a professional association of scientists dedicated to enhancing the understanding and appreciation of physics through education. AAPT promotes and improves physics education by, among other things, (1) organizing and hosting conferences, workshops, and symposia that provide opportunities for attendees to share information about educational innovations, results, and physics educational resources; (2) providing teaching resources, including peer-reviewed journals and other online teaching and learning resources for physics education; (3) organizing and hosting physics competitions and contests; and (4) making awards and grants to physics educators and physics students. AAPT has received NSF grants that have been terminated by the NSF because, according to NSF, the grants "no longer effectuate[] the program goals or agency priorities." AAPT also has members who work on projects funded by NSF grants that have been cancelled for the same purported reason. AAPT also has a pending application for an award that NSF has not acted on. AAPT likewise has members who are named as principal investigators or co-principal investigators on pending NSF grant applications that NSF has not acted upon. AAPT sues on its own behalf and on behalf of its members.

19.    The American Association of Colleges and Universities ("AAC&U") is a global membership organization dedicated to advancing the democratic purposes of higher education by promoting equity, innovation, and excellence in liberal education. Founded in 1915, AAC&U is headquartered in Washington, D.C. AAC&U has received four NSF grants that have been terminated by the NSF because, according to the NSF, the grants no longer effectuate agency priorities. AAC&U also has members who work on projects funded by NSF grants that have

been cancelled by the NSF because, according to NSF, each of the grants no longer effectuates agency priorities. AAC&U sues on its own behalf.

20.     The American Association of University Professors ("AAUP") is a nonprofit membership association of faculty and other academic professionals. Headquartered in Washington, D.C., AAUP has approximately 44,000 members, who are based at colleges and universities across the country. Since its founding in 1915, the AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in this country's colleges and universities. AAUP includes members who work or worked on projects funded by NSF grants that have been cancelled by the NSF because, according to NSF, each of the grants no longer effectuates agency priorities. AAUP likewise has members who are named as principal investigators or co-principal investigators on pending NSF grant applications that NSF has not acted upon. AAUP sues on its own behalf and on behalf of its members.

21.     The American Educational Research Association ("AERA") is a leading national research society, founded in 1916, concerned with improving the educational process by encouraging scholarly inquiry related to education and evaluation and by promoting the dissemination and practical application of research results. AERA has approximately 25,000 members, including professional researchers, graduate students, and postdoctoral fellows working in higher education, research organizations, schools and educational agencies, other educational institutions or settings, foundations, nonprofit organizations, and companies in just about every state and district in the United States. Also, AERA includes institutional memberships under the designation the Consortium of University and Research Institutions, represented by deans of schools of education and leaders of other education research

organizations. AERA publishes seven leading peer-reviewed journals and holds an annual
scientific conference of well over 14,000 participants that drive future research in the field and
inform policy and practice. AERA is headquartered and incorporated in Washington, D.C. Many
AERA members work on projects funded by NSF grants that have been cancelled by the NSF
because, according to NSF, each of the grants no longer effectuates agency priorities. AERA also
has members who are named as principal investigators or co-principal investigators on pending
NSF grant applications that NSF has not acted upon. Disruption of research pursued by AERA
members has immediate adverse effects on AERA's activities that depend on those researchers'
endeavors and NSF's longstanding participation. AERA sues on its own behalf and on behalf of
its members.

      22.     The International Union, United Automobile, Aerospace, and Agricultural
Implement Workers of America ("UAW") is one of the largest and most diverse unions in North
America, with members in the United States, Canada and Puerto Rico and in virtually every
sector of the economy. From its earliest days, the UAW has been a leader in the struggle to
secure economic and social justice for all people. It has a rich history of supporting inclusion,
equity, and diversity in the higher education sector and in all workplaces. The UAW has nearly
1,000,000 active and retired members and represents approximately 120,000 workers in higher
education—graduate students, postdoctoral scientists, researchers, university staff, and faculty—
at institutions across the country including Northeastern University, Wellesley College,
University of Southern California, Columbia University, Harvard University, New York
University, University of Pennsylvania, Princeton University, University of California, Columbia
University, California State University, University of Washington, California Institute of
Technology, Washington State University, University of Alaska, and Worcester Polytechnic

Institute, among many others. Thousands of UAW members rely on NSF grant funding for their jobs and training. UAW has members who work on projects funded by NSF grants that have been cancelled by the NSF because, according to NSF, each of the grants no longer effectuates agency priorities. UAW also has members who have pending NSF grant and fellowship applications that NSF has not acted upon, or who depend for their continuing employment on pending NSF applications. UAW sues on behalf of its members.

23.     Women in Engineering ProActive Network ("WEPAN") is a non-profit educational organization that is dedicated to advancing cultures of inclusion and diversity in engineering education and professions. WEPAN connects people, research, and practice to increase participation, retention and success of women and other underrepresented groups in engineering from college to executive leadership. WEPAN is based in Washington, D.C. WEPAN has received NSF grants that have been terminated by the NSF because, according to NSF, the grants no longer effectuate agency priorities. WEPAN also has members who work on projects funded by NSF grants that have been cancelled by the NSF because, according to NSF, each of the grants no longer effectuates agency priorities. WEPAN also has pending applications for awards that NSF has not acted on. WEPAN likewise has members who are named as principal investigators or co-principal investigators on pending NSF grant applications that NSF has not acted upon. WEPAN sues on its own behalf and on behalf of its members.

## II.    <u>Defendants</u>

24.     Defendant NSF is an independent agency of the federal government.[5] NSF consists of a National Science Board and a Director.[6]

---

[5] 42 U.S.C. § 1861.
[6] *Id.*

25.    The office of NSF Director is currently vacant.[7] Defendant Brian Stone is NSF

Chief of Staff, performing the duties of the Director of NSF. He is sued in his official capacity.

## STATEMENT OF FACTS

### I.    <u>The National Science Foundation</u>

26.    Congress established NSF as an independent agency in the National Science

Foundation Act of 1950.[8] Congress did so in recognition of the crucial role that science played in

the Allies' success in World War II and the importance of supporting science for this country's

welfare and national security.[9] Among the statutorily defined purposes of NSF are "[t]o promote

the progress of science; to advance the national health, prosperity, and welfare; [and] to secure

the national defense."[10]

27.    To that end, Congress has "authorized and directed" NSF "to initiate and support

basic scientific research and programs to strengthen scientific research potential and science

education programs at all levels in the mathematical, physical, medical, biological, social, and

other sciences."[11]

28.    NSF funds: basic research and education across all fields of fundamental science

and engineering, except the medical sciences; research with the potential to create new products

and solutions that improve people's lives; research partnerships between academic, industry,

---

[7] NSF, *Leadership,* https://www.nsf.gov/about/leadership [https://perma.cc/HKK9-NQXE].
[8] National Science Foundation Act of 1950, Pub. L. No. 81-507, 64 Stat. 149 (May 10, 1950).
[9] NSF, *History,* https://www.nsf.gov/about/history [https://perma.cc/7DPZ-BF2A].
[10] Pub. L. No. 81-507, 64 Stat. at 149.
[11] 42 U.S.C. § 1862(a)(1).

nonprofits, and government; education and training programs in science and engineering from pre-K to graduate school and beyond; and research tools and infrastructure.[12]

29.    NSF provides funding through grants, cooperative agreements, and fellowships.[13]

30.    NSF-funded research has made the United States a world leader in science. Each year, NSF funding directly supports 307,000 researchers, technical professionals, post-doctoral students, graduate students, undergraduates, K-12 teachers, and students.[14]

31.    In NSF's own words, NSF funding for education and training "fuel[s] innovation across the nation with investments that build a *diverse* next-generation workforce of scientists, engineers, technicians and teachers."[15] NSF funding supports research on learning and teaching across all STEM disciplines.[16] NSF funding supports a wide range of STEM education, from pre-K-12 education to graduate studies.[17] As a result, NSF education "support[s] efforts that build the STEM-capable U.S. workforce of the future and ensure Americans are prepared to meet evolving workplace demands."[18]

## II.    NSF's congressional mandate to expand participation in science

32.    Throughout the statutory provisions governing NSF, Congress has mandated NSF support for broadening participation of women and underrepresented populations in STEM.

---

[12] NSF, *Getting Started,* https://www.nsf.gov/funding/getting-started [https://perma.cc/VBJ5-AK8X].
[13] *Id.*
[14] NSF, Fact Sheet, *NSF By The Numbers,* https://nsf-govresources.nsf.gov/files/Factsheet_ByTheNumbers.pdf?VersionId=CqK4KW39D4nNtO_xZR KkhyGznH659z4h [https://perma.cc/JW7S-2Y23].
[15] NSF, *Education & Training,* https://www.nsf.gov/focus-areas/education [https://perma.cc/8BMB-R4GR] (emphasis added).
[16] *Id.*
[17] *Id.*
[18] *Id.*

33.     In the National Science Foundation Authorization and Science and Technology Equal Opportunities Act of 1980, "Congress declare[d] that the highest quality science over the long-term requires substantial support, from currently available research and educational funds, for increased participation in science and technology by women and minorities." Pub. L. No. 96-516, § 32(b), 94 Stat. 3007, 3011 (Dec. 12, 1980) (codified as amended at 42 U.S.C. § 1885(b)); Pub. L. No. 107-368, § 16, 116 Stat. 3034, 3059 (Dec. 19, 2002) (adding "persons with disabilities" to congressional declaration). Expanding participation in science by women, minorities, and persons with disabilities supports the "full use of the human resources of the Nation in science and engineering." 42 U.S.C. § 1885(b).

34.     In the National Science Foundation Authorization Act of 1998, Congress directed NSF to pursue a "core strategy" of "[d]evelop[ing] intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." Pub. L. No. 105-207, § 101(b)(1), 112 Stat. 869, 870 (July 29, 1988) (codified at 42 U.S.C. § 1862k(b)(1)).

35.     In the American Innovation and Competitiveness Act of 2017, Congress also found that "historically, underrepresented populations are the largest untapped STEM talent pools in the United States." Pub. L. No. 114-329, § 305(b)(3), 130 Stat. 2969, 3007 (Jan. 6, 2017) (codified at 42 U.S.C. § 1862s–5(b)(3)). Accordingly, Congress mandated that NSF "shall continue to support programs designed to broaden participation of underrepresented populations in STEM fields." 42 U.S.C. § 1862s–5(c).

36.     In the Promoting Women in Entrepreneurship Act of 2017, Congress found that "the National Science Foundation's mission includes supporting women in STEM disciplines. Pub. L. No. 115–6, § 2(6), 131 Stat. 11, 11 (Feb. 28, 2017) (codified at 42 U.S.C. § 1885a note).

37.     In 2022, in a part of appropriations legislation titled "National Science Foundation for the Future," Congress declared that "the Federal Government must utilize the full talent and potential of the entire Nation by . . . encouraging broader participation of populations underrepresented in STEM." Pub. L. No. 117-167, § 10301, 136 Stat. 1366, 1506 (Aug. 9, 2022).

38.     Congress also specifically mandated that NSF fund certain programs to expand participation in science. The following are just some examples.

> a.     The Louis Stokes Alliances for Minority Participation (LSAMP) supports partnerships between higher education institutions and other organizations that aim to increase STEM degrees to underrepresented populations.[19] Congress required that NSF "shall continue to support" LSAMP. 42 U.S.C. § 1862p–4.

> b.     The Eddie Bernice Johnson INCLUDES Initiative is statutorily mandated. The statute provides that NSF "shall make awards, on a competitive basis, to institutions of higher education or non-profit organizations (or consortia of such institutions or organizations) to carry out a comprehensive national initiative to facilitate the development of networks and partnerships to build on and scale up effective practices in broadening participation in STEM studies and careers of groups historically underrepresented in such studies and careers." *Id.* § 19012(a).

> c.     Congress required that NSF "shall award grants on a competitive, merit-reviewed basis, to eligible entities to increase the participation of underrepresented populations in STEM fields." *Id.* § 1862s–5(d)(1).

---

[19] NSF, *Louis Stokes Alliances for Minority Participation (LSAMP)*, https://www.nsf.gov/funding/opportunities/lsamp-louis-stokes-alliances-minority-participation [https://perma.cc/G8T3-5YAR].

d.      Congress required that NSF "shall make awards to institutions of higher education (or consortia thereof) for the development and assessment of innovative reform efforts designed to increase the recruitment, retention, and advancement of individuals from underrepresented minority groups in academic STEM careers, which may include implementing or expanding successful evidence-based practices." *Id.* § 1862s–5(e)(1).

e.      Congress required that NSF "shall make awards to institutions of higher education (or a consortium of such institutions) to implement or expand research-based reforms in undergraduate STEM education for the purpose of recruiting and retaining students from minority groups who are underrepresented in STEM fields." *Id.* § 1862s–5(f)(1).

f.      Congress required that NSF "shall make awards on a competitive, merit-reviewed basis, to institutions of higher education or non-profit organizations (or consortia of such institutions or organizations), to enable such entities to increase the participation of women and underrepresented minorities in STEM studies and careers." *Id.* § 19017(a). Congress has appropriated $5 million for each fiscal year for such awards until 2027. *Id.* § 19017(d).

g.      The Historically Black Colleges and Universities Undergraduate Program ("HBCU-UP") provides awards to strengthen STEM undergraduate education and research at Historically Black Colleges and Universities ("HBCUs").[20] Congress

---

[20] NSF, *Historically Black Colleges and Universities - Undergraduate Program (HBCU-UP)*, https://www.nsf.gov/funding/opportunities/hbcu-historically-black-colleges-universities-undergraduate [https://perma.cc/WEH5-SCF8].

required that NSF "shall continue to support the Historically Black Colleges and Universities Undergraduate Program." *Id.* § 1862p–4.

39.     The U.S. Code is replete with other provisions in which Congress authorized, and at times directed, NSF to fund projects to increase the participation of women, underrepresented minorities, and persons with disabilities in STEM. *E.g.*, 42 U.S.C. §§ 1862i(a)(3)(C), (c)(3), (d)(2)(D), (e)(3)(C), (f)(2)(C); 1862n(a)(3)(I), (a)(3)(K), (a)(5), (b)(1)(B)(iv), (b)(2)(G); 1862n–1(b)(2)(F), (c)(2), (d)(2); 1862n–1a(d)(3)(F), (d)(4)(B), (k)(2)(D); 1862n-2(b)(2)(C), (b)(3); 1862n-8(a)(1); 1862n-10(a); 1862o; 1862o-4; 1862o-12; 1862o-14(c)(2)(A)(ii); 1862p-2(b)(2)(A);1862p-6; 1862p-13; 1862q(c)(2)(C); 1862s-7(b)(2)(C); 1869(c); 1885a; 1885b; 1885c; 18991(c)(6)(B); 18992(a)(3); 18994(d)(4)(B); 18997(b)(5)–(6); 19011(b); 19014(b); 19015; 19016; 19018; 19084(c)(6); 19104(1); 19108(d)(3); 19110(b)(7); 19112(c); 19119(c)(1).

40.     NSF has acknowledged that congressional mandate in its own policy documents. Consistent with these statutory mandates, the latest version of NSF's Proposal and Award Policies and Procedures Guide states in a section on "Proposal Preparation Instructions": "NSF's mission calls for the broadening of opportunities and expanding participation of groups, organizations, and geographic regions that are underrepresented in STEM disciplines, which is essential to the health and vitality of science and engineering. NSF is committed to this principle of diversity and deems it central to the programs, projects, and activities it considers and supports."[21] Earlier versions of NSF's Proposal and Award Policies and Procedures Guide contained identical language.[22]

---

[21] NSF, *Proposal and Award Policies and Procedures Guide (NSF 24-1)* (effective May 20, 2024), https://nsf-gov-resources.nsf.gov/files/nsf24_1.pdf [https://perma.cc/DJD8-ZUG5].
[22] *E.g.*, NSF, *Proposal and Award Policies and Procedures Guide (NSF 16-1)* (effective Jan. 2016), https://nsf-gov-resources.nsf.gov/pubs/policydocs/pappguide/nsf16001/nsf16_1.pdf [https://perma.cc/695W-D32Z].

41.    NSF's 2022-2026 Strategic Plan also identified "Diversity and Inclusion" as one of NSF's "Core Values," and stated that its "Strategic Objective 1.1" was to "[e]nsure accessibility and inclusivity" by "[i]ncreas[ing] the involvement of communities underrepresented in STEM and enhance capacity throughout the nation."[23]

42.    NSF's report on "The State of U.S. Science and Engineering 2024" explains the importance of this mission.[24] "Many groups of Americans remained underrepresented among [science and engineering] degree recipients when compared to their share of the U.S. population ages 20–34 years old."[25]

### III.    NSF's funding award process

43.    NSF "fulfills [its] mission chiefly by making grants."[26] NSF allocates 94% of its congressionally appropriated budget for grants and awards to support research projects, facilities, and STEM (science, technology, engineering, and mathematics) education.[27] In an average year, NSF funds about 12,000 competitive awards for scientific research, education, and training.[28]

44.    Thousands of researchers apply for NSF funding each year. NSF reviews funding applications through a careful and thorough competitive process that can take up to six months.[29] That process typically begins when NSF publicly announces funding opportunities.[30]

---

[23] NSF, *2022–2026 Strategic Plan*, https://nsf-gov-resources.nsf.gov/pubs/2022/nsf22068/nsf22068.pdf [https://perma.cc/29XS-752F].
[24] NSF, *Talent: U.S. and Global STEM Education and Labor Force,* https://ncses.nsf.gov/pubs/nsb20243/talent-u-s-and-global-stem-education-and-labor-force [https://perma.cc/VJ8Y-A3SW].
[25] *Id.*
[26] NSF, *About NSF,* https://www.nsf.gov/about [https://perma.cc/93N7-3BF2].
[27] *NSF By The Numbers* [https://perma.cc/JW7S-2Y23].
[28] *Id.*
[29] NSF, *NSF Proposal and Award Process*, https://www.nsf.gov/attachments/116169/public/nsf_proposal_and_award_process.pdf [https://perma.cc/D6SQ-3PMZ].
[30] *Id.*

45.     A researcher may then submit a proposal. NSF has set out detailed instructions to prepare in-depth proposals.[31] Proposals that pass an initial compliance screen are closely reviewed by a scientist, engineer, or educator serving as an NSF program officer and nearly always also through an external peer-review process involving three to ten outside experts.[32] External peer reviewers provide expert analysis and evaluation of a proposal, which the NSF program officer reviews to make a recommendation to the NSF division director about whether to make an award.[33]

46.     NSF reviews all proposals under two merit criteria: Intellectual Merit and Broader Impacts.[34] These criteria are mandated by law,[35] and Congress defined the Broader Impacts criteria in statute.[36] One of the statutorily defined Broader Impacts criteria is "[e]xpanding participation of women and individuals from underrepresented groups in STEM." 42 U.S.C. § 1862p–14(a)(7).

47.     The Broader Impacts criterion has been a formal part of NSF's review of funding proposals since 1997.[37] In the American COMPETES Reauthorization Act of 2010, Congress

---

[31] NSF, *Chapter II: Proposal Preparation Instructions (from Proposal & Award Policies & Procedures Guide (PAPPG) (NSF 24-1)*), https://www.nsf.gov/policies/pappg/24-1/ch-2-proposal-preparation [https://perma.cc/M4TM-XDRX].

[32] NSF, *Overview of the NSF Proposal and Award Process*, https://www.nsf.gov/funding/overview [https://perma.cc/UT67-97ZC].

[33] *Id.*

[34] *Id.*; NSF, *Merit Review Process: Fiscal Year 2021 Digest* (June 2023), https://nsf-gov-resources.nsf.gov/nsb/publications/2022/merit_review/nsb202314.pdf [https://perma.cc/2EY4-ACM5].

[35] 42 U.S.C. §§ 1862s(a)(2), (b).

[36] *Id.* § 1862p-14.

[37] NSF, *Perspectives on Broader Impacts,* https://nsf-gov-resources.nsf.gov/2022-09/Broader_Impacts_0.pdf [https://perma.cc/9YUU-2DZ8]; NSF, *NSF PR 97-28: NSF to Adopt New Merit Review Criteria* (Apr. 8, 1997), https://www.nsf.gov/pubs/1997/pr9728/pr9728.txt [https://perma.cc/32KN-CMN4]; Peter Lee, *Innovation in the Service of Society*, 104 B.U. L. Rev. 695, 731 (2024).

codified the Broader Impacts review criterion in statute. Pub. L. No. 111-358, § 526, 124 Stat. 3982, 4019 (Jan. 4, 2011) (codified at 42 U.S.C. § 1862p–14). Congress revised the mandate to its current form in 2017 in the American Innovation and Competitiveness Act. Pub. L. No. 114-329, § 102(c), 130 Stat. 969, 2972 (2017). In that law, Congress reaffirmed the statutory directive by requiring that NSF "shall maintain the intellectual merit and broader impacts criteria, among other specific criteria as appropriate, as the basis for evaluating grant proposals in the merit review process." Pub. L. No. 114-329, § 101(b), 130 Stat. at 2970–71 (codified at 42 U.S.C. § 1862s(b)).

48.     NSF's Proposal and Award Policies and Procedures Guide instructs applicants that proposals "must contain" a separate section on "Broader Impacts" that include impacts on "societally relevant outcomes," including "full participation of women, persons with disabilities, and underrepresented minorities in science, technology, engineering, and mathematics (STEM)."[38]

49.     Prior to April 2025, terminations of grants awarded pursuant to NSF's rigorous and competitive process were rare and undertaken for identified violations of grant terms and conditions, such as misconduct.

## IV.     NSF's award termination procedures

50.     NSF's award termination procedures are based on the termination procedures in the Office of Management and Budget's Uniform Administrative Requirements. 2 C.F.R. §§ 200.340, 2500.100.

---

[38] *Proposal and Award Policies and Procedures Guide (NSF 24-1)* [https://perma.cc/DJD8-ZUG5].

51.     NSF's award termination procedures are part of NSF's Proposal and Award Policies and Procedures Guide. The current version of the Guide, which applies to proposals submitted or due on or after May 20, 2024, provides that an award may be terminated "[b]y NSF, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." [39] The Guide has reflected that termination language since Version 22-1, effective October 4, 2021.[40]

52.     NSF also incorporates award termination provisions into award notices.

a.      The October 1, 2024, version of the Grant General Conditions (GC-1) is effective for all new grants and funding amendments made between October 1, 2024, and May 19, 2025. It states that a grant award may be terminated "[b]y NSF if an award no longer effectuates the program goals or agency priorities."[41]

b.      Before October 1, 2024, Grant General Conditions applied only to awards made to for-profit organizations and state, local, or tribal governments. Meanwhile, grants to institutions of higher education and nonprofit organizations were governed by Research Terms and Conditions.[42]

---

[39] *Id.*

[40] NSF, *Proposal and Award Policies and Procedures Guide (NSF 22-1)* (effective Oct. 4, 2021) https://nsf-gov-resources.nsf.gov/pubs/policydocs/pappg22_1/nsf22_1.pdf [https://perma.cc/K6RB-6RBE]; NSF, *Proposal and Award Policies and Procedures Guide (NSF 23-1)* (effective Jan. 30, 2023), https://nsf-gov-resources.nsf.gov/2022-10/nsf23_1.pdf [https://perma.cc/2Z3E-9VLP].

[41] NSF, *Grant General Conditions (GC-1)* (Oct. 1, 2024), https://nsf-gov-resources.nsf.gov/files/oct24-r.pdf [https://perma.cc/KE5F-U8VA].

[42] NSF, *Award Terms and Conditions,* https://www.nsf.gov/awards/terms-conditions [https://perma.cc/JVF2-54QR].

c.      Research Terms and Conditions starting November 12, 2020, provided

that an award can be terminated "[b]y NSF, to the greatest extent authorized by

law, if an award no longer effectuates the program goals or agency priorities."[43]

53.      NSF procedures provide for pre-termination notice and post-termination appeal.

"Normally, action by NSF to suspend or terminate an award will be taken only after the recipient

has been informed by NSF of the proposed action, or informed of any deficiency on its part and

given an opportunity to correct it. NSF, however, may immediately suspend or terminate an

award without notice when it believes such action is reasonable to protect the interests of the

government."[44] NSF also allows a grant recipient to appeal a termination to the agency, upon

which the appeal will be reviewed by a person not involved with the original decision who will

review all relev4ant information and prepare a report.[45]

**V.      NSF's Change in Priorities Decision**

54.      On April 18, 2025, approximately three months after the President issued his

Executive Order "Ending Radical and Wasteful Government DEI Programs and Preferencing,"

and on the same day DOGE arrived at NSF, NSF published a statement on its website

announcing "updates" on NSF priorities (the "Change in Priorities Decision").[46]

---

[43] NSF, *Research Terms and Conditions,* https://www.nsf.gov/awards/terms-conditions/research [https://perma.cc/ZSB5-W53G].

[44] NSF, *Chapter XII: Award Administration Disputes and Misconduct (from Proposal & Award Policies & Procedures Guide (PAPPG) (NSF 24-1))*, https://www.nsf.gov/policies/pappg/24-1/ch-12-disputes-misconduct [https://perma.cc/NAZ8-2PT6]; *Grant General Conditions (GC-1)* [https://perma.cc/KE5F-U8VA]; NSF, *Research Terms & Conditions: Agency Specific Requirements* (May 20, 2024), https://nsf-gov-resources.nsf.gov/files/nsf-research-terms-conditions-20240520-r.pdf [https://perma.cc/2M8D-JV3D].

[45] *Chapter XII: Award Administration Disputes and Misconduct* [https://perma.cc/NAZ8-2PT6].

[46] NSF, *Updates on NSF Priorities* (May. 23, 2025), https://www.nsf.gov/updates-on-priorities [https://perma.cc/C5BK-KUCZ].

55.     According to the statement, "NSF priorities are grounded in the mission of the agency and modulated by statutory directives and administration priorities." NSF identified "two statutory criteria" for making funding awards: Intellectual Merit and Broader Impacts.

56.     Much of the statement purported to reaffirm existing practices. NSF identified various ways in which it would "continue" its past approach. NSF stated that it "continues to review all projects using Intellectual Merit and Broader Impacts criteria"; that it "will continue to support research with the goal of understanding or addressing participation in STEM, in accordance with all applicable statutes and mandates, with the core goal of creating opportunities for all Americans"; and that it "will continue to support basic and use-inspired research in S&E [science and engineering] fields that focus on protected characteristics when doing so is intrinsic to the research question and is aligned with Agency priorities."

57.     Only a small part of NSF's statement acknowledged a change in policy. NSF stated that "NSF's broadening participation activities . . . must aim to create opportunities for all Americans everywhere. These efforts should not preference some groups at the expense of others, or directly/indirectly exclude individuals or groups. Research projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities." The statement does not explain how the change in policy is consistent with the Broader Impacts Criterion or other statutory mandates to support STEM education for underrepresented groups.

58.     NSF's statement on priorities was accompanied by a set of "frequently asked questions" (FAQs) and NSF's responses.[47] These FAQs and responses reveal that NSF has

_____

[47] *Id.*

changed its policies (without a reasoned explanation) to end support of programs that promote "diversity, equity and inclusion" in STEM fields—even where required by law.

59.     The first FAQ is "Why is NSF changing its priorities?" The response to that question does not actually acknowledge, much less explain, any change. Instead, NSF responds: "NSF is continuing to prioritize cutting-edge discovery science and engineering (S&E) research, advancing technology and innovation, and creating opportunities for all Americans in every region of the Nation. NSF has always established priorities within the policy context set forth by Congress, the Administration and the Director of NSF, and it continues to do so."[48]

60.     Another FAQ response does reveal a significant change in NSF policy.  The question asks: "What types of awards are being terminated?" NSF responds: "Awards that are not aligned with program goals or agency priorities have been terminated, including but not limited to those on diversity, equity, and inclusion (DEI), environmental justice, and misinformation/disinformation."  NSF does not define the concepts of DEI, environmental justice, misinformation, or disinformation. Nor does NSF explain how it is identifying and evaluating previously awarded grants related to these concepts or, again, how this change in priorities is consistent with the laws governing NSF awards.[49]

61.     Another FAQ is "Why is NSF terminating awards?" NSF responds that "Awards and funding opportunities that do not align with [NSF's research priorities] cannot be funded."[50]

62.     Another FAQ is: "Can I appeal or seek alternative dispute resolution?" NSF responds: "Appeals for terminated awards will not be reviewed or considered. Terminations of awards on the basis that they no longer effectuate program goals or agency priorities are the final

---

[48] *Id.*
[49] *Id.*
[50] *Id.*

agency decision and are not appealable to NSF. In these instances, NSF does not allege a

deficiency occurred (e.g., noncompliance with award terms and conditions or research

misconduct of the awardee). Because there are no allegations of deficiencies by the awardee to

dispute, there are no grounds for agency appeal. Similarly, alternative dispute resolution is not

available where terminations were based on effectuation of program goals or agency

priorities."[51]

## VI.    NSF's Mass Termination Action

63.    Although NSF's April 18, 2025, statement reflecting its Change in Priorities

Decision did not explain the nature, reasoning, or extent of the policy change, the Change in

Priorities Decision had immediate and drastic consequences. As a direct result of the Change in

Priorities Decision, NSF initiated a massive purge of previously awarded grants and other

funding assistance ("Mass Termination Action").

64.    On April 18, 2025, DOGE stated on X (formerly Twitter) that NSF had canceled

"402 wasteful DEI grants" worth $233 million.[52]

65.    On April 25, 2025, DOGE stated on X (formerly Twitter) that NSF had canceled

"701 wasteful DEI grants" worth $203 million.[53]

66.    NSF carried out its Mass Termination Action in several large waves. Many grants

were terminated on April 18, the day that NSF announced its Change in Priorities Decision. NSF

made subsequent waves of terminations on April 25, May 2, May 9, and May 15, 2025.

---

[51] *Id.*
[52] Department of Government Efficiency (@DOGE), X/Twitter (Apr. 18, 2025, 9:26 PM ET),
https://x.com/doge/status/1913403692906324405 [https://perma.cc/6SAW-8HR].
[53] Department of Government Efficiency (@DOGE), X/Twitter (Apr. 25, 2025, 6:45 PM ET),
https://x.com/DOGE/status/1915899958974464017 [https://perma.cc/ZR4G-FWFK].

67.     As of early May, media reports indicated that NSF has terminated almost 1,400 grants worth more than $1 billion.[54] This sum is a significant portion of NSF's $9 billion budget.[55]

68.     Because NSF initially did not provide any public information on the number of terminated grants, members of the scientific community assembled a list of terminated NSF grants. https://grant-watch.us/nsf-data.html. NSF itself eventually provided on its website its own list of terminated NSF grants. These lists show that the NSF has terminated approximately 1600 NSF grants, including numerous grants for projects aimed at broadening participation of women, minorities and disabled individuals in STEM, as well as other goals.

69.     NSF's mass grant terminations were based on the same boilerplate, cursory, nonspecific rationale. The notices include language saying that NSF "has undertaken a review of its award portfolio." The notices state: "Each award was carefully and individually reviewed, and the agency has determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities."

70.     Some waves of grant termination notices include a common typographical error: "not in alignment with NSF priorites [sic]." This is a hallmark of boilerplate language being used *en masse*, copied and pasted or mail merged without individualized review.

---

[54] Jeffrey Mervis, *Exclusive: NSF faces radical shake-up as officials abolish its 37 divisions*, Science (May 8, 2025), https://www.science.org/content/article/exclusive-nsf-faces-radical-shake-officials-abolish-its-37-divisions [https://perma.cc/8MYR-H9RM].
[55] NSF, *Fiscal Year 2024 Appropriations*, https://www.nsf.gov/about/budget/fy2024/appropriations [https://perma.cc/8LAZ-LFKN]; Consolidated Appropriations Act of 2024, Pub. L. No. 118-42, div. C, tit. III, 138 Stat. 25, 161–63 (July 26, 2024); Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4, § 1101(a)(2), 139 Stat. 9, 10 (Apr. 4, 2025).

71.    Some waves of termination notices include a link to the statement on NSF's website reflecting NSF's Change in Priorities Decision.

72.    The termination notices also state: "NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

73.    The boilerplate termination notices did not explain why any individual awards failed to align with NSF priorities. Nor did the termination notices offer any further explanation or factual findings. The termination notices do not address NSF's prior decisions to award the grants, at which time the projects did meet agency priorities.

74.    Many of the grants that the NSF terminated were previously awarded under programs that Congress expressly chose to mandate by law, by program name. For instance, federal law mandates NSF continue to support the Louis Stokes Alliances for Minority Participation. 42 U.S.C. § 1862p-4. Yet NSF has terminated grants for about two-thirds of the alliances (i.e., groups of institutions of higher education working together) in the program, and NSF plans to eliminate the division that funds them and fire the program's managers.[56]

**VII.    Harms resulting from the mass terminations**

75.    Plaintiffs and their members have suffered and will continue to suffer the following injuries as a direct result of Defendants' conduct:

a.    Interruption or abandonment of ongoing research projects, including research related to diversity and inclusion in STEM fields, as a direct result of the loss of awards;

---

[56] Jeffrey Mervis, *NSF's grant cuts fall heaviest on scientists from underrepresented groups*, Science (May 16, 2025), https://www.science.org/content/article/nsf-s-grant-cuts-fall-heaviest-scientists-underrepresented-groups [https://perma.cc/2L44-A3CL].

b.      Attendant reduction of employment for, or layoffs of, researchers and their staff, including graduate student research assistants;

c.      Career setbacks, including loss of opportunities to publish research, inability to attend project-relevant conferences, reduced ability to obtain related or follow-on grants/awards, and disruption of dissertations required for completion of graduate degrees;

d.      Reputational injury, including loss of trust from community partners who are integral to ensuring that university and non-profit research is responsive and relevant to local needs;

e.      Expenditure of considerable time and effort to find partial substitute funding, where feasible, which is still insufficient to fill the gap in funding caused by the grant terminations; and

f.      Diversion of limited financial resources to support project team members with discretionary funds or to otherwise duct-tape solutions, where feasible, to partially—and incompletely—address the massive funding shortfall caused by grant terminations.

76.      These direct, concrete injuries to Plaintiffs have an inexorable and damaging ripple effect on the research mission of individual researchers and research teams, as well as on the research mission of the Plaintiff organizations themselves.

### A.      Harm to Plaintiff AAPT and Its Members

77.      NSF recently terminated two active NSF grants that were made directly to AAPT, as well as a third active NSF grant under which AAPT was an active sub-grantee. Specifically, in April and May 2025, NSF terminated, effectively immediately, (1) an active grant (NSF Award 2300609) to AAPT for a four-year project that seeks to address the historic marginalization of

women and minoritized racial/ethnic groups in physics; (2) an active grant (NSF Award 2212807) to AAPT for a four-year project to create and operate a professional organization for physics educators that provides support for, among other things, DEI training for educators; and (3) an active grant (NSF Award 1841687) to American Association for the Advancement of Science for a multi-year project called "STEM Equity Achievement (SEA Change)," under which AAPT held a sub-award (which now has been terminated as a result of NSF's termination of the prime award) for work on an extension project that supports colleges and universities in identifying and making plans to address DEI issues in their physics and astronomy departments.

78.     The projects for which NSF previously awarded these grants implement NSF's statutory mission of supporting basic scientific and engineering research, and contributing to mathematics, science, and engineering education in the United States. They also fulfilled  NSF's statutory directive to support an increase in the participation of underrepresented populations in STEM fields, including women, minorities, and people with disabilities.

79.     The notices of termination that NSF provided for these grant terminations do not contain any grant-specific explanation for the terminations. The notices state that NSF "ha[d] determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities" (one notice mis-spells "priorities" as "priorites"), and further state:

> NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal.

80.     NSF's termination of awards has resulted in a loss of approximately $1.7 million in NSF funding for AAPT for the underlying projects.

81.     NSF's termination of AAPT's awards has negatively impacted the underlying projects, the teachers and students participating in them, the AAPT, and the broader mission of supporting and broadening participation of underrepresented populations in physics and physics education.

82.     AAPT will not be able to secure sufficient alternative funding to allow AAPT to complete, or fully fund, the projects these awards were made to fund.

83.     As a result, the termination of the awards will have a severe negative impact on AAPT's ability to conduct the programs the awards were made to fund—programs that are designed to support and broaden participation in physics and physics education, including participation by women and racial and ethnic minority groups in physics. These programs— which specifically impact K-12 physics educators, Two-Year College faculty, and Four-Year College and University faculty—will need to be cut or substantially reduced in scope.

84.     In total, because of the termination of three NSF awards, AAPT will have to lay off two staff members and reassign time for three other staff members who were partially paid by the grants.

85.     Because NSF is no longer funding these awards, AAPT is using its own funds to temporarily cover the salaries of the two staff members who AAPT will have to lay off (likely in August of this year), and to partially support three additional staff members. AAPT is also covering the cost of (a) hosting a physics education workshop held during the week of May 12, 2025, immediately after the termination of the grant; and (b) hosting several physics education events in August 2025. Canceling these workshops after they have been scheduled and marketed, and not being able to deliver the projects' services and products as advertised because of a lack of funding, would cause AAPT to be negatively viewed and cause damage to AAPT's reputation.

86.    The grant terminations also produce uncertainty as to whether the programs

funded by the NSF awards will continue. Many features of these programs require funding (e.g.,

support for participants attending events, compensation for the program directors, etc.). As a

result, AAPT expects some future would-be participants will be less inclined to participate for

fear of the program not continuing. Fewer participants will attend other AAPT events such as the

Summer and Winter national meetings, and many current and future participants will not

consider joining AAPT as members. The longer this uncertainty related to funding continues, the

more likely AAPT's funded programs will shrink due to the uncertainty and reputational harms,

which will cause irreparable damage to the programs. Fundamental metrics, like number of

participants, are likely to decrease, rendering an accurate representation of metrics impossible, as

these changes effectively change the programs themselves.

87.    The termination of the awards will also hurt AAPT's ability to recover the costs it

incurs in preparing final reports for the projects. Normally, an institution has 120 calendar days

to submit all reports, including financial reports, after the grant ends (*see* 2 C.F.R. § 200.344(b)

"Closeout"), and an institution is reimbursed for time spent on preparing final reports (*see* 2

C.F.R. § 200.472(b) "Closeout Costs"). As described in NSF's termination letters, AAPT was

given only 30 days "from the termination date to furnish an itemized accounting of allowable

costs incurred prior to the termination date." AAPT will be unable to complete its final reports

within the 30-day period specified in the termination letters. Thus, if NSF adheres to the 30-day

deadline stated in its letters, AAPT will be unable to recover all of the costs, including the salary

of personnel preparing final reports) associated with closing out the grants and subaward.

88.    In addition to terminating grants to AAPT, in April and May 2025, NSF

terminated active grants on which AAPT *members* rely for their work, including grants for

projects that support the broadening of participation of underrepresented populations in STEM, including women, minorities and individuals with disabilities. AAPT members rely heavily on funding from NSF. NSF grants are essential to AAPT's members' ability to support a wide range of activities, from Louis Stokes Alliance for Minority Participation programs to research into innovative teaching and learning. AAPT members have reasonably relied on the continued receipt of NSF grants that have already been awarded and, in general, on the continued availability of NSF grants to support work that is consistent with congressional mandates of the NSF.

89.    NSF's Change in Priorities Decision and Mass Termination have already severely impacted AAPT members' work by disrupting ongoing programs and making it difficult, if not impossible, to plan for the future.  It has directly harmed AAPT members whose jobs were and are supported by this funding.

90.    If not enjoined, the Change in Priorities Decision and Mass Termination Action will severely harm physics education and AAPT's mission to advance physics education, including education and training aimed at supporting broader participation of underrepresented populations in STEM, including women, minorities, and individuals with disabilities.

**B.    Harms to Plaintiff WEPAN**

91.    On May 2, 2025, NSF sent notice that two NSF awards to WEPAN—NSF Award Nos. 2017953 ("ARC") and 2121468 ("ACCESS+")—were terminated, effectively immediately.

92.    The notices terminating awards 2017953 and 2121468 came without any previous process or communication about the projects from NSF. The notices contain little explanation for the termination, and no explanation with respect to the intellectual merit or broader impact of the

31

underlying project. The notices recite that "termination of certain awards is necessary because they are not in alignment with current NSF priories [sic]" and continues:

> "NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

93.     ARC, however, is not governed by NSF Grant General Conditions (GC-1) but rather by a Cooperative agreement.

94.     Further, the project activities were and continue to be strongly aligned with the National Science Foundation's Intellectual Merit and Broader Impacts criteria. NSF's Broader Impacts criteria are Congressionally mandated as part of the NSF Act of 1950 and more specifically in the 2010 America COMPETES Reauthorization Act (42 U.S.C. § 1862p–14). Like all NSF proposals, WEPAN's were peer-reviewed against the program priorities of the NSF ADVANCE Program, and were found to be in alignment with the ADVANCE Program's aims to identify and eliminate barriers embedded within academic institutions that impede full participation and advancement of science, technology, engineering, and mathematics (STEM) faculty.

95.     The ADVANCE Resource and Coordination Network seeks to support a nation-wide community of researchers and practitioners in their efforts to empirically understand, identify, and effectively remove barriers to full participation and advancement in STEM faculty careers. WEPAN's projects sought to achieve this goal by serving as a community hub for researchers, practitioners, and decision-makers across the country who share this goal; curating, collecting, synthesizing, building on, and disseminating related research, effective policies, and

evidence-based practices across the community and to the public; and facilitating community knowledge development, exchange, and collaboration.

96.    NSF's termination of awards has resulted in a loss of approximately $397,005.95 in NSF funding for WEPAN for the underlying projects.

97.    The termination of the ARC award will result in immediate termination of the WEPAN projects that award was funding.

98.    As a result, the loss of funding will have a severe impact on WEPAN's ability to serve the public and fulfill its mission as an educational nonprofit organization.

99.    The loss of funding and termination of projects will hinder WEPAN's ability to conduct programs designed to support and broaden participation in STEM, including participation by women and racial and ethnic minority groups. Funding reductions will most likely result in all full-time staff being laid off as early as August 2025 due to an inability to make up the funds from the terminated NSF grants. WEPAN leadership is doing the best it can to preserve some of the work funded by the grants but is doing so for free due to the grant terminations.

100.    At this time, WEPAN does not anticipate it will be able to secure sufficient additional funding to allow it to resume or complete the projects that the ACCESS+ and ARC awards funded.

101.    Examples of programs impacted include the Virtual Visiting Scholar program and the annual ADVANCE meeting. At the time of termination, the Virtual Visiting Scholar program was supporting five, early- and mid- career scholars through the final quarter of their research projects. These scholars have abruptly had their work and funding cut short, impacting their livelihoods and impeding their progress toward graduation, tenure, and promotion.

102.    The annual ADVANCE convening, related travel grants, and accepted session proposals were canceled, impacting over 400 people. This meeting served the entire ADVANCE community and prospective grantees and was a critical space for the exchange of knowledge, research, and resources centered on creating positive STEM educational and career opportunities and outcomes for everyone. This event was also an outreach mechanism for NSF to build greater awareness of its work and funding opportunities.

103.    The termination of awards successfully peer-reviewed under NSF's intellectual merit and broader impacts criterion undermines WEPAN's ability to undertake free intellectual and scientific inquiry.

104.    Besides the termination of long-standing multi-layered projects, WEPAN and the greater STEM community will suffer a loss of critical community, resources, knowledge, and support due to the WEPAN's award terminations. WEPAN acted as the hub for NSF's ADVANCE program—providing crucial information and helping those without resources access NSF's ADVANCE grants and the products of those grants. This work has come to a complete halt with the termination of WEPAN's awards which will have a significant impact on the STEM community's ability to create opportunities for all and contribute to innovation, public health, safety, economic growth, and environmental sustainability.

105.    In addition to terminating grants to WEPAN, in April and May 2025, NSF terminated active grants on which WEPAN *members* rely for their work, including grants for projects that support the broadening of participation of women in STEM. WEPAN members rely heavily on funding from NSF. WEPAN members have reasonably relied on the continued receipt of NSF grants that have already been awarded and, in general, on the continued availability of NSF grants to support work that is consistent with congressional mandates of the NSF.

Accordingly, the mass termination of grants by NSF has already severely impacted WEPAN members' work by disrupting ongoing programs and making it difficult, if not impossible, to plan for the future. It has directly harmed individuals whose jobs are supported by this funding. And if allowed to continue unabated, these terminations will have a severely negative impact on STEM education.

### C.    Harms to Plaintiff AAC&U

106.    On August 4, 2021, NSF accepted AAC&U's proposal and awarded the ADVANCE Partnership Award (Award No. 2121858) for the expected amount of $210,626 to run from September 1, 2021, to August 31, 2026. The ADVANCE Partnership Award was for a 5-year project that informs intersectional gender equity reform efforts in STEM by implementing five Faculty Online Learning Communities for Gender Equity in higher education. A total of $119,614.28, or approximately 56% of the ADVANCE Partnership Award, remained unpaid at the time of termination for future work on the project, and was cancelled by NSF.

107.    On February 24, 2021, NSF accepted AAC&U's proposal and awarded the Virtual Community Award (Award No. 2102910) for the expected amount of $2,161,574, to run from April 1, 2021, through March 31, 2026. The Virtual Community Award was for a 5-year project to create a robust-knowledge transfer platform, STEM Central, that is based on years of qualitative needs assessment. A total of $1,377,071.61, or approximately 63% of the Virtual Community Award, remained unpaid at the time of termination for future work on the project, and was cancelled by NSF.

108.    On August 24, 2023, NSF accepted AAC&U's proposal and awarded the Knowledge Management Resource Center Award (Award No. 2334406) for the expected amount of $5,422,930, to run from October 1, 2023, through September 30, 2028. The Knowledge

Management Resource Center Award was for a 5-year project to leverage the AAC&U's academic brokering capacity, extensive experience advocating for and supporting the Historically Black Colleges and Universities Undergraduate Program community, and mission-level commitment to inclusive excellence to implement a culturally-responsive, values-engaged approach to designing and deploying a Knowledge Management Resource Center. A total of $4,262,707.35, or approximately 78% of the Knowledge Management, remained unpaid at the time of termination for future work on the project, and was cancelled by NSF.

109.    On August 24, 2023, NSF accepted AAC&U's proposal and awarded the Broadening Participation Research Center Award (Award No. 2309126) for the expected amount of $1,692,061, to run from October 1, 2023, through September 30, 2028. The Broadening Participation Research Center Award was for a 6-year project to create the Center for the Advancement of STEM Leadership, which was to serve as the nation's premier intellectual resource of examining and confirming leadership as an immutable factor in broadening the participation of African Americans in STEM. A total of $1,306,712.44, or approximately 77% of the Broadening Participation Research Center Award remained unpaid at the time of termination for future on the project, and was cancelled by NSF.

110.    On April 25, 2025, AAC&U received an email notice from NSF that its ADVANCE Partnership award had been terminated. On May 2, 2025, AAC&U received notice that its Virtual Community Award, Knowledge Management Resource Center Award, and Broadening Participation Research Center Award had been terminated. Both termination emails stated that NSF "ha[d] determined that termination of certain awards is necessary because they are not in alignment with current NSF priorites [sic]." It further stated:

> NSF is issuing this termination to protect the interests of the government
> pursuant to NSF Grant General Conditions (GC-1) term and condition

entitled 'Termination and Enforcement,' on the basis that they no longer
effectuate the program goals or agency priorities.  This is the final agency
decision and not subject to appeal.

111.    None of the award notices of AAC&U's grants referenced NSF Grant General

Conditions (GC-1). Instead the award notices stated that the awards are subject to the Research

Terms and Conditions (RTCs).

112.    The four awards totaled $9,487,191 in expected funding.  The terminations

resulted in a loss of funding of $7,066,105.67.

113.    The four terminated awards align with NSF's statutory mission of supporting

basic scientific and engineering research, and contributing to mathematics, science, and

engineering education in the United States.  They also align with NSF's statutory directive to

increase the participation of underrepresented populations in STEM fields, including women,

minorities, and people with disabilities.

114.    The Virtual Community Award, the Knowledge Management Resource Center

Award, and the Broadening Participation Research Center Award were funded through NSF's

Historically Black Colleges and Universities Undergraduate Program, a congressionally

mandated program which provides awards to strengthen STEM undergraduate education and

research at Historically Black Colleges.  *See* 42 U.S.C. § 1862p–4.  The projects funded by the

Virtual Community Award, the Knowledge Management Resource Center Award, and the

Broadening Participation Research Center Award advanced this mission and directive.

115.    The termination of AAC&U's awards has negatively impacted its underlying

projects, the students and faculty that benefit from them, AAC&U, and its broader mission of

promoting equity, innovation, and excellence in higher education.

116.    AAC&U will not be able to secure sufficient alternative funding to allow AAC&U to complete, or fully fund, the projects these awards were made to fund.

117.    As a result, the termination of the awards will have a severe negative impact on AAC&U's ability to conduct the programs the awards were made to fund—programs that are designed to support and broaden participation of marginalized students and faculty in STEM, including participation by women and racial and ethnic minority groups.  These programs— which specifically impact higher education faculty and students—will need to be cut or substantially reduced in scope.

118.    In addition, the loss of funding will hamper AAC&U's ability to host meaningful professional development institutes for STEM faculty; design and deploy its national conference on enhancing undergraduate STEM teaching, which hosts, on average 400 STEM faculty from all institution types across the county; offer cutting-edge leadership development and promote new advances in undergraduate STEM teaching for all STEM faculty through its Project Kaleidoscope; and ensure STEM faculty are able to publish their scholarly work in a peer-reviewed journal.

119.    Due to the termination of four NSF awards, AAC&U has laid off two employees, as well as consultants.

120.    Because NSF is no longer funding these awards, AAC&U is using its own funds to fill the gap by providing salary support for staff to re-design AAC&U's undergraduate STEM enterprise, secure project assets, and analyze and interpret project data.

D.    **Harms to Plaintiff AERA and Its Members**

121.    In April and May 2025, NSF terminated numerous active grants on which AERA members rely for their work.

122.    The notices terminating these awards came without any previous process or communication about the projects from NSF. The notices contain no specific explanation for the termination, and no explanation with respect to the intellectual merit or broader impact of the underlying project. The notices recite that "termination of certain awards is necessary because they are not in alignment with current NSF priorites [sic]" and continues:

> "NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

123.    The terminated awards align with NSF's statutory mission of supporting basic scientific and engineering research, and contributing to mathematics, science, and engineering education in the United States. They also align with NSF's statutory directive to increase the participation of underrepresented populations in STEM fields, including women, minorities, and people with disabilities.

124.    The NSF's mass termination of grants has already severely impacted AERA's members' work by disrupting ongoing projects by the grants and ending important education research, including establishing the Hispanic-Serving Institution Network Center for Evaluation, Research and Synthesis.

125.    As a result of the grant terminations, AERA members have lost their jobs or experienced significant salary reductions. The terminations have directly prevented graduate students whose dissertations address NSF grant-funded research from completing their degrees, ended the development and employment of postdoctoral associates and other early career professionals on NSF grant-funded projects, and ended jobs of other individuals that are supported by this funding.

126.    AERA itself has also been harmed by the grant terminations. AERA had a substantially lower attendance at its annual meeting on April 23–27, 2025, by approximately 1,000 registrants. This resulted in decreased revenue, which AERA uses to advance its mission. In addition, several NSF scientific staff, including program officers, division directors, and NSF assistant directors, were not permitted to attend. NSF's absence from the meeting diminished its effectiveness as NSF staff convey funding opportunities, offer an invaluable perspective, and foster meaningful connections across the fields of science and education.

**E.    Harms to Plaintiff UAW and Its Members**

127.    In April and May 2025, NSF terminated numerous active grants on which UAW members rely for their work.

128.    The notices terminating these awards came without any previous process or communication about the projects from NSF. The notices contain no specific explanation for the termination, and no explanation with respect to the intellectual merit or broader impact of the underlying project. The notices recite that "termination of certain awards is necessary because they are not in alignment with current NSF priorites [sic]" and continues:

> "NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

129.    The terminated awards align with NSF's statutory mission of supporting basic scientific research, and contributing to mathematics, science, and engineering education in the United States. They also align with NSF's statutory directive to increase the participation of underrepresented populations in the STEM fields, including women, minorities, and people with disabilities.

130.    The NSF's mass termination of grants has already severely impacted UAW's members' work by disrupting ongoing projects funded by the grants and ending important research, such as city-scale efforts to transition away from fossil fuels to more just and sustainable energy systems, and research to develop new therapies for cancer and other diseases.

131.    As a result of the terminations, UAW members' employment terms have been shortened, and renewal decisions delayed, or start dates rescinded because of uncertainty surrounding cancellation or threatened cancellation of NSF funding, leaving their future in academia uncertain.  Postdocs, research staff, and graduate student researchers have been told by principal investigators that they cannot be reappointed unless or until NSF makes funding determinations that are months overdue.  Some of the impacted members are on F-1, H-1B, or J-1 visas and will be at risk of deportation if their positions end.

**F.    Harms to Plaintiff AAUP and its Members**

132.    In April and May 2025, NSF terminated numerous active grants on which AAUP members rely for their work.

133.    The notices terminating these awards came without any previous process or communication about the projects from NSF.  The notices contain no specific explanation for the termination, and no explanation with respect to the intellectual merit or broader impact of the underlying project. The notices recite that "termination of certain awards is necessary because they are not in alignment with current NSF priorites [sic]" and continues:

> "NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

134.    The terminated awards align with NSF's statutory mission of supporting basic scientific research, and contributing to mathematics, science, and engineering education in the United States. They also align with NSF's statutory directive to increase the participation of underrepresented populations in the STEM fields, including women, minorities, and people with disabilities.

135.    The NSF's mass termination of grants has already severely impacted AAUP's members' work by disrupting ongoing projects funded by the grants and ending important education research, such as the Rising Tides program which provides mentorship and training to undergraduates in the ocean and marine sciences.

136.    AAUP has committed staff and leadership time to help members respond to the NSF funding termination.

137.    The terminations have made it more difficult and resource-intensive for the AAUP to carry out its representation of chapters and individual members. Because of government pressure on universities to abandon their commitment to faculty directed research, teaching, and publication, the AAUP must now expend more time and money to ensure that its members' rights in these regards are protected.

138.    The government's actions have also caused a pervasive sense of fear and intimidation among AAUP members. Some AAUP members no longer feel comfortable participating in and supporting the AAUP's activities, or asserting their academic freedom, shared governance, and due process rights, because of the federal government's conduct. In response to the government's threats to cut federal funding and actual termination of funding, some AAUP members at universities across the county have canceled conferences, pulled papers set for publication, decided not to teach classes or certain topics within those classes that may be

perceived as being at odds with the administration's viewpoints, stopped attending talks, refrained from attending lawful protests, and stepped down from their AAUP chapter board.

**VIII.  NSF's refusal to fund grants with money Congress appropriated for that purpose**

139.    NSF staff were instructed by email on April 30, 2025, to "stop awarding all funding actions until further notice."[57] The email did not provide a reason for the freeze.[58] The policy prevented NSF from awarding new research grants and from supplying allotted funds for existing grants, such as those that receive yearly increments of money.[59]

140.    On May 13, 2025, another email to NSF staff purported to allow for some new funding but kept in place a freeze on new funding to all institutions of higher education— historically, major recipients of NSF awards.[60]

141.    As of May 22, 2025, NSF has funded less than half the amount of grants compared to its ten-year average at that point in the funding cycle.[61] From October 1 to June 1 of this fiscal year, compared to fiscal year 2024, NSF funding of new grants has dropped by $809 million or approximately 44% although Congress appropriated level funding.[62]

142.    Grants from NSF's directorate for STEM education this year have declined by 80%.[63]

---

[57] Dan Garisto, *Exclusive: NSF stops awarding new grants and funding existing ones*, Nature (May 6, 2025), https://www.nature.com/articles/d41586-025-01396-2 [https://perma.cc/8U4T-9ZHE].

[58] *Id.*

[59] *Id.*

[60] *See* Aatish Bhatia, et al., *Trump Has Cut Science Funding to Its Lowest Level in Decades,* N.Y. Times (May 22, 2025), https://www.nytimes.com/interactive/2025/05/22/upshot/nsf-grants-trump-cuts.html [https://perma.cc/LNX3-3K7B].

[61] *Id.*

[62] Public data available at https://www.usaspending.gov/search.

[63] Bhatia, *Trump Has Cut Science Funding to Its Lowest Level in Decades* [https://perma.cc/LNX3-3K7B].

143.    NSF's graduate education division typically approves $21 million grants by May of a fiscal year to graduate students like the members of Plaintiff UAW but, as of May 2025, has not awarded any.[64]

144.    NSF's funding for physics grants in 2025 has fallen by 85 percent.[65]

145.    In early June 2025, OMB directed NSF to freeze billions of dollars in spending of funds appropriated in Fiscal Year 2024 on research and education.[66] NSF's budget director wrote to staff that "we are immediately focused on pulling the funds back to ensure there are no further commitments or obligations."[67] This will effectively gut congressionally-mandated programs.[68]

146.    NSF states that it "strives to be able to tell applicants whether their proposals have been declined or recommended for funding within six months."[69] However, NSF is failing to act on Plaintiffs' pending grant applications in that timeframe.

147.    Plaintiff AAPT submitted a new grant proposal to the NSF's ADVANCE program on November 6, 2024. Five months later, on April 14, 2025, AAPT's Chief Executive Officer, Beth Cunningham, contacted the ADVANCE Program Officer to inquire about the status of AAPT's grant proposal. Dr. Cunningham was told that AAPT's grant proposal was still in the review process. As of June 9, 2025, NSF's website indicates that the NSF has "archived" the ADVANCE program altogether.

---

[64] *Id.*

[65] *Id.*

[66] Scott Waldman and Corbin Hiar, *White House looks to freeze more agency funds — and expand executive power*, E&E News by Politico (June 10, 2025), https://www.eenews.net/articles/white-house-looks-to-freeze-more-agency-funds-and-expand-executive-power/ [https://perma.cc/W8VV-XXEL].

[67] *Id.*

[68] *Id.*

[69] *Proposal & Award Policies & Procedures Guide (24-1)*, at III-8 (Ex. III-1: NSF Proposal & Award Process & Timeline (text description of exhibit)) [https://perma.cc/DJD8-ZUG5].

148.    Plaintiff WEPAN has two grant proposals that are currently undergoing NSF review: the Preparing Inclusive STEM Educators ("PISE") initiative, and the ADVANCE Partnership: Nurturing Equitable STEM Future Faculty Development through STEM Professions" ("NESTED") proposal. WEPAN submitted the PISE proposal to NSF on October 21, 2024, and submitted the NESTED proposal to NSF on November 6, 2024. Both proposals have been listed as "pending" on research.gov for over seven months without any communication from the corresponding program officers at NSF.

149.    The Center for Evaluation & Research for STEM Equity at the University of Washington (an institutional member of Plaintiff WEPAN), currently has 18 grants undergoing review by NSF. One of the Center's grants was submitted to NSF in March 2024 and a decision has not been reached.

150.    The billion-dollar slowdown in awarding new grants is an across-the-board hit to American science, affecting research ranging from math, physics, chemistry, biology, engineering, computer science, behavioral and social sciences, and education research.

## CAUSES OF ACTION

### COUNT I: Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary, Capricious, and Abuse of Agency Discretion

151.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

152.    Under the Administrative Procedure Act, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, or an abuse of discretion." 5 U.S.C. § 706(2)(A).

153.    The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

154.    NSF's Change in Priorities Decision is final agency action subject to the Court's review. The Change in Priorities Decision marks the consummation of NSF's decision-making and is also an action by which rights or obligations have been determined or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). In the Change in Priorities Decision, NSF set forth its final decision on its changed priorities, which directly affected a wide swath of previously awarded grants and other financial awards.  The Change in Priorities Decision is a discrete final action.

155.    NSF's Mass Termination Action is also a final agency action subject to the Court's review. NSF's decision to conduct a mass termination of NSF grants marks the consummation of NSF's decision-making and is also an action by which rights or obligations have been determined or from which legal consequences will flow. The Mass Termination Action is a discrete agency action because, rather than terminating grants based on individualized rationales, NSF decided to terminate a broad swath of grants based on a single boilerplate rationale.

156.    Alternatively, each wave of terminations within the Mass Termination Action is final agency action subject to the Court's review. On several days—April 18, April 25, May 2, May 9, and May 15, 2025—NSF sent identical termination notices to large groups of grantees. Each wave of terminations is a discrete agency action because, rather than terminating grants based on individualized rationales, NSF decided to terminate broad swaths of grants based on boilerplate notices.

157.    Alternatively, each individual grant termination within the Mass Termination Action is final agency action subject to the Court's review. NSF's decision to terminate a grant marks the consummation of NSF's decision-making and is also an action by which rights or

obligations have been determined or from which legal consequences will flow. NSF stated in each termination notice that "[t]his is the final agency decision and not subject to appeal."

158.     Each of these final actions by NSF is arbitrary, capricious, and an abuse of discretion.

159.     First, NSF's actions are not reasonable or reasonably explained. "An agency action qualifies as 'arbitrary' or 'capricious' if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). An agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

160.     NSF's Change in Priorities Decision has no indicia of reasoned decision making. The Change in Priorities Decision did not provide any rationale for the agency's abrupt policy reversal. NSF largely purported to continue its past practices, and NSF described its change in only a few conclusory sentences—even though the change in policy was, in fact, highly significant. The Mass Termination Action, and the waves of terminations and individual terminations within the Mass Termination Action, are also not reasonable and not adequately explained because the only rationale provided is vague boilerplate language. NSF did not provide any explanation of why any particular grants or other funding awards were inconsistent with agency priorities. NSF's sweeping approach to terminating numerous awards *en masse* without meaningful individualized consideration was substantively unreasonable.

161.     Indeed, NSF conceded that the Mass Termination Action was not based on any individualized considerations when it responded to a frequently asked question by denying the

possibility of administrative appeal. NSF stated that it "does not allege a deficiency occurred" and that "[b]ecause there are no allegations of deficiencies by the awardee to dispute, there are no grounds for agency appeal."[70]

162.    Second, NSF did not adequately "display awareness that it is changing position." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). NSF also did not show "that there are good reasons for the new policy." *Id.* The Change in Priorities Decision only briefly acknowledged its change in position, let alone the magnitude of its change. Nothing in the Decision acknowledged that the Decision would cause the termination of a billion dollars of science funding. The Mass Termination Action also did not consider that at the time that NSF made the awards, the awards were consistent with NSF priorities. NSF did not explain why it changed its priorities so significantly that numerous meritorious awards that were previously consistent with agency priorities are no longer consistent.

163.    Third, NSF did not consider the substantial reliance interests of award recipients. "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account,'' and the failure to do so is arbitrary and capricious. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). Award recipients relied on NSF's grant awards and planned for their futures based on those awards. NSF gave no consideration to significant reliance interests of grantees. Award recipients also applied to NSF awards based on NSF's Proposal and Award Policies and Procedures Guide and the Broader Impacts Review Criterion. NSF may not instruct applicants to submit proposals that emphasize impacts on underrepresented groups and then later terminate awards for doing exactly

---

[70] *Updates on NSF Priorities* [https://perma.cc/C5BK-KUCZ].

what NSF instructed. NSF also failed to acknowledge the significant practical consequences of abrupt grant terminations on ongoing projects and salaries.

**COUNT II: Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

**Not in Accordance with Law**

164.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

165.    Under the Administrative Procedure Act, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). The reference to "law" in that provision phrase "means, of course, *any* law." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003).

166.    The final agency actions identified above—the Change in Priorities Decision, the Mass Termination Action, and the waves of terminations and individual terminations within the Mass Termination Action—are contrary to law for several reasons.

167.    First, NSF's actions are contrary to the statutory provisions that govern NSF. Throughout the statutory provisions governing NSF, Congress has mandated NSF support for broadening participation of women and underrepresented populations in STEM. *Supra* Statement of Facts Section II. Congress thus required NSF to apply a Broader Impacts review criterion when considering grant proposals, and Congress defined one of those criteria to be "[e]xpanding participation of women and individuals from underrepresented groups in STEM." 42 U.S.C. § 1862p–14(a)(7); *supra* Statement of Facts Section III.

168.    Instead of complying with the law and fulfilling these statutory mandates as it has in the past, NSF terminated grants *because* they comply with those statutes, i.e., because they seek to broaden participation of underrepresented populations in STEM fields.

169.    Second, NSF unlawfully interpreted the termination provision in OMB's Uniform Administrative Requirements, NSF's Proposal and Award Policies and Procedures Guide, and the terms and conditions incorporated into funding awards. With slight variation, depending on the version of the termination provision that was in effect at the time that NSF made an award, NSF may terminate an award when "an award no longer effectuates the program goals or agency priorities." NSF has interpreted that provision to allow the agency to terminate a grant based on a post-award change in agency priorities. But the best reading of the termination provision is that it allows agencies to terminate an award if the agency learns new information about the award that shows that the award no longer effectuates the agency priorities that existed at the time that the grant was awarded. NSF must identify its priorities at the time it puts out a notice of funding opportunity. 2 C.F.R. pt. 200 app. I, § (b)(3)(i)(B) (notice of funding opportunity must include "[t]he Federal agency's funding priorities or focus areas, if any"); 2 C.F.R. § 200.204(c)(1) (requiring agencies to include information in subpart 200, Appendix I "for every funding opportunity"). Applicants rely on the notice of funding opportunity to design their proposals, and NSF may not retroactively change its priorities after making an award. NSF's contrary reading of the termination provision would turn the provision into a unilateral termination right that nullifies the other, more specific termination provisions and imposes retroactive conditions on grantees in violation of the separation of powers and the Spending Clause of the United States Constitution.

170.    Third, as discussed below, the NSF's actions are "contrary to constitutional right, power, privilege, or immunity" in violation of the APA, 5 U.S.C. §§ 706(2)(A)–(C).  The Change in Priorities Decision, Mass Termination Action, and waves of terminations and

individual terminations within the Mass Termination Action violate the separation of powers, the Spending Clause, and the Appropriations Clause.

## COUNT III: Administrative Procedure Act, 5 U.S.C. § 706(1)
### Agency Action Unlawfully Withheld

171.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

172.    Under the APA, a reviewing court "shall compel agency action unlawfully withheld." 5 U.S.C. § 706(1).

173.    Such a claim arises when "an agency fail[s] to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). "If an agency withholds a required action, it violates § 706(1) regardless of its reason for doing so." *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, No. 22-55988, 2024 WL 5692756, at *12 (9th Cir. May 24, 2025). An agency "has 'withheld'" action when it "refuses to accept, in any form, a request that it take a required action." *Id.* at *13.

174.    Congress has commanded that NSF *shall* "make awards" under and "continue to support" various grant programs designed to broaden participation of underrepresented populations in STEM fields. *E.g.*, 42 U.S.C. §§ 1862p-4; 1862s-5(e); 1862s-5(e); 19012. These provisions require NSF to both process applications for the above grant programs and subsequently "make awards" under those programs.

175.    NSF has withheld these required actions. It categorically froze all new awards, first across the board and then to institutions of higher education. It has stopped making awards under programs mandated by Congress and has not approved grant proposals that should be awarded under NSF's longstanding, lawful criteria. In other words, NSF will no longer fund the very activities that Congress requires it to fund via the above grant programs. NSF has therefore

unlawfully withheld agency action by "refus[ing] to accept, in any form, a request that it take a required action." *Al Otro Lado*, 2024 WL 5692756 at *13.

### COUNT IV: Separation of Powers, Spending and Appropriations Clauses

176.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

177.    Plaintiffs have a non-statutory right of action to seek, and federal courts have the equitable power to grant, injunctive relief for "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

178.    The Constitution vests exclusive power over federal spending with Congress. U.S. Const. art. I, § 8, cl. 1. The Constitution denies that power to the other branches via the Appropriations Clause, which forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." *Id.* § 9, cl. 7.

179.    When Congress appropriates money, the Executive Branch's only role is to spend it consistent with the congressional command and purpose. The Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). An appropriation is a law like any other, and the President must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see also City & Cnty. of San Francisco*, 897 F.3d at 1234 ("Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations.").

180.    The Executive Branch has no power to amend or rescind appropriations based on its own view of what the spending priorities should be. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). Whatever "policy reason" he may have "for wanting to spend less than the full amount appropriate by Congress for a particular project or program," the

President "does not have unilateral authority to refuse to spend the funds." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). The same is, of course, true of an Executive Branch agency or officer.

181.    Congress has appropriated, and directed NSF to expend, funds for defined programs to advance science. Congress directed NSF to spend the funds as Congress allocated, for the purposes Congress chose.

182.    With the Change in Priorities Decision, Mass Termination Action, and the waves of terminations and individual terminations within the Mass Termination Action, NSF has refused to spend funds as Congress directed. For example, Plaintiff AAC&U was awarded three grants under NSF's Historically Black Colleges and Universities Undergraduate Program ("HBCU-UP"). The HBCU-UP program, which provides awards to strengthen STEM undergraduate education and research at Historically Black Colleges, is mandated by law. *See* 42 U.S.C. § 1862p–4. Nonetheless, on May 2, 2025, NSF notified AAC&U that it was terminating all three of its HBCU-UP grants, years before the grant programs were slated to end, because they are "not in alignment with current NSF priorites [sic]." NSF has no authority to refuse to spend the funds Congress appropriated to HBCU-UP.

183.    As another example, Plaintiff AAPT held a collaborative grant with a university and the American Physical Society, which was awarded under NSF's Discovery Research K-12 Program ("DRK-12"). The DRK-12 program is congressionally mandated under 42 U.S.C. Section 1862s-5. Nonetheless, on April 25, 2025, NSF notified AAPT that its DRK-12 grant was being terminated because it is "not in alignment with current NSF priorities [sic]." *Id.* at ¶ 11. NSF has no authority to refuse to spend the funds Congress appropriated to the DRK-12 program.

184.     Another example: the Center for Evaluation & Research for STEM Equity, directed by Plaintiff WEPAN's member Elizabeth Litzler, held a sub-award of an NSF grant made to five four-year universities in the Pacific Northwest, under the Pacific Northwest Louis Stokes Alliance for Minority Participation ("PNW LSAMP"). The Louis Stokes Alliance for Minority Participation ("LSAMP") is congressionally mandated under 42 U.S.C. § 1862p-4. Nonetheless, on May 2, 2025, Dr. Litzler was notified by the prime awardee of the PNW LSAMP grant that NSF had purportedly terminated the grant, effective immediately, because the grant "no longer effectuates program goals or agency priorities." *Id*. at 17. NSF has no authority to refuse to spend the funds Congress appropriated to LSAMP.

185.     Yet another example: Plaintiff AERA member Anne-Marie Núñez, Distinguished Centennial Professor in Educational Leadership and Foundations at The University of Texas, El Paso, held a grant from NSF that was a Cooperative Agreement to establish a Hispanic-Serving Institution Center for Evaluation and Research Synthesis. NSF's Hispanic-Serving Institutions ("HSI") program is congressionally mandated under 42 U.S.C § 1862o-12. Nonetheless, on May 2, 2025, Dr. Núñez was notified that the HSI grant was being terminated effective immediately because the grant "no longer effectuates agency priorities." NSF has no authority to refuse to spend the funds Congress appropriated to the HSI program.

186.     In addition, NSF instructed staff to stop awarding new funds until further notice, then maintained a freeze on funds to colleges, universities, other institutions of higher education, resulting in a billion-dollar slowdown in awarding the funds that Congress directed NSF to award.

187.     NSF's refusal to spend congressional appropriations violates the constitutional separation of powers, which restrains the Executive Branch from interfering with Congress'

exclusive powers; and the Spending Clause and Appropriations Clause, which give Congress alone the power of the purse.

## COUNT V: Procedural Due Process

188.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

189.    Under the Fifth Amendment, the federal government may not deprive a person or entity of property "without due process of law." U.S. Const. amend. V.

190.    Plaintiffs have a constitutionally protected property interest in NSF awards that they applied for, were awarded, and relied on. *E.g.*, *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).  Plaintiff grant recipients have funded positions, made commitments, and expended significant resources to conduct research and projects in reliance on their grant awards—while passing up other opportunities. Plaintiffs' interest in their awards is established and governed by the acceptance of their application by the federal government. Plaintiffs' "[l]egitimate and reasonable reliance on a promise from the government" established a property right under the Due Process Clause. *See Forgue v. City of Chicago*, 873 F.3d 962, 970 (7th Cir. 2017).

191.    Because grant recipient Plaintiffs have a protected property interest in their grant funding, they were entitled to reasonable notice and due process, including a meaningful opportunity to be heard, before NSF summarily terminated the grants.

192.    The Mass Termination Action deprived Plaintiffs of their due process rights. NSF's termination notices did not provide any explanation of why any particular grants no longer effectuate current NSF priorities.

193.    Plaintiffs received no notice in advance of the terminations. The notices that accompanied the grant terminations did not provide Plaintiffs with the factual basis for the terminations. Plaintiffs received no opportunity to respond and explain why their work actually did align with NSF priorities. In any case, NSF set out its new priorities in such a vague way that Plaintiffs had no opportunity to respond by explaining why their projects do effectuate the new priorities.

194.    NSF announced that "appeals are not being considered."[71] NSF stated that "[b]ecause there are no allegations of deficiencies by the awardee to dispute, there are no grounds for agency appeal."[72] That was despite NSF's policy stating that "Normally, action by NSF to suspend or terminate an award will be taken only after the recipient has been informed by NSF of the proposed action, or informed of any deficiency on its part and given an opportunity to correct it. NSF, however, may immediately suspend or terminate an award without notice when it believes such action is reasonable to protect the interests of the government."[73] NSF did not state, other than in a conclusory boilerplate statement, why denial of advance notice and the opportunity for correction was reasonable to protect the interests of the government.

195.    Whatever process was constitutionally required before NSF terminated grants, that process was not provided because NSF provided no process at all.

196.    NSF's actions therefore violate the Fifth Amendment Due Process Clause and the requirements of the APA.

**COUNT VI: Due Process, Void for Vagueness**

197.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

---

[71] *Updates on NSF Priorities* [https://perma.cc/C5BK-KUCZ].
[72] *Id.*
[73] *Proposal and award Policies and Procedures Guide (24-1)* [https://perma.cc/DJD8-ZUG5].

198.     The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law. A fundamental aspect of due process is that government-imposed obligations must be stated with sufficient clarity to provide fair notice and prevent arbitrary enforcement.

199.     Government regulatory enforcement is void for vagueness if it (1) does not provide a person of ordinary intelligence fair notice of what is prohibited or (2) if it risks arbitrary application. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012); *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 736 (D.C. Cir. 2016); *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993). Open-ended regulatory terminology that allows for "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" violate due process. *United States v. Williams*, 553 U.S. 285, 306 (2008); *Coates v. City of Cincinnati*, 402 U.S. 611, 611–14 (1971); *Smith v. Goguen*, 415 U.S. 566, 573–77 (1974).

200.     NSF's Change in Priorities Decision, Mass Termination Action, and the waves of terminations and individual terminations within the Mass Termination Action applied 2 C.F.R. § 200.340(a)(4) to Plaintiffs in a manner that is unconstitutionally vague and constitutes an arbitrary exercise of authority. The termination letters NSF sent to grant recipient Plaintiffs summarily assert that the grants are being terminated because "they no longer effectuate the program goals or agency priorities." The words "effectuate, "goals," and "priorities," are not defined in the letters, law, or regulations, and are unconstitutionally vague.

201.     NSF's terminations violate the Fifth Amendment's Due Process Clause and the APA as unconstitutionally vague. The terminations are accordingly invalid under 5 U.S.C. § 706(2)(A).

## COUNT VII: Equitable Relief for Ultra Vires Action
### (Against Defendant Stone)

202.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

203.    The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong*, 575 U.S. at 326–27, includes cases in which a federal officer has acted unconstitutionally as well as cases in which the officer has acted "beyond th[e] limitations" set by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

204.    NSF, through its officials, may exercise only the authority conferred by statute.

205.    NSF and its Director lacked constitutional, statutory, and regulatory authority to issue or implement the Change in Priorities Decision and the *en masse* termination of the Plaintiffs' and others' grant awards. As explained above, these terminations violate the Constitution's separation of powers as well as the Spending and Appropriations Clauses; deprive Plaintiffs of their procedural due process rights; are void for vagueness; and have no basis in any law or other authority.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter the following relief:

A.    Declare unlawful and set aside the Change in Priorities Decision and the Mass Termination Action as arbitrary or capricious, an abuse of discretion, or not in accordance with law under 5 U.S.C. § 706(2).

B.    Declare unlawful and enjoin NSF's withholding of congressionally appropriated funding and order NSF to timely process award applications using lawful criteria;

C.    Issue preliminary and permanent relief, including a stay under 5 U.S.C. § 705, barring Defendants, their officers, employees, and agents from continuing to carry out the termination of awards based on a change in agency priorities.

D.      Award Plaintiffs their costs, reasonable attorney fees, and other disbursements as

appropriate.

E.      Grant such other relief as the Court deems necessary, just, and proper.

Respectfully submitted,

*/s/ Steven Y. Bressler*
Steven Y. Bressler (D.C. Bar No. 482492)
Tsuki Hoshijima (*pro hac vice* forthcoming)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
sbressler@democracyforward.org
thoshijima@democracyforward.org

Nathan L. Walker (*pro hac vice* forthcoming)
Celine Purcell (*pro hac vice* forthcoming)
Emily Kirk (*pro hac vice* forthcoming)
Heather C. Bates (*pro hac vice* forthcoming)
THE NORTON LAW FIRM PC
300 Frank H. Ogawa Plaza, Suite 450
Oakland, CA 94612
Tel: (510) 906-4900
nwalker@nortonlaw.com
cpurcell@nortonlaw.com
ekirk@nortonlaw.com
hbates@nortonlaw.com

*Attorneys for Plaintiffs*