# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN ASSOCIATION OF PHYSICS
TEACHERS, et al.,

*Plaintiffs*,

v.

NATIONAL SCIENCE FOUNDATION, et
al.,

*Defendants.*

Case No. 1:25-cv-01923

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Steven Y. Bressler (D.C. Bar No. 482492)
Tsuki Hoshijima (*pro hac vice* forthcoming)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
sbressler@democracyforward.org
thoshijima@democracyforward.org

Nathan L. Walker (*pro hac vice* forthcoming)
Celine Purcell (*pro hac vice* forthcoming)
Emily Kirk (*pro hac vice* forthcoming)
Heather C. Bates (*pro hac vice* forthcoming)
THE NORTON LAW FIRM PC
300 Frank H. Ogawa Plaza, Suite 450
Oakland, CA 94612
Tel: (510) 906-4900
nwalker@nortonlaw.com
cpurcell@nortonlaw.com
ekirk@nortonlaw.com
hbates@nortonlaw.com

## TABLE OF CONTENTS

Table of Authorities .................................................................................................... ii

Introduction .................................................................................................................1

Background ...................................................................................................................2

   *I.*   *The National Science Foundation* ....................................................................... *2*

   *II.*   *NSF's congressional mandate to expand participation in science* ...................... *3*

   *III.*   *NSF grant process* ............................................................................................. *7*

   *IV.*   *Change in Priorities Decision* ............................................................................ *8*

   *V.*   *Mass Termination Action* .................................................................................. *9*

   *VI.*   *NSF's refusal to fund awards with money Congress appropriated for that purpose* ........ *11*

   *VII.*   *Plaintiffs and their harms* ................................................................................ *12*

      A.   American Association of Physics Teachers .................................................. 12

      B.   Women in Engineering Pro-Active Network................................................ 13

      C.   American Association of Colleges and Universities .................................... 14

      D.   American Association of University Professors............................................ 15

      E.   American Educational Research Association ............................................... 15

      F.   International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ................................................................... 16

Legal Standards .........................................................................................................17

Argument....................................................................................................................17

   *I.*   *Plaintiffs are likely to succeed on the merits.* ................................................. *17*

      A.   NSF's actions violate the Administrative Procedure Act. .......................... 17

      B.   NSF's actions violate the Constitution. ..................................................... 26

      C.   This Court has jurisdiction over Plaintiffs' claims. .................................... 34

   *II.*   *Plaintiffs are likely to suffer irreparable harm absent preliminary relief.* ...... *41*

   *III.*   *The balance of equities and public interest weigh in Plaintiffs' favor.* ............ *43*

   *IV.*   *The Court should not require a bond.* ............................................................... *45*

Conclusion .................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*112 Genesee St., LLC v. United States*, 172 Fed. Cl. 426 (2024) ..................................................36

*Aids Vaccine Advoc. Coal. v. Dep't of State*, No. 1:25-cv-00400, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ........................................................................................................................................34, 35

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 1:25-cv-00702, 2025 WL 833917 (D. Md. Mar. 17, 2025) ................................................................................................................22, 23, 42

*Am. Bar Ass'n v. DOJ*, No. 1:25-cv-01263, 2025 WL 1388891 (D.D.C. May 14, 2025) ............41

*Am. Fed'n of Gov't Emps. v. Trump*, No. 25-3293, 2025 WL 1541714 (9th Cir. May 30, 2025) .45

*Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126 (D.D.C. 2023)...................................38

*Archdiocese of Washington v. WMATA*, 897 F.3d 314 (D.C. Cir. 2018).......................................44

*Ass'n of Am. Univs. v. Dep't of Energy*, No. 1:25-cv-10912, 2025 WL 1414135 (D. Mass. May 15, 2025).................................................................................................................................41

*Auction Co. of Am. v. FDIC*, 132 F.3d 746 (D.C. Cir. 1997)......................................................37

*Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45 (D.C. Cir. 2000)...................................19

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972)........................................................27

*Bennett v. Spear*, 520 U.S. 154 (1997) ......................................................................................18

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)...........................................................35, 36, 37, 40

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020) ....................................................................44

*California v. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025)............................................................41

*Cemex Inc. v. Dep't of the Interior*, 560 F. Supp. 3d 268 (D.D.C. 2021) .....................................38

*Chi. Women in Trades v. Trump*, No. 1:25-cv-02005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) ....................................................................................................................................41

*Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986)......................................................18, 19

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ...............................27, 33

*City of Houston, Tex. v. HUD*, 24 F.3d 1421 (D.C. Cir. 1994) .................................................36, 43

*Climate United Fund v. Citibank, N.A.*, No. 1:25-cv-00698, 2025 WL 1131412 (D.D.C. Apr. 16, 2025)..............................................................................................................................41, 42, 43

*Clinton v. City of New York*, 524 U.S. 417 (1998)........................................................................34

*Cmty. Legal Servs. in E. Palo Alto v. HHS*, No. 25-2808, 2025 WL 1393876 (9th Cir. May 14, 2025)..........................................................................................................................................41

*Cmty. Legal Servs. in E. Palo Alto v. HHS*, No. 3:25-cv-02847, 2025 WL 973318 (N.D. Cal. Apr. 1, 2025)......................................................................................................................................45

*Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017) .......................................27

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) ......................................................................29

*Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1017775 (D.R.I. Apr. 5, 2025)........................45

*Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1426226 (D.R.I. May 16, 2025) .....................41

*Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022) ........................................38, 40

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798 (D.C. Cir. 2006) .......18

*District of Columbia v. USDA*, 444 F. Supp. 3d 1 (D.D.C. 2020) ................................................43

*Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) ...............................................................40, 41

*Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339 (D.C. Cir. 2012).......................................31

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ...............................................................20

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999).............................................................45

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ..........................................................21

*Esparraguera v. Dep't of the Army*, 101 F.4th 28 (D.C. Cir. 2024)..............................................27

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)......................................................20, 22

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012).....................................................29, 30

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021).............................................................20

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) ......................................34

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)................................................................29, 30

*Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002)..............................................40

*Green & Healthy Home Initiatives, Inc., v. EPA*, No. 1:25-cv-01096, 2025 WL 1697463 (D. Md. June 17, 2025) ........................................................................................21, 23, 25

*Gulf Coast Mar. Supply, Inc. v. United States*, 218 F. Supp. 3d 92 (D.D.C. 2016) ......................44

*Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412 (D.C. Cir. 1994) ...............................................25

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) .........................................................................32, 34

*Judulang v. Holder*, 565 U.S. 42 (2011).............................................................................................20

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020) ..........................................................................43

*Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994)............................................................................40

*Kendall v. United States*, 37 U.S. (12 Pet.) 524 (1838) ...............................................................33

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ...............................42, 44

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) .......................................................................19

*Maine Cmty. Health Options v. United States*, 590 U.S. 296 (2020) ...............................35, 37, 40

*Maine v. USDA*, No. 1:25-cv-00131, 2025 WL 1088946 (D. Me. Apr. 11, 2025) ......................41

*Massachusetts v. NIH*, 770 F. Supp. 3d 277 (D. Mass. 2025) .....................................................43

*Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441 (D.C. Cir. 1985) ...............................................35

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982)..............................................................38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .20, 21, 22

*Nat. Res. Def. Council v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) .............................................45

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-cv-00333, 2025 WL 573764 (D. Md. Feb. 21, 2025) .......................................................................................45

*Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025 WL 368852 (D.D.C. Feb. 3, 2025) ........................................................................................................43

*Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) .................................................................................................................................17, 45

*Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196 (Fed. Cir. 1997) ......................................36

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ........................................................30

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022)..............................................................25

*NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31 (D.C. Cir. 2015) ....................................27

*New York v. Trump*, 133 F.4th 51 (1st Cir. 2025)............................................................................19

*New York v. Trump*, 769 F. Supp. 3d 119 (D.R.I. Mar. 6, 2025) ....................................................42

*New York v. Trump*, No. 1:25-cv-00039, 2025 WL 1098966 (D.R.I. Apr. 14, 2025) ....................41

*New York v. Trump*, No. 1:25-cv-00039, 2025 WL 357368 (D.R.I. Jan. 31, 2025).......................33

*Nken v. Holder*, 556 U.S. 418 (2009) .............................................................................................43

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020)...........................45

*Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017)..........................................................37

*PFLAG, Inc. v. Trump*, No. 8:25-cv-00337, 2025 WL 510050 (D. Md. Feb. 14, 2025) .........33, 34

*RFE/RL, Inc. v. Lake*, No. 1:25-cv-00799, 2025 WL 900481 (D.D.C. Mar. 25, 2025)................23

*Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180 (D.C. Cir. 1992)..............................................31

*S. Educ. Found. v. Dep't of Educ.*, No. 1:25-cv-01079, 2025 WL 1453047 (D.D.C. May 21, 2025) ................................................................................................................................................41

*Smith v. Goguen*, 415 U.S. 566 (1974) .....................................................................................29, 31

*Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247 (D.C. Cir. 2021) ........................................................22

*St. Bernard Par. v. United States*, 134 Fed. Cl. 730 (2017) ...........................................................38

*Tootle v. Sec'y of the Navy*, 446 F.3d 167 (D.C. Cir. 2006)......................................................37, 39

*Train v. City of New York*, 420 U.S. 35 (1975) ..............................................................................33

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992) ..............37

*Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020) ............................44

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) .................................................18

*U.S. Enrichment Corp. v. United States*, 117 Fed. Cl. 548 (2014) ................................................40

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) ..........................................................29

*United States v. Williams*, 553 U.S. 285 (2008) ....................................................................29, 30

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ......................................................................25

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ........................................................43

*Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1 (D.D.C. 2020) ......................................43

*Widakuswara v. Lake*, No. 1:25-cv-01015, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ..............41

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ......................39

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ....................39

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ...............................................................17, 41

*Woonasquatucket River Watershed Council v. USDA*, No. 1:25-cv-00097, 2025 WL 1116157
    (D.R.I. Apr. 15, 2025)....................................................................................................41, 42, 45

**Statutes**

2 U.S.C. § 682 ..............................................................................................................................32

2 U.S.C. § 683 ..............................................................................................................................32

2 U.S.C. § 684 ..............................................................................................................................32

28 U.S.C. § 1331 ..........................................................................................................................34

28 U.S.C. § 1491 ..........................................................................................................................37

28 U.S.C. § 2517 ..........................................................................................................................36

31 U.S.C. § 1304 ..........................................................................................................................36

31 U.S.C. § 6304 ..........................................................................................................................38

42 U.S.C. § 1862 ............................................................................................................................2

42 U.S.C. § 1862i ........................................................................................................5

42 U.S.C. § 1862k ................................................................................................3, 4, 24

42 U.S.C. § 1862n .......................................................................................................6

42 U.S.C. § 1862n–1 ....................................................................................................6

42 U.S.C. § 1862n-10 ...................................................................................................6

42 U.S.C. § 1862n–1a ..................................................................................................6

42 U.S.C. § 1862n-2 ....................................................................................................6

42 U.S.C. § 1862n-8 ....................................................................................................6

42 U.S.C. § 1862o .......................................................................................................6

42 U.S.C. § 1862o-12 ..................................................................................................6

42 U.S.C. § 1862o-14 ..................................................................................................6

42 U.S.C. § 1862o-4 ....................................................................................................6

42 U.S.C. § 1862p-13 ..................................................................................................6

42 U.S.C. § 1862p–14 ...........................................................................................7, 24

42 U.S.C. § 1862p-2 ....................................................................................................6

42 U.S.C. § 1862p–4 ..........................................................................................5, 6, 26

42 U.S.C. § 1862p-6 ....................................................................................................6

42 U.S.C. § 1862q .......................................................................................................6

42 U.S.C. § 1862s .................................................................................................7, 8, 24

42 U.S.C. § 1862s-5 ....................................................................................................5

42 U.S.C. § 1862s–5 ..............................................................................................4, 44

42 U.S.C. § 1862s-7 ....................................................................................................6

42 U.S.C. § 1869 .........................................................................................................6

42 U.S.C. § 1885 .................................................................................................. 4, 5, 23

42 U.S.C. § 1885a ...................................................................................................... 4, 6

42 U.S.C. § 1885b ......................................................................................................... 6

42 U.S.C. § 1885c ......................................................................................................... 6

42 U.S.C. § 18991 ......................................................................................................... 6

42 U.S.C. § 18992 ......................................................................................................... 6

42 U.S.C. § 18994 ......................................................................................................... 6

42 U.S.C. § 18997 ......................................................................................................... 6

42 U.S.C. § 19011 ......................................................................................................... 6

42 U.S.C. § 19012 .................................................................................................... 5, 25

42 U.S.C. § 19014 ......................................................................................................... 6

42 U.S.C. § 19015 ......................................................................................................... 6

42 U.S.C. § 19016 ......................................................................................................... 6

42 U.S.C. § 19017 ......................................................................................................... 6

42 U.S.C. § 19018 ......................................................................................................... 6

42 U.S.C. § 19084 ......................................................................................................... 6

42 U.S.C. § 19104 ......................................................................................................... 6

42 U.S.C. § 19108 ......................................................................................................... 6

42 U.S.C. § 19110 ......................................................................................................... 6

42 U.S.C. § 19112 ......................................................................................................... 6

42 U.S.C. § 19119 ......................................................................................................... 6

Pub. L. No. 105-207, 112 Stat. 869 (1998) ................................................................... 4

Pub. L. No. 107-368, 116 Stat. 3034 (2002) ................................................................. 4

Pub. L. No. 114-329, 130 Stat. 2969 (2017)...................................................................4

Pub. L. No. 115–6, 131 Stat. 11 (2017) ........................................................................4

Pub. L. No. 117-167, 136 Stat. 1366 (2022)..................................................................5

Pub. L. No. 119-4, 139 Stat. 9 (2025)..........................................................................11

Pub. L. No. 81-507, 64 Stat. 149 (1950) ...................................................................2, 8

Pub. L. No. 93-344, 88 Stat. 297 (1974) .....................................................................32

Pub. L. No. 96-516, 94 Stat. 3007 (1980) ....................................................................4

**Other Authorities**

Aatish Bhatia, et al., *Trump Has Cut Science Funding to Its Lowest Level in Decades*, N.Y. Times (May 22, 2025) https://www.nytimes.com/interactive/2025/05/22/upshot/nsf-grants-trump-cuts.html [https://perma.cc/LNX3-3K7B]....................................................11, 12, 31, 32

Dan Garisto, *Exclusive: NSF stops awarding new grants and funding existing ones*, Nature (May 6, 2025), https://www.nature.com/articles/d41586-025-01396-2 [https://perma.cc/8U4T-9ZHE]..........................................................................................................................12

Jeffrey Mervis, *Exclusive: NSF faces radical shake-up as officials abolish its 37 divisions*, Science (May 8, 2025), https://www.science.org/content/article/exclusive-nsf-faces-radical-shake-officials-abolish-its-37-divisions [https://perma.cc/US4L-A9D6] ..................................9

John Drake, *The NSF Is Being Dismantled — With Broad Implications For The American Economy*, Forbes (May 9, 2025), https://www.forbes.com/sites/johndrake/2025/05/09/the-national-science-foundation-is-being-dismantled-what-the-economy-needs-is-more-investment/ [https://perma.cc/V2AE-E88E]...............................................................................44

John Drake, *Trump's NIH And NSF Cuts Estimated To Cost The U.S. Economy $10 Billion Annually*, Forbes (May 19, 2025), https://www.forbes.com/sites/johndrake/2025/05/19/trumps-nih-and-nsf-cuts-could-cost-the-us-economy-10-billion-annually [https://perma.cc/H29E-GCQV] ........................................................................................................................44

Letter from Coal. for Nat'l Sci. Funding to Members of Senate and House Committees on Appropriations (Mar. 13, 2025), https://www.acs.org/policy/washington-science/jb-2025-public-comments-acs-signs-cnsf-nsf-letter-2025.html [https://perma.cc/UPJ5-M6C3]..............3

NSF, *2022–2026 Strategic Plan*, https://nsf-gov-resources.nsf.gov/pubs/2022/nsf22068/nsf22068.pdf [https://perma.cc/29XS-752F] ...............6

NSF, *About NSF,* https://www.nsf.gov/about [https://perma.cc/93N7-3BF2] ............................2, 7

NSF, *Award Terms and Conditions*, https://www.nsf.gov/awards/terms-conditions [https://perma.cc/JVF2-54QR] ...................................................................................10

NSF, *Chapter II: Proposal Preparation Instructions* (from *Proposal & Award Policies & Procedures Guide (PAPPG) (NSF 24-1)*), https://www.nsf.gov/policies/pappg/24-1/ch-2-proposal-preparation [https://perma.cc/M4TM-XDRX] ...........................................7

NSF, *Chapter XII: Award Administration Disputes and Misconduct* (from *Proposal & Award Policies & Procedures Guide (PAPPG) (NSF 24-1)*), https://www.nsf.gov/policies/pappg/24-1/ch-12-disputes-misconduct [https://perma.cc/NAZ8-2PT6] ...........................................28, 29

NSF, *Fiscal Year 2024 Appropriations*, https://www.nsf.gov/about/budget/fy2024/appropriations [https://perma.cc/86DX-H4QY] ................................................................................11

NSF, *Grant General Conditions (GC-1)* (Oct. 1, 2024), https://nsf-govresources.nsf.gov/files/oct24-r.pdf [https://perma.cc/KE5F-U8VA] ..................................10

NSF, *Historically Black Colleges and Universities – Undergraduate Program (HBCU-UP)*, https://www.nsf.gov/funding/opportunities/hbcu-historically-black-colleges-universities-undergraduate [https://perma.cc/WEH5-SCF8] .........................................................................26

NSF, *History*, https://www.nsf.gov/about/history [https://perma.cc/7DPZ-BF2A] ........................3

NSF, *Louis Stokes Alliances for Minority Participation (LSAMP)*, https://www.nsf.gov/funding/opportunities/lsamp-louis-stokes-alliances-minority-participation [https://perma.cc/G8T3-5YAR] ......................................................................................5

NSF, *Overview of the NSF Proposal and Award Process,* https://www.nsf.gov/funding/overview [https://perma.cc/UT67-97ZC] ....................................................................................7

NSF, *Program Solicitation, NSF 24-563: Louis Stokes Alliances for Minority Participation* (Mar. 28, 2024), https://www.nsf.gov/funding/opportunities/lsamp-louis-stokes-alliances-minority-participation/nsf24-563/solicitation [https://perma.cc/9DA2-BVN4].....................................26

NSF, *Proposal and Award Policies and Procedures Guide (NSF 24-1)* (effective May 20, 2024), https://nsf-gov-resources.nsf.gov/files/nsf24_1.pdf [https://perma.cc/DJD8-ZUG5].............6, 7

NSF, *Statement of NSF Priorities* (Apr. 18, 2025), https://www.nsf.gov/updates-on-priorities [https://perma.cc/Z68M-CMKK] ..................................................................8, 9, 10, 24, 25, 37

*Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303 (1969)...................................................................................33

Scott Waldman & Corbin Hair, *White House looks to freeze more agency funds — and expand executive power*, E&E News by Politico (June 10, 2025),

https://www.eenews.net/articles/white-house-looks-to-freeze-more-agency-funds-and-expand-executive-power/ [https://perma.cc/EPC5-R6JL] ..........................................................11, 12, 32

The Federalist No. 58 (James Madison) (Clinton Rossiter ed., 1961) ..........................................31

**Rules**

Fed. R. Civ. Pro. 65 ..........................................................................................................17, 45

**Regulations**

2 C.F.R. § 200.340 ..........................................................................................................29, 30

**Constitutional Provisions**

U.S. Const. amend. V ..........................................................................................................27

U.S. Const., art. I, § 8 ..........................................................................................................32

U.S. Const., art. I, § 9 ..........................................................................................................32

U.S. Const., art. II, § 3 ..........................................................................................................34

## INTRODUCTION

The United States has been the world leader in scientific research and advancement for over seven decades. That is due in large part to sustained congressional support of basic scientific research through the National Science Foundation ("NSF"). Now, however, NSF is walking away from its statutory obligations, severely damaging the foundation of the United States' scientific world leadership and harming a generation of scientists.

Congress has long recognized that the future of American scientific research depends on supporting early-career scientists and education of young people in science, technology, engineering, and mathematics ("STEM"). Accordingly, it has mandated NSF support for STEM education and for tapping America's full human resources by increasing participation in science by persons from underrepresented groups. Under political pressure, however, NSF recently announced a "change in priorities" under which it will no longer fund projects related to diversity, equity, and inclusion or other disfavored topics like environmental justice and the spread of misinformation. As a result, NSF abruptly terminated over 1,600 previously awarded grants, cooperative agreements, and other financial assistance (collectively, "grants") worth approximately $1 billion. NSF's change in priorities, and its resulting mass termination of meritorious grants, will harm America's world leadership in science, economic growth, and national security. It is also harming Plaintiffs and their members—teachers, professors, researchers, graduate students, and organizations who have applied for and received NSF awards, then recently seen them terminated.

NSF's change in priorities and mass termination of grants is unlawful. NSF's actions violate the Administrative Procedure Act because they are not reasonable or reasonably explained. The mass termination of 1,600 grants based on cursory boilerplate rationales reflects nearly every hallmark of arbitrary and capricious government action, including a failure to

1

consider significant reliance interests. NSF's actions are also contrary to statutes governing NSF as well as the Constitution. NSF's refusal to spend money for the purposes and programs that Congress mandated violates the separation of powers, Spending Clause, and Appropriations Clause. Grant terminations without any notice or process violate Plaintiffs' due process rights, and NSF's application of its award criteria is unconstitutionally vague.

Plaintiffs and their members are educators, researchers, scientists, and organizations representing them that have been and will continue to be irreparably harmed by NSF's illegal actions. They have been forced to lay off staff and they are suffering career setbacks, reputational injury, loss of significant time, and diversion of their limited resources. These harms far outweigh any NSF interest in arbitrary termination of meritorious funding awards. Plaintiffs respectfully request that the Court preliminarily enjoin NSF's change in priorities decision and its mass grant termination.

## BACKGROUND

### I.    The National Science Foundation

Congress established NSF in 1950 "[t]o promote the progress of science; to advance the national health, prosperity, and welfare; [and] to secure the national defense." Pub. L. No. 81-507, 64 Stat. 149 (1950). To that end, Congress "authorized and directed" NSF "to initiate and support basic scientific research and programs to strengthen scientific research potential and science education programs at all levels in the mathematical, physical, medical, biological, social, and other sciences." 42 U.S.C. § 1862(a)(1).

Ever since, NSF has supported "basic research: research driven by curiosity and discovery" to further its statutory mission.[1] NSF funding has had a profound impact on the

---

[1] NSF, *About NSF*, https://www.nsf.gov/about [https://perma.cc/93N7-3BF2].

United States' global leadership in science. NSF has funded research on data compression algorithms now used in everyday items such as televisions and computers; computer-aided design and modeling, which revolutionized manufacturing; 3D printing; the development of Doppler radar as a meteorological tool; law enforcement and biological DNA testing; the computer network NSFNET, a forerunner of today's internet; improved microsurgery and LASIK eye surgery; improved efficiency for organ donation; CRISPR genetic therapies; detection of the subatomic Higgs boson; early intervention to ameliorate children's reading problems; and the development of artificial intelligence.[2]

Federal science funding remains critical today. As a large group of academic, scientific, and business organizations told Congress earlier this year, "[i]nvesting in fundamental research is imperative to win the technology race with China" and the "United States cannot afford to cede leadership in the fields that will define the future."[3]

NSF has also long supported STEM education to ensure the future of American scientific advancement and leadership. Congress declared that NSF's mission includes being a "primary contributor to mathematics, science, and engineering education at academic institutions in the United States" because "[a] nation that is not technologically literate cannot compete in the emerging global economy." 42 U.S.C. § 1862k(a).

## II.    NSF's congressional mandate to expand participation in science

Part of NSF's mission, as determined by Congress, is to expand the participation in STEM of persons from underrepresented groups. Congress has repeatedly recognized that

---

[2] NSF, *History*, https://www.nsf.gov/about/history [https://perma.cc/7DPZ-BF2A].
[3] *See* Letter from Coal. for Nat'l Sci. Funding to Members of Senate and House Committees on Appropriations (Mar. 13, 2025), https://www.acs.org/policy/washington-science/jb-2025-public-comments/acs-signs-cnsf-nsf-letter-2025.html [https://perma.cc/UPJ5-M6C3].

tapping into the STEM potential of traditionally underrepresented groups is necessary to maximize the full STEM talent of this country and to meet the workforce needs of the future.

In the National Science Foundation Authorization and Science and Technology Equal Opportunities Act of 1980, "Congress declare[d] that the highest quality science over the long-term requires substantial support, from currently available research and educational funds, for increased participation in science and technology by women and minorities." Pub. L. No. 96-516, § 32(b), 94 Stat. 3007, 3011 (1980) (codified as amended at 42 U.S.C. § 1885(b)); Pub. L. No. 107-368, § 16, 116 Stat. 3034, 3059 (2002) (adding "persons with disabilities" to congressional declaration). Expanding participation in science supports the "full use of the human resources of the Nation in science and engineering." 42 U.S.C. § 1885(b).

In the National Science Foundation Authorization Act of 1998, Congress directed NSF to pursue a "core strategy" of "[d]evelop[ing] intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." Pub. L. No. 105-207, § 101(b)(1), 112 Stat. 869, 870 (1998) (codified at 42 U.S.C. § 1862k(b)(1)).

In 2017, Congress found that "historically, underrepresented populations are the largest untapped STEM talent pools in the United States." Pub. L. No. 114-329, § 305(b)(3), 130 Stat. 2969, 3007 (2017) (codified at 42 U.S.C. § 1862s–5(b)(3)). Congress thus mandated that NSF "shall continue to support programs designed to broaden participation of underrepresented populations in STEM fields." 42 U.S.C. § 1862s–5(c). Also in 2017, Congress found that "the National Science Foundation's mission includes supporting women in STEM disciplines." Pub. L. No. 115–6, § 2(6), 131 Stat. 11, 11 (2017) (codified at 42 U.S.C. § 1885a note).

In 2022, in a part of appropriations legislation titled "National Science Foundation for the Future," Congress declared that "the Federal Government must utilize the full talent and potential of the entire Nation by . . . encouraging broader participation of populations underrepresented in STEM." Pub. L. No. 117-167, § 10301, 136 Stat. 1366, 1506 (2022).

Congress also specifically mandated that NSF fund specific programs to expand participation in science. For example, the Louis Stokes Alliances for Minority Participation ("LSAMP") supports partnerships between higher education institutions and other organizations to increase STEM degrees to underrepresented populations.[4] Congress required that NSF "shall continue to support" LSAMP. 42 U.S.C. § 1862p–4. The Eddie Bernice Johnson INCLUDES Initiative is based on a mandate that NSF make awards to promote "broadening participation in STEM studies and careers of groups historically underrepresented in such studies and careers." *Id.* § 19012. Congress also required that NSF "shall award grants on a competitive, merit-reviewed basis, to eligible entities to increase the participation of underrepresented populations in STEM fields," *id.* § 1862s–5(d)(1), and that NSF "shall make awards to institutions of higher education (or consortia thereof) for the development and assessment of innovative reform efforts designed to increase the recruitment, retention, and advancement of individuals from underrepresented minority groups in academic STEM careers," *id.* § 1862s–5(e)(1).

The U.S. Code is replete with other provisions in which Congress authorized or directed NSF to fund projects to increase the participation in STEM of persons from underrepresented groups. *E.g.*, 42 U.S.C. § 1885(b) (identifying need for "increased participation in science and engineering by women, minorities, and persons with disabilities"); *id.* §§ 1862i(a)(3)(C), (c)(3),

---

[4] NSF, *Louis Stokes Alliances for Minority Participation (LSAMP)*, https://www.nsf.gov/funding/opportunities/lsamp-louis-stokes-alliances-minority-participation [https://perma.cc/G8T3-5YAR].

(d)(2)(D), (e)(3)(C), (f)(2)(C); 1862n(a)(3)(I), (a)(3)(K), (a)(5), (b)(1)(B)(iv), (b)(2)(G); 1862n–
1(b)(2)(F), (c)(2), (d)(2); 1862n–1a(d)(3)(F), (d)(4)(B), (k)(2)(D); 1862n-2(b)(2)(C), (b)(3);
1862n-8(a)(1); 1862n-10(a); 1862o; 1862o-4; 1862o-12; 1862o-14(c)(2)(A)(ii); 1862p-
2(b)(2)(A); 1862p-4; 1862p-6; 1862p-13; 1862q(c)(2)(C); 1862s–7(b)(2)(C); 1869(c); 1885a;
1885b; 1885c; 18991(c)(6)(B); 18992(a)(3); 18994(d)(4)(B); 18997(b)(5)–(6); 19011(b);
19014(b); 19015; 19016; 19017; 19018; 19084(c)(6); 19104(1); 19108(d)(3); 19110(b)(7);
19112(c); 19119(c)(1).

NSF has acknowledged that congressional mandate in its own policy documents. For
instance, the latest version of NSF's Policy and Award Policies and Procedures Guide states:
"NSF's mission calls for the broadening of opportunities and expanding participation of groups,
organizations, and geographic regions that are underrepresented in STEM disciplines, which is
essential to the health and vitality of science and engineering. NSF is committed to this principle
of diversity and deems it central to the programs, projects, and activities it considers and
supports."[5] NSF's 2022-2026 Strategic Plan identified "Diversity and Inclusion" as one of NSF's
"Core Values," and stated that its "Strategic Objective 1.1" was to "[e]nsure accessibility and
inclusivity" by "[i]ncreas[ing] the involvement of communities underrepresented in STEM."[6]

---

[5] NSF, *Proposal and Award Policies and Procedures Guide (NSF 24-1)* (effective May 20, 2024),
https://nsf-gov-resources.nsf.gov/files/nsf24_1.pdf [https://perma.cc/DJD8-ZUG5]. Earlier
versions of the Guide included the same language. *E.g.*, NSF, *Proposal and Award Policies and
Procedures Guide (NSF 16-1) (effective Jan. 2016)*, https://nsf-gov-
resources.nsf.gov/pubs/policydocs/pappguide/nsf16001/nsf16_1.pdf [https://perma.cc/695W-
D32Z].
[6] NSF, *2022–2026 Strategic Plan*, https://nsf-gov-
resources.nsf.gov/pubs/2022/nsf22068/nsf22068.pdf [https://perma.cc/29XS-752F].

### III.     NSF grant process

NSF "fulfills [its] mission chiefly by making grants."[7] NSF allocates 94% of its budget

for grants and awards to support research projects, facilities, and STEM education.[8]

NSF makes funding decisions through a competitive and rigorous merits review process.[9]

NSF has set out detailed instructions for grant applicants to prepare proposals.[10] NSF's multiple

rounds of review generally include external peer review by experts in the field.[11] An NSF

program officer reviews peer reviewers' analyses to recommend whether to make an award.[12]

NSF reviews all proposals using two merit review criteria, Intellectual Merit and Broader

Impacts, that are mandated by law.[13] 42 U.S.C. § 1862s(a)(2), (b). Congress also defined the

Broader Impacts criteria. *Id.* § 1862p–14. One of the statutorily defined Broader Impacts criteria

is whether the proposed project "[e]xpand[s] participation of women and individuals from

underrepresented groups in STEM." *Id.* § 1862p–14(a)(7). Accordingly, NSF instructs applicants

that proposals "must contain" a section on "Broader Impacts," including impacts on "societally

relevant outcomes," among them "full participation of women, persons with disabilities, and

underrepresented minorities in [STEM]."[14]

---

[7] NSF, *About NSF,* https://www.nsf.gov/about [https://perma.cc/93N7-3BF2].
[8] NSF, *NSF By the Numbers,* https://nsf-gov-resources.nsf.gov/
files/Factsheet_ByTheNumbers.pdf?VersionId=CqK4KW39D4nNtO_xZRKkhyGznH659z4h
[https://perma.cc/JW7S-2Y23].
[9] NSF, *Overview of the NSF Proposal and Award Process,*
https://www.nsf.gov/funding/overview [https://perma.cc/UT67-97ZC].
[10] NSF, *Chapter II: Proposal Preparation Instructions* (from *Proposal & Award Policies & Procedures Guide (PAPPG) (NSF 24-1)*), https://www.nsf.gov/policies/pappg/24-1/ch-2-proposal-preparation [https://perma.cc/M4TM-XDRX].
[11] *Overview of the NSF Proposal and Award Process* [https://perma.cc/UT67-97ZC].
[12] *Id.*
[13] *Id.*
[14] *Proposal and Award Policies and Procedures Guide (NSF 24-1)* [https://perma.cc/DJD8-ZUG5].

Prior to April 2025, terminations of grants awarded pursuant to NSF's rigorous and competitive process were rare and undertaken not *en masse* but for identified violations of grant terms and conditions, such as misconduct. *See* Williams Decl. ¶ 30; Cunningham Decl. ¶ 14; Mack Decl. ¶ 14.

## IV.    <u>Change in Priorities Decision</u>

In April 2025, NSF published a short statement and accompanying FAQs on its website announcing a change in NSF priorities ("Change in Priorities Decision").[15] The Change in Priorities Decision marked a radical change in NSF policy for funding scientific research and education.

Much of the statement purported to reaffirm existing practices, as if NSF were making no change. NSF acknowledged its statutorily defined purpose "to promote the progress of science, to advance the national health, prosperity and welfare," and to "secure the national defense." *See* Pub. L. No. 81-507, 64 Stat. at 149. NSF reiterated the two statutory criteria—Intellectual Merit and Broader Impacts—that it has long used to evaluate awards. *See* 42 U.S.C. §§ 1862s(a)(2), (b). NSF identified various ways in which it would "continue" its past approach, including "continu[ing] to review all projects using Intellectual Merit and Broader Impacts criteria."[16]

The statement only briefly acknowledged a change in policy when it stated "NSF's broadening participation activities . . . must aim to create opportunities for all Americans everywhere. These efforts should not preference some groups at the expense of others, or directly/indirectly exclude individuals or groups. Research projects with more narrow impact

---

[15] NSF, *Statement of NSF Priorities* (Apr. 18, 2025), https://www.nsf.gov/updates-on-priorities [https://perma.cc/Z68M-CMKK].
[16] *Id.*

limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities."[17]

The FAQs stated more clearly what NSF meant and its import: "Awards that are not aligned with program goals or agency priorities have been terminated, including but not limited to those on diversity, equity, and inclusion (DEI), environmental justice, and misinformation/disinformation." The FAQs did not define those terms, nor did NSF explain how it would identify for termination grants supposedly related to these concepts.[18]

## V.   **Mass Termination Action**

The Change in Priorities Decision had immediate and drastic consequences. As a direct result of the Change in Priorities Decision, NSF terminated over 1,600 previously awarded grants worth more than $1 billion ("Mass Termination Action")—particularly those pertaining to diversity, equity, and inclusion, environmental justice, and disinformation or misinformation.[19] The agency sent large waves of boilerplate termination notices, Delaney Decl. ¶¶ 17–23, containing identical language, *id.* ¶¶ 19–23; Cunningham Decl. ¶¶ 11, 19; Williams Decl. ¶¶ 20, 29; Mack Decl. ¶¶ 11, 19, 26, 33. They identify affected grants only by their NSF Award ID number but provide no individualized rationale—though NSF purports to have performed individualized review:

> The U.S. National Science Foundation (NSF) has undertaken a review of its award portfolio. Each award was carefully and individually reviewed, and the agency has determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities. . . . NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they

---

[17] *Id.*

[18] *Id.*

[19] Jeffrey Mervis, *Exclusive: NSF faces radical shake-up as officials abolish its 37 divisions*, Science (May 8, 2025), https://www.science.org/content/article/exclusive-nsf-faces-radical-shake-officials-abolish-its-37-divisions [https://perma.cc/US4L-A9D6].

no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal.

Delaney Decl. ¶¶ 20, 22; Cunningham Decl. ¶¶ 11, 19; Williams Decl. ¶¶ 20, 29; Mack Decl. ¶¶ 11, 19, 26, 33.

Some waves of grant termination notices include a common typographical error: "not in alignment with NSF priorites [sic]." Delaney Decl. ¶ 21; Mack Decl. ¶ 11; Cunningham Decl.¶ 11; Sweeney Decl. ¶ 13; Williams Decl. ¶¶ 20, 29. And the termination notices universally invoke the termination provision in NSF Grant General Conditions (GC-1), even for grants that were never governed by those Grant General Conditions. Williams Decl. ¶¶ 20–21; Mack Decl. ¶¶ 11–12, 19–20, 26–27, 33–34; Cunningham Decl. ¶¶ 11, 12, 19, 20.[20]

NSF stated that the terminations are final and that grantees should not file administrative appeals because NSF would not reconsider its decision: "NSF does not allege a deficiency occurred (*e.g.*, noncompliance with award terms and conditions or research misconduct of the awardee). Because there are no allegations of deficiencies by the awardee to dispute, there are no grounds for agency appeal."[21] By declaring that there are no potential grounds for appeal, NSF reaffirmed that the Mass Termination Action was based on a single policy decision, with no individualized consideration underlying the terminations.

---

[20] The October 1, 2024, version of the Grant General Conditions (GC-1) applies to all new grants and funding amendments made between October 1, 2024, and May 19, 2025. NSF, *Grant General Conditions (GC-1)* (Oct. 1, 2024), https://nsf-govresources.nsf.gov/files/oct24-r.pdf [https://perma.cc/KE5F-U8VA]. Before October 1, 2024, grants to institutions of higher education and nonprofit organizations were governed by Research Terms and Conditions—not Grant General Conditions, which applied only to awards made to for-profit organizations and state, local, or tribal governments. NSF, *Award Terms and Conditions*, https://www.nsf.gov/awards/terms-conditions [https://perma.cc/JVF2-54QR]. Cooperative agreements were subject to yet another set of terms and conditions, not the Grant General Conditions. *See, e.g.*, Williams Decl. Ex. A at 2.

[21] *Statement of NSF Priorities* [https://perma.cc/Z68M-CMKK].

As a result of the Mass Termination Action, NSF is not spending about $1 billion in appropriated funds.[22] The terminations are across a wide range of program areas, but the largest number relate to STEM education. Delaney Decl. ¶ 24. NSF terminated 66% of LSAMP awards and 46% of INCLUDES Initiative awards. *Id*. ¶¶ 25–26. NSF's cancellation of over $1 billion in awards is significant given that NSF's annual appropriations are about $9 billion. *See* Pub. L. No. 118-42, div. C, tit. III, 138 Stat. 25, 161–63; Pub. L. No. 119-4, sec. 1101(a)(2), 139 Stat. 9, 10.[23]

## VI.     NSF's refusal to fund awards with money Congress appropriated for that purpose

NSF's Change in Priorities Decision and Mass Termination Action have led the agency to withhold a significant sum of appropriated funds, including most funding to effectuate Congress's commands to increase representation of diverse populations in STEM.[24] Grants from NSF's directorate for STEM education this year have declined by 80%.[25] NSF's graduate education division typically approves $21 million in grants by May of a fiscal year to graduate students like the members of Plaintiff UAW but, as of May 2025, has not awarded any.[26]

In June 2025, the Office of Management and Budget directed NSF to freeze billions of dollars in spending of funds appropriated in Fiscal Year 2024 on research and education.[27] NSF's budget director told staff that NSF was "immediately focused on pulling the funds back to ensure

---

[22] Aatish Bhatia, et al., *Trump Has Cut Science Funding to Its Lowest Level in Decades*, N.Y. Times (May 22, 2025) https://www.nytimes.com/interactive/2025/05/22/upshot/nsf-grants-trump-cuts.html [https://perma.cc/LNX3-3K7B].

[23] NSF, *Fiscal Year 2024 Appropriations*, https://www.nsf.gov/about/budget/fy2024/appropriations [https://perma.cc/86DX-H4QY].

[24] Bhatia, *Trump Has Cut Science Funding to Its Lowest Level in Decades* [https://perma.cc/LNX3-3K7B].

[25] *Id*.

[26] *Id*.

[27] Scott Waldman & Corbin Hair, *White House looks to freeze more agency funds — and expand executive power*, E&E News by Politico (June 10, 2025), https://www.eenews.net/articles/white-house-looks-to-freeze-more-agency-funds-and-expand-executive-power/ [https://perma.cc/EPC5-R6JL].

there are no further commitments or obligations."[28] This followed an April 30, 2025 directive to "stop awarding all funding actions until further notice," which had prevented NSF from awarding new grants or supplying allotted money for existing grants that receive incremental funding,[29] and a May 13, 2025, directive that lifted the ban on some new funding but kept in place a freeze on new funding to all institutions of higher education.[30]

VII.   __Plaintiffs and their harms__

   A.   **American Association of Physics Teachers**

American Association of Physics Teachers, Inc. ("AAPT") is a professional association of scientists dedicated to enhancing the understanding and appreciation of physics through education at both the K-12 level and at colleges and universities. Cunningham Decl. ¶ 2.

Before April 25, 2025, AAPT was awarded NSF grants totaling more than $37.9 million in anticipated total award funding. *Id.* ¶ 4. The funding AAPT receives from NSF supports critical programs that enhance U.S. scientific competitiveness and contribute to the national interest by promoting the full use of human resources in physics and related STEM disciplines, including the full development of scientific talents of persons from underrepresented groups. *Id.* Hundreds of thousands of Americans benefit from these AAPT programs. *Id.*

NSF prematurely terminated two NSF awards to AAPT, as well as a third under which AAPT held a sub-award. Cunningham Decl. ¶¶ 11–14, 19–21, and 25–26. This has resulted in a loss of approximately $1.7 million in NSF funding for AAPT for the underlying projects. *Id.* ¶¶ 13, 21, 26. The termination of AAPT's NSF awards and sub-award will irreparably harm—

---

[28] *Id.*

[29] Dan Garisto, *Exclusive: NSF stops awarding new grants and funding existing ones*, Nature (May 6, 2025), https://www.nature.com/articles/d41586-025-01396-2 [https://perma.cc/8U4T-9ZHE].

[30] *See* Bhatia, *Trump Has Cut Science Funding to Its Lowest Level in Decades* [https://perma.cc/LNX3-3K7B].

and indeed already has irreparably harmed—the underlying projects, the teachers and students participating in them, AAPT, and the broader mission of supporting and broadening participation in physics and physics education. *Id.* ¶¶ 13, 21, 26–32.

In addition to terminating grants to AAPT, in April and May 2025, NSF terminated active grants on which AAPT *members* rely for their work, not as grantees but as principal investigators or otherwise, including grants for projects that support the broadening of participation of underrepresented populations in STEM. Cunningham Decl. ¶¶ 33–35; Quan Decl. ¶¶ 7–31; Franklin Decl. ¶¶ 7–17. This has directly harmed AAPT members whose jobs were supported by this funding. *Id.*

### B.    Women in Engineering Pro-Active Network

The Women in Engineering Pro-Active Network (WEPAN) was founded in 1990 as a 501(c)(3) non-profit organization. Williams Decl. ¶ 5. Its mission is to advance cultures of inclusion and diversity in engineering education and professions. *Id*.

On May 2, 2025, NSF terminated two critical awards to WEPAN. *Id.* ¶ 10. Historically, including for fiscal year 2025, approximately 80% of WEPAN's budget has come from NSF grant funding. *Id.* ¶ 8. As discussed below, the loss of this NSF funding threatens WEPAN's existence and will have a severe impact on its ability to serve the public and fulfill its mission. *Id.* ¶¶ 36–43.

Unless the grant terminations are reversed, WEPAN will have to lay off all its full-time staff members, five employees, as early as August 2025 due to an inability to make up the funds from the terminated NSF grants. *Id*. Additionally, five part-time and contract personnel will likely lose approximately 50% of their income from WEPAN. WEPAN leadership is working without pay (due to the terminations) to try to preserve some of the grant-funded work. *Id*. Also, at the time of the relevant grant termination, WEPAN's Virtual Visiting Scholar program

supported five early- and mid- career scholars through the final quarter of their research projects. *Id.* ¶ 39. Without the grant funding, these scholars' progress toward graduation, tenure, and promotion has been disrupted. *Id.* The terminations have also forced WEPAN to cancel its annual ADVANCE convening and related travel grants, impacting over 400 people. *Id.* ¶ 40. This meeting was a critical space for the exchange of knowledge, research, and resources centered on creating positive STEM educational and career opportunities and outcomes for everyone. *Id.* The terminations also harm WEPAN's mission of broadening and supporting participation of women and underrepresented groups—including, but not limited to, people of color, the LGBTQ community, and those differently abled—in STEM. *Id.* ¶ 43.

In addition to terminating grants to WEPAN, in April and May 2025, NSF terminated active grants on which WEPAN *members* rely for their work, including grants for projects that support the broadening of participation of underrepresented populations in STEM, including women, minorities and individuals with disabilities. Williams Decl. ¶¶ 44–46; Litzler Decl. ¶¶ 7-29. This has directly harmed WEPAN members and their projects. *Id.*

### C.    American Association of Colleges and Universities

The American Association of Colleges and Universities ("AAC&U") is a global membership organization dedicated to advancing the democratic purposes of higher education by promoting equity, innovation, and excellence in education. Through its programs and events, publications and research, public advocacy and campus-based projects, AAC&U serves as a catalyst and facilitator for innovations that improve educational quality and equity that supports the success of all students. Mack Decl. ¶ 2.

Before April 25, 2025, AAC&U received grants from NSF totaling more than $16.4 million in anticipated total award funding. *Id.* ¶ 4. The NSF funding AAC&U receives supports

14

critical programs that enhance U.S. scientific competitiveness and contributes to the national interest, including by increasing the participation of women and minorities in STEM. *Id.*

On April 25 and May 2, 2025, NSF prematurely terminated four awards to AAC&U. *Id.* ¶¶ 5, 11–12, 19–20, 26–27, 33–34. This resulted in immediate termination of the AAC&U projects that those awards were funding and will have a severe impact on AAC&U's ability to conduct programs designed to support broader participation of marginalized students and faculty in STEM. *Id.* ¶¶ 37–42.

### D.    American Association of University Professors

The American Association of University Professors ("AAUP") is a nonprofit member association of faculty and other academic professionals. Wolfson Decl. ¶ 5. Since its founding in 1915, the AAUP has helped shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in the country's colleges and universities. *Id.* ¶ 5.

In April and May 2025, NSF terminated numerous active grants on which AAUP members rely for their work. Wolfson Decl. ¶¶ 8–14.  As a result of the terminations, AAUP members have had to end the research the grants were funding. *Id*. This has resulted in salary decreases for AAUP members and hindered their ability to advance in their careers. *Id.* AAUP itself has diverted organizational resources to helping its members deal with the fallout from the terminations. *Id.*

### E.    American Educational Research Association

The American Educational Research Association ("AERA") is a leading national research society, concerned with improving the educational process by encouraging scholarly inquiry related to education and evaluation and by promoting the dissemination and practical application of research results. Levine Decl. ¶¶ 5–11. AERA's members include university faculty,

researchers, statisticians, data scientists, graduate students, and other professionals with expertise in education research. *Id.* ¶ 6.

In April and May 2025, NSF terminated approximately 1,750 active grants on which AERA members rely for their work. *Id.* ¶¶ 12–15. As a result of the terminations, education research projects on which AERA members were working have been terminated or paused. Levine Decl. ¶¶ 16–19; Núñez Decl. ¶¶ 9–20; Bang. Decl. ¶¶ 7–28. The terminations have prevented graduate students whose dissertations address NSF grant-funded research from completing their degrees, ended the development and employment of postdoctoral associations and other early career professionals on NSF grant-funded projects, and ended jobs of individuals that are supported by this funding. *Id.*

F.    **International Union, United Automobile, Aerospace and Agricultural Implement Workers of America**

The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") is one of the largest and most diverse unions in North America. Sweeney Decl. ¶ 2. It has a rich history of supporting inclusion, equity, and diversity in the higher education sector and in all workplaces. *Id.* The UAW represents approximately 120,000 workers in higher education, including graduate students, postdoctoral scientists, researchers, university staff, and faculty, at institutions across the country. *Id.*

In April and May 2025, NSF terminated numerous active grants on which UAW members rely for their work. Sweeney Decl. ¶¶ 5-13; Adams Decl. ¶¶ 7-15; Thompson Decl. ¶¶ 6-12; Zhang Decl. ¶¶ 7-19. The NSF's mass termination of grants has already severely impacted UAW's members' work by disrupting ongoing projects funded by the grants and ending important research, such as city-scale efforts to transition away from fossil fuels to more just and sustainable energy systems. *Id.*; Adams Decl. ¶¶ 8, 13. As a result of the terminations, UAW

members' employment terms have been shortened, and renewal decision delayed, or start dates

rescinded because of uncertainty surrounding cancellation or threatened cancellation of NSF

funding, leaving their future in academia uncertain. Sweeney Decl. ¶ 10. Postdocs, research staff,

and graduate student researchers have been told by principal investigators that they cannot be

reappointed unless or until NSF makes funding determinations that are months overdue. *Id.*

Some of the impacted members are on F-1, H-1B, or J-1 visas and will be at risk of required

voluntary departure from the United States if their positions end. *Id.*

## LEGAL STANDARDS

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed

on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that

the balance of equities tips in [its] favor, and that an injunction is in the public interest. *Winter v.*

*Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The Court can grant preliminary relief under

Federal Rule of Civil Procedure 65 and under the APA, 5 U.S.C. § 705. The familiar four-factor

test applies under both provisions. *Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025

WL 597959, at *11 (D.D.C. Feb. 25, 2025).

## ARGUMENT

**I.    <u>Plaintiffs are likely to succeed on the merits.</u>**

NSF's Change in Priorities Decision and Mass Termination Action are quintessentially

arbitrary and capricious final agency actions that are also contrary to NSF's governing statutes

and the Constitution.

**A.    NSF's actions violate the Administrative Procedure Act.**

**1)    NSF's actions are final agency actions.**

Plaintiffs challenge final agency actions that are reviewable under 5 U.S.C. § 704. Final

agency action "must mark the consummation of the agency's decisionmaking process" and

determine "rights or obligations . . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Courts must "apply the finality requirement in a 'flexible' and 'pragmatic' way." *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (noting the "'pragmatic' approach [the Supreme Court] ha[s] long taken to finality").

The Change in Priorities Decision was final action. It included no indication that the decision was "tentative or interlocutory." *Bennett*, 520 U.S. at 178. To the contrary, the Decision directly determines both how NSF will evaluate previously awarded grants for termination and how NSF will award future grants. These "direct and appreciable legal consequences," *id.*, make the decision reviewable under the APA. After all, NSF's reliance on the Change in Priorities Decision as the definitive statement of agency priorities in its termination notices shows that the Decision is "finally determinative" of a key issue. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006).

NSF's Mass Termination Action is also final action. NSF finalized its decision to terminate numerous grants, disclaiming even the possibility of administrative appeal, with the legal consequence of directly eliminating access to previously awarded funds. The Mass Termination Action is a discrete action because of NSF's blanket approach to grant terminations. If NSF had made case-by-case decisions on individual grants, those might be separate actions. But NSF's *en masse* termination of grants based on a single boilerplate rationale is a single discrete action. The identical termination language was a copy-paste repetition of a single decision—as indicated by a telltale typo and NSF invoking the Grant General Conditions (GC-1) even for grants not governed by those General Conditions. *Supra* Background § V. The final agency action inquiry is "pragmatic," *Hawkes*, 578 U.S. at 599, and "final agency action may

18

result 'from a series of agency pronouncements rather than a single edict.'" *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000) (quoting *Ciba-Geigy*, 801 F.2d at 435 n.7). Likewise, this Court should recognize NSF's conduct for what it is: a single decision based on a single rationale to conduct a mass termination of politically disfavored grants.[31]

Because Plaintiffs challenge these discrete actions, their claims are not impermissible programmatic attacks under *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), as Defendants may argue. There, the plaintiffs impermissibly sought "wholesale improvement of [a] program by court decree" when they challenged a so-called "land withdrawal review program" that did not "refer to a single [agency] order or regulation, or even to a completed universe of particular [agency] orders and regulations" and instead referred to "continuing" and "constantly changing" agency operations. *Id.* at 890–91. In contrast, the Change in Priorities Decision is a single completed decision setting NSF policy. As *Lujan* recognized, APA review is appropriate for a "specific order or regulation, applying some particular measure across the board to all individual classification terminations and withdrawal revocations. *Id.* at 890 n.2; *see also New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025) (review available for discrete action that is "categorical in nature" and not "based on individual assessments").

---

[31] If the Court does not consider the Mass Termination Action to be final action, then alternatively, each wave of terminations within the Mass Termination Action is final action. On several days—including April 18, April 25, May 2, May 9, and May 15, 2025—NSF sent identical termination notices to large groups of grantees. Delaney Decl. ¶¶ 17–23. Terminating a broad swath of grants in one go is a discrete action. As a final alternative, there is no question that each individual grant termination is final action because each termination is a final decision with legal consequences.

2)      **NSF's actions are arbitrary and capricious and an abuse of discretion.**

The Change in Priorities Decision and the Mass Termination Action are arbitrary and

capricious and an abuse of discretion. NSF failed to adequately explain its changes, failed to

consider serious reliance interests, and failed to consider significant consequences of its actions.

Under the APA, an agency action must be both "reasonable and reasonably explained."

*FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That requirement derives from the

Court's authority under the APA to "hold unlawful and set aside agency action . . . found to be

arbitrary, capricious, or an abuse of discretion." 5 U.S.C. § 706(2)(A). Although that standard is

deferential, "courts retain a role, and an important one, in ensuring that agencies have engaged in

reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). An agency must

"examine the relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of

U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

When an agency changes policy, a reasoned explanation requires it to "display awareness

that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Then, the agency also "must show that there are good reasons for the new policy." *Id.* In doing

so, an agency must consider "when its prior policy has engendered serious reliance interests that

must be taken into account" and, if there are such reliance interests, the agency must "provide a

more detailed justification." *Id.*; *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

The Change in Priorities Decision had no indicia of reasoned decisionmaking. NSF's

short statement barely acknowledged its change in position, let alone the magnitude of the

change. NSF relegated any mention of grant terminations to the FAQs and, even there, did not

acknowledge that its policy change was so drastic that it would terminate over $1 billion of

science funding. NSF did not acknowledge that its policy change would cut off projects already

in progress, cause researchers and educators to lose their jobs, and derail the careers of countless people who expected to carry projects through to completion and passed up other opportunities to do so. "In light of the serious reliance interests at stake," it was unlawful that the agency "gave almost no reasons at all." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

NSF also "entirely failed to consider an important aspect of the problem," *State Farm*, 464 U.S. at 43, by not even recognizing the relevant congressional policies in enacted statutes. It was unreasonable for NSF to declare new priorities without even considering that Congress had declared contrary priorities. *See supra* Background § II, *infra* Argument § I.A.3. Nor did NSF acknowledge its own prior contrary statements—in multiple versions of its Policy and Award Policies and Procedures Guide and its 2022–2026—that its mission and "Strategic Objective 1.1" was to expand participation of underrepresented communities in STEM. *Supra* Background § II; *see Green & Healthy Home Initiatives, Inc., v. EPA*, No. 1:25-cv-01096, 2025 WL 1697463, at *21 (D. Md. June 17, 2025) (grant terminations unreasonably failed to consider "prior policies under which these grants at issue were awarded").

The Mass Termination Action was also unreasoned. NSF did not acknowledge that, in NSF's own past judgment, the grants were consistent with agency priorities when NSF awarded them through a rigorous, multi-step process that included analysis by external peer reviewers. *Supra* Background § III. NSF did not claim that the grants were wrongly issued in the first instance. Moreover, NSF did not acknowledge that its own grant proposal instructions required applicants to explain how the project "contributes to the achievement of societally relevant outcomes," including the "full participation of women, persons with disabilities, and underrepresented minorities in [STEM]." *Supra* Background § III. By instructing grant

applicants to explain how the proposed project serves that mission, and then later terminating

grants for doing exactly that, NSF changed the rules in the middle of the game.

"[A] reasoned explanation is needed for disregarding facts and circumstances that

underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 516. NSF did not consider the

reasons it awarded these grants in the first place. Nor did NSF evaluate the progress that grantees

had made toward achieving the purposes of the grant. Instead, NSF's boilerplate termination

notices provided only a brief, blanket, and conclusory rationale that did not identify the specific

change in priorities that justified terminating each grant.

NSF failed to consider another "important aspects of the problem," *State Farm*, 464 U.S.

at 43, by ignoring the societal and economic effects of terminating a billion dollars' worth of

scientific funding that supports the building blocks of American scientific advancement as well

as the careers of scientists and educators nationwide. It likewise failed to consider the specific

harm of eliminating programs to increase representation in STEM when it had previously found

"broadening of opportunities and expanding participation of groups, organizations, and

geographic regions that are underrepresented in STEM disciplines" to be "essential to the health

and vitality of science and engineering."[32] Nor did NSF consider reasonable alternatives or "give

a reasoned explanation for its rejection of such alternatives," *Spirit Airlines, Inc. v. DOT*, 997

F.3d 1247, 1255 (D.C. Cir. 2021), such as whether it could pursue its objectives by other means

that provide grantees advance notice so they could show NSF why their projects remain

consistent with agency priorities or revise the projects to retain funding.

---

[32] *Proposal and Award Policies and Procedures Guide (NSF 24-1)*, https://nsf-gov-resources.nsf.gov/files/nsf24_1.pdf [https://perma.cc/DJD8-ZUG5].

With no substantive analysis or individualized assessment, NSF failed to provide a "workable, sensible, or meaningful reason or basis for the termination" of awards. *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 1:25-cv-00702, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025). The "use of a template or boilerplate letter issued to all Grant Recipients further strengthens Plaintiffs' argument that the [agency] did not consider individual, or any, data or information." *Id.* Another court found a similar "one line," "conclusory" reference to "agency priorities," "unsupported by any facts or reasoning," to be arbitrary and capricious. *RFE/RL, Inc. v. Lake*, No. 1:25-cv-00799, 2025 WL 900481, at *3 (D.D.C. Mar. 25, 2025); *see also Rhode Island v. Trump*, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868, at *11 (D.R.I. May 6, 2025) (grant terminations based on "boilerplate" explanation consisting of "mere conclusory statements" were likely arbitrary and capricious); *Green & Healthy Home*, 2025 WL 1697463, at *21 (agency failed to "conduct[] any individualized analysis for why these grants or grantees conflict with the agency's priorities").

Finally, NSF's lack of reasoned decisionmaking is evident by its use of a boilerplate reference to the termination provision in the Grant General Conditions (GC-1), even for grants not governed by the General Conditions. *Supra* Background § III. A failure to even identify the correct termination provision for each grant is patently unreasonable and proves that NSF did not give actual individual consideration to each grant, like it claimed.

### 3) NSF's actions are contrary to law.

Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). The Change in Priorities Decision and the Mass Termination Action are contrary to law. Throughout the statutes that govern NSF, Congress mandated that NSF support programs to increase participation of underrepresented

23

populations in STEM. NSF has now decided that grants should be terminated because they do exactly that. NSF's decision to cast aside those congressional policies and priorities was illegal.

Congress's mandate to NSF is clear. "[T]he highest quality science and engineering over the long-term requires substantial support, from currently available research and educational funds, for increased participation in science and engineering by women, minorities, and persons with disabilities." 42 U.S.C. § 1885(b). Congress thus required NSF to pursue a "core strategy" of "[d]evelop[ing] intellectual capital . . . with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." *Id.* § 1862k(b)(1). The U.S. Code is replete with other provisions in which Congress authorized or directed NSF to fund projects to increase the participation in STEM of persons from underrepresented groups. *Supra* Background § II (string cite of statutory provisions).

Congress operationalized that policy by requiring that when NSF evaluates funding proposals, NSF "shall apply a broader impacts review criterion to identify and demonstrate project support of" seven specified goals. 42 U.S.C. § 1862p–14(a). One of the mandated criteria is "[e]xpanding participation of women and individuals from underrepresented groups in STEM." *Id.* § 1862p–14(a)(7). Congress reaffirmed in 2017 that NSF "shall maintain" the "broader impacts criteria" "as the basis for evaluating grant proposals." *Id.* § 1862s(c).

NSF's Change in Priorities Decision is contrary to the statutorily mandated broader impacts review criterion and the other mandates that NSF support increased participation of underrepresented populations in STEM fields. The Change in Priorities Decision acknowledged the broader impacts criteria and purported to continue applying the criteria. But in fact, the Change in Priorities Decision wrote the criterion out of its review process by deciding that funding awards "should not preference some groups at the expense of others" or support research

24

"with more narrow impact limited to subgroups of people based on protected class or characteristics."[33] NSF's accompanying FAQ shows what NSF is really doing: NSF is rewriting the statutory mandate from "[e]xpanding participation of women and individuals from underrepresented groups in STEM," 42 U.S.C. § 1862p–14(a)(7), to "ensur[ing] that all outreach, recruitment, or participatory activities in NSF projects are open and available to all Americans."[34] Of course, an agency "may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). NSF's Mass Termination Action is similarly contrary to law because it relies on the Change in Priorities Decision's rewriting of Congress's statutory mandates.

NSF, like all agencies, is a "creature[] of statute" that derives all its authority from Congress. *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). NSF's policy judgments may not "conflict with the policy judgments that undergird the statutory scheme." *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994). "The violation of statutory authority is especially clear here, because the stated basis for terminating these grants is entirely incompatible with the statutory mandate." *Green & Healthy Home,* 2025 WL 1697463, at *18. Where Congress dictated the agency's priorities—and where Congress has done so repeatedly, as here—it is contrary to law for NSF to adopt conflicting priorities.

NSF's sweeping approach in the Change in Priorities Decision is also contrary to law because NSF terminated grants under congressionally mandated programs, on the basis that the grants were doing exactly what Congress had mandated. For example, Congress required NSF to fund the INCLUDES program. 42 U.S.C. § 19012. NSF has thus far terminated nearly half of its

---

[33] *Statement of NSF Priorities* [https://perma.cc/Z68M-CMKK].
[34] *Id.*

INCLUDES grants, including the award to WEPAN member Dr. Litzler. Delaney Decl. ¶ 25; Litzler Decl. ¶ 23. Terminating INCLUDES grants for promoting DEI is contrary to law, given that the statutorily defined purpose of the INCLUDES initiative is to promote "effective practices in broadening participation in STEM studies and careers of groups historically underrepresented in such studies and careers." 42 U.S.C. § 19012(a).

As another example, NSF has terminated a majority of grants under the LSAMP program, including Dr. Litzler's. Delaney Decl. ¶ 26; Litzler Decl. ¶¶ 11, 17. But the purpose of LSAMP is "to assist the nation in diversifying its STEM workforce,"[35] and Congress has mandated the program, 42 U.S.C. § 1862p-4. NSF has also terminated grants under the Historically Black Colleges and Universities Undergraduate Program ("HBCU-UP"), including AAC&U's three grants under the program. Mack Decl. ¶¶ 15–17, 19, 22–24, 29–31, 33. The "HBCU-UP provides awards to strengthen STEM undergraduate education and research at Historically Black Colleges and Universities,"[36] and is statutorily mandated, 42 U.S.C. § 1862p–4. The Change in Priorities Decision unlawfully caused the termination of LSAMP and HBCU-UP grants for doing what Congress directed.

Finally, NSF's actions are unconstitutional. *See infra*.

### B.    NSF's actions violate the Constitution.

NSF's constitutional violations are a basis for APA relief, but Plaintiffs separately have a non-statutory right of action to seek—and federal courts have the equitable power to grant—

---

[35] NSF, *Program Solicitation, NSF 24-563: Louis Stokes Alliances for Minority Participation* (Mar. 28, 2024), https://www.nsf.gov/funding/opportunities/lsamp-louis-stokes-alliances-minority-participation/nsf24-563/solicitation [https://perma.cc/9DA2-BVN4].

[36] NSF, *Historically Black Colleges and Universities – Undergraduate Program (HBCU-UP)*, https://www.nsf.gov/funding/opportunities/hbcu-historically-black-colleges-universities-undergraduate [https://perma.cc/WEH5-SCF8].

injunctive relief for "violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27; *Free Enter. Fund*, 561 U.S. at 491 n.2.

> **1)    The Mass Termination Action, which gave no notice to Plaintiffs, violates their procedural due process rights.**

The Fifth Amendment guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This Clause protects "property" interests where a person or entity has a "legitimate claim of entitlement" to something. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). A property interest may be created by "an independent source," such as other laws or regulations, "that secure certain benefits and that support claims of entitlement to those benefits." *Id.* "[A] property interest exists" where governing law provides that the government may not terminate a benefit except "for cause." *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024).

Federal grantees "have a legitimate property interest in federal funds that Congress has already appropriated and that the [grantees] have accepted." *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *see NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (a person has a protected property interest if that "person would be entitled to receive the government benefit assuming she satisfied the preconditions to obtaining it" and "award of the benefit would follow from satisfaction of applicable eligibility criteria.").

Grant recipients have a constitutionally protected property interest in the funding they applied for, were awarded, and currently rely on, including to pay staff and continue research that will benefit millions of Americans, advance science education, and advance science. Some Plaintiffs have already been forced to furlough or lay off staff, Mack Decl. ¶ 39, use limited

resources to cover salaries that had been grant-funded, Mack Decl. ¶ 41, Cunningham Decl. ¶ 30–31, cancel longstanding programs, Williams Decl. ¶ 40, and are suffering harm to their reputations from canceled projects, Cunningham Decl. ¶ 31. Plaintiffs' members have likewise lost employment, Sweeney Decl. ¶¶ 9–10, withdrawn from job searches, id. ¶ 10, suffered harm to their reputation, Wolfson Decl. ¶¶ 10–11, and career progression, *id*., Bang Decl. ¶ 28, and been forced to spend hours attempting to manage the fallout of lost grants, Litzler Decl. ¶ 29, Zhang Decl. ¶ 17, Adams Decl ¶ 15, Núñez Decl. ¶ 19, Quan Decl. ¶ 17. The substantive and reputational harms Plaintiff grant recipients have already experienced reflect a legitimate property interest that the Due Process Clause protects.

Plaintiffs were not afforded any process before (or after) their grants were canceled. The summary termination notices asserted that grants no longer align with agency priorities, but did not explain why, and did not provide grantees with a chance to contest the basis for that determination. NSF also expressly denied any post-deprivation opportunity for administrative appeal. All the while, Plaintiffs' operations and reputations are harmed with each passing day, proving that the risk of erroneous deprivation is not only high but already occurring.

On the other side of the ledger, NSF would not be harmed by giving grantees due process. Indeed, NSF's own procedures contemplate notice and an opportunity to be heard. "Normally, action by NSF to suspend or terminate an award will be taken only after the recipient has been informed by NSF of the proposed action, or informed of any deficiency on its part and given an opportunity to correct it."[37] Recipients may respond by "describing the action taken or

---

[37] NSF, *Chapter XII: Award Administration Disputes and Misconduct* (from *Proposal & Award Policies & Procedures Guide (PAPPG) (NSF 24-1)*), https://www.nsf.gov/policies/pappg/24-1/ch-12-disputes-misconduct [https://perma.cc/NAZ8-2PT6].

the plan designed to correct the deficiency."[38] If a grant is nonetheless terminated, a grantee may

appeal to NSF.[39] It cannot be unduly burdensome for NSF to follow its own established

procedures, yet NSF skipped all these steps and provided grantees with no process at all.

> **2)    NSF's implementation of 2 C.F.R. § 200.340 in the Mass Termination Action is void for vagueness.**

Defendants have also violated the Due Process Clause by terminating Plaintiffs' grants in

an unconstitutionally vague manner, without fair notice to Plaintiffs of the applicable standard.

Government regulatory enforcement is void for vagueness if it (1) does not provide a person of

ordinary intelligence fair notice of what is prohibited or (2) if it risks arbitrary application.

*Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *FCC v. Fox Television Stations, Inc.*,

567 U.S. 239, 253 (2012); *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 734 (D.C. Cir. 2016).

Open-ended regulatory and policy terminology that allows for "wholly subjective judgments

without statutory definitions, narrowing context, or settled legal meanings" violate due process.

*United States v. Williams*, 553 U.S. 285, 306 (2008); *Coates v. City of Cincinnati*, 402 U.S. 611,

611–14 (1971) (holding a regulation against "annoying" conduct unconstitutionally vague);

*Smith v. Goguen*, 415 U.S. 566, 573–77 (1974) (holding a prohibition on treating the American

flag "contemptuously" unconstitutionally vague).

NSF's termination notices claim that grants "no longer effectuate the program goals or

agency priorities," which references the termination provision in 2 C.F.R. § 200.340(a)(4).[40]

Defendants' application of 2 C.F.R. § 200.340 in the Mass Termination Action is

unconstitutionally vague and arbitrary. NSF failed to explain how Plaintiffs' projects fail to

---

[38] *Id.*

[39] *Id.* Then, Officials not "involved with the original decision" will be assigned to "review and consider all relevant information available" and complete a written report within 30 days to support a final agency decision.

[40] An earlier version of this termination provision was in 2 C.F.R. § 200.340(a)(2) (2020).

effectuate the agency's priorities or, largely, what those priorities are. In any event, if the government's undefined change in political priorities, with no notice, allows abrupt termination of billions of dollars in grants, then there would no longer be any stability associated with federal grant funding, and the United States would be deprived the benefit of long-term research that requires multiyear funding. NSF's open-ended interpretation of 2 C.F.R. § 200.340 would fail to provide prospective and actual grantees with any notice of the conditions upon which their grants could be terminated. It is thus so capacious that it is void for vagueness.

In *National Endowment for the Arts v. Finley*, 524 U.S. 569, 588–89 (1998), the Supreme Court recognized that vague standards promote arbitrary and discriminatory enforcement. While the Court noted that the constitutional concerns with the agency's vague grant selection criteria in that First Amendment case would be more severe if it involved a criminal statute or regulatory scheme rather than "in the context of grants," *id*. at 588, the Court did not foreclose claims of unconstitutional vagueness for already-awarded grants, nor did it reject a Due Process claim. The regulation as applied in the Mass Termination Action is so vague as to deprive Plaintiffs of due process. NSF has provided no "definitions, narrowing context, or settled legal meanings" regarding what the words "effectuate," "goals," and "priorities" mean. *Accord Williams*, 553 U.S. at 306 (lack of "definitions, narrowing context, or settled legal meanings" rendered statutes unconstitutionally vague). Nor were they defined in grant award notices. This is unlawfully vague because nothing lets Plaintiffs "know what is required of them so they may act accordingly." *Fox*, 567 U.S. at 253. Their vagueness allows for what has happened to Plaintiffs: "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 109.

Regulations fail to provide fair notice if they "delegate[] basic policy matters to [government officials] for resolution on an ad hoc and subjective basis," *id*. at 108–09, or impose

"a standard so indefinite that [officials are] free to react to nothing more than their own preferences," *Goguen*, 415 U.S. at 578. Termination of lawfully issued grants on which Plaintiffs have relied, based on unannounced priorities, fails this test.

3) **NSF violated the separation of powers, the Spending Clause, and the Appropriations Clause.**

NSF's refusal to spend appropriations because of policy disagreements with Congress violates constitutional provisions preserving the separation of powers by giving Congress—not the Executive—the "exclusive power" of the purse. *Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)); *see* The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)) (Congress' exclusive power of the purse is "a bulwark of the Constitution's separation of powers among the three branches of the National Government.").

As noted, under the Change in Priorities Decision and Mass Termination, NSF is not spending about $1 billion that Congress appropriated.[41] That includes 66% of statutorily mandated Louis Stokes Alliances for Minority Participation awards and 46% of Eddie Bernice Johnson INCLUDES Initiative awards. Delaney Decl. ¶ 25. *See also* Mack Decl. ¶¶ 19, 26, 33 (discussing termination of all of Plaintiff AAC&U's grants under the HBCU-UP program, which is mandated by law). As discussed further infra, NSF is also failing to award new grants as Congress has directed it to do with its current appropriation. Grants from the directorate for STEM education have declined by 80%, physics grants have fallen by 85%, and grants from the graduate education division have fallen by 100%.[42] Overall, as of May 2025, NSF has funded less than half the amount of grants on an annual basis compared to its ten-year average at that

---

[41] Bhatia, *Trump Has Cut Science Funding to Its Lowest Level in Decades* [https://perma.cc/LNX3-3K7B].
[42] *Id*.

point in the funding cycle.[43] NSF has provided no indication it is lawfully redirecting this spending; to the contrary, staff have been told to freeze billions of dollars in spending of already-appropriated research and education funds.[44]

But the Executive Branch and its agencies have no power to refuse to spend money Congress has appropriated. The Constitution vested the power of the purse in Congress through the Spending Clause—first among Congress' enumerated power in Article I, Section 8—and the Appropriations Clause, which forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. Underscoring its constitutional authority, Congress specifically barred the Executive Branch from interfering in appropriations and spending. The Impoundment Control Act commands that appropriated funds "shall be made available for obligation" absent congressional recission. 2 U.S.C. § 683(b); *see generally* Pub. L. No. 93-344, 88 Stat. 297, 334 (1974) (codified as amended at 2 U.S.C. §§ 682 *et seq.*). And Congress amended the Impoundment Control Act to make clear that an agency cannot defer appropriated spending except in limited circumstances not present here, and only when following statutory procedures to propose and justify the deferral. 2 U.S.C. § 684.

There is no exception present to these rules, even if NSF was (and is) acting pursuant to Presidential direction.[45] "Absent congressional authorization, the Administration may not

---

[43] *Id.*

[44] Waldman & Hair, *White House looks to freeze more agency funds — and expand executive power* [https://perma.cc/EPC5-R6JL].

[45] Where the Executive Branch wants to "spend less than the full amount appropriated by Congress for a particular project or program . . . the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.)

redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of San Francisco*, 897 F.3d at 1235.

NSF's refusal to disburse funds Congress appropriated, on already approved awards (as well as new ones), offends these bedrock principles. *Train v. City of New York*, 420 U.S. 35, 42 (1975) (statute providing that sums "authorized to be appropriated . . . shall be allotted" required the expenditure of the entire amount, leaving the Executive no discretion to reduce the amount of funding.); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838) (compelling Executive Branch official to pay a congressionally mandated award he had attempted to withhold). *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309 (1969) (William Rehnquist writing that "the suggestion that the President has a constitutional power to decline to spend appropriated funds … is supported by neither reason nor precedent."). As another court recently explained, "[t]he Executive Branch has a duty to align federal spending and action with the will of the people as expressed through congressional appropriations, not through 'Presidential priorities.'" *New York v. Trump*, No. 1:25-cv-00039, 2025 WL 357368, at *2 (D.R.I. Jan. 31, 2025). Thus here, as in yet another recent case, the Executive Branch seeks to "unconstitutionally intrude upon the Congressional prerogative to control the public fisc" by declining spend appropriated grant funds rather than "ask[ing] Congress to rescind" them. *PFLAG, Inc. v. Trump*, No. 8:25-cv-00337, 2025 WL 510050, at *17 (D. Md. Feb. 14, 2025).

It is of no moment that Congress allocated the funds at issue here to be disbursed through an award process rather than earmarking them to specific researchers. Congress gave NSF discretion (within the bounds of many statutory commands to award grants like Plaintiffs', as

discussed *supra*) in how to allocate the funds. It did not give NSF the option of rescinding funds itself or revoking properly awarded research grants without reasoned explanation or process.

An agency cannot, as it did here, "unilaterally amend[] or cancel[] federal appropriations." *PFLAG,* 2025 WL 510050, at *21. That violation of core constitutional principles warrants preliminary relief. *See* U.S. Const., art. II, § 3; *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *see also In re Aiken Cnty.*, 725 F.3d at 261 n.1.

**C.    This Court has jurisdiction over Plaintiffs' claims.**

Plaintiffs' constitutional, equitable, and APA claims are within this Court's jurisdiction. Nonetheless, in other cases challenging this Administration's funding terminations, the government's primary defense has been that those cases can be brought only as breach-of-contract claims in the Court of Federal Claims. That argument would be unsuccessful.

Starting with Plaintiffs' constitutional and equitable claims, it is well established that Plaintiffs may obtain an order in district court to enjoin unconstitutional and ultra vires conduct. 28 U.S.C. § 1331 (conferring "original jurisdiction of all civil actions arising under the Constitution"); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) (recognizing federal courts' power to enjoin federal officials from violations of federal law); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). As the government has conceded in a recent case, there is no question that Plaintiffs' constitutional claims belong in district court and not the court of Federal Claims. *Aids Vaccine Advoc. Coal. v. Dep't of State*, No. 1:25-cv-00400, 2025 WL 752378, at *7 (D.D.C. Mar. 10, 2025).

This Court also may hear Plaintiffs' APA challenges. The Court has jurisdiction under 28 U.S.C. § 1331, and the APA authorizes suit against the federal government notwithstanding sovereign immunity when (1) the claim seeks "relief other than money damages," and (2) no

other statute "expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Both requirements are met here.

### 1)    Plaintiffs do not seek money damages.

The APA's waiver of sovereign immunity is available because Plaintiffs seek relief other than money damages. *Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (interpreting "money damages" in 5 U.S.C. § 702 as a "sum of money used as compensatory relief"). Plaintiffs do not seek a judgment for any sum of money; nor do Plaintiffs seek an order mandating that any payment be made. Compl. ¶ 16 & pp. 57–58. Instead, Plaintiffs seek an order that declares unlawful the Change in Priorities Decision and Mass Termination Action and vacates those actions. Setting those actions aside would have the effect of restoring the terminated grants, for the government to administer in the ordinary course, which would ultimately require further disbursements of grant funding absent individualized, lawful termination decisions. But "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). Rather, "money damages" are amounts "given to the plaintiff to substitute for a suffered loss," such as "injury to [the plaintiff's] person, property, or reputation." *Id.* at 893, 895. Money damages "could be far greater than the amount withheld pursuant to the agency policy." *Aids Vaccine*, 2025 WL 752378, at *8.

Any money that NSF would disburse because of restored grants would not be compensatory money damages. Instead, any payment would follow from the government carrying out its remaining obligations under the original terms of the grants. Plaintiffs are not seeking past-due sums "designed to compensate for completed labors." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020). NSF stated in its termination notices that NSF will pay "allowable costs incurred prior to the termination date," so past-due sums are not at

issue in this case. *E.g.*, Delaney Decl. ¶ 23; Mack Decl. Ex. C, F. What Plaintiffs seek instead is an order that would "give [Plaintiffs] the very thing to which [they were] entitled," *Bowen*, 487 U.S. at 895, by restoring the remainder of the funding that NSF previously awarded.

Any money disbursed by NSF would not be unrestricted money damages but instead would be accompanied by all the conditions attached to the grant funding and could be used only for the purposes for which they were awarded. If Plaintiffs were to obtain money damages from a contract claim in the Court of Federal Claims, then that payment would be a "free and clear transfer of money," to be used for any purpose. *Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313, 1319 (Fed. Cir. 2017). Such payment would be from the Judgment Fund, which is a permanent appropriation for payment of court judgments. 31 U.S.C. § 1304(a)(3)(A) (citing 28 U.S.C. § 2517); *112 Genesee St., LLC v. United States*, 172 Fed. Cl. 426, 448 (2024). In contrast, what Plaintiffs seek is equitable relief that would lead to the reinstatement of grants subject to the same restrictions to which grantees were previously bound. Restoring the grants would restore funding "out of a specific res"—the money that Congress appropriated to NSF to award grant funding. *City of Houston, Tex. v. HUD*, 24 F.3d 1421, 1428 (D.C. Cir. 1994). And it would restore the relationship between NSF and the grantees, which is more appropriate than a "simple money judgment" when funds designated for specific purposes are improperly withheld. *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 201 (Fed. Cir. 1997).

In addition, Plaintiffs seek prospective relief. Setting aside the Change in Priorities Decision, 5 U.S.C. § 706(2), will ensure that NSF does not apply its unlawful policy when NSF makes future decisions about whether to award grants to Plaintiffs. It will also ensure that NSF

does not apply the Change in Priorities Decision to terminate more of Plaintiffs' previously awarded grants, since NSF has stated that there may be more terminations to come.[46]

### 2)    The Tucker Act does not forbid the relief sought.

The government is likely to argue that the APA waiver of sovereign immunity is unavailable because the Tucker Act "expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act vests the Court of Federal Claims with jurisdiction over claims against the United States brought "upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The D.C. Circuit has held that the Tucker Act provides exclusive jurisdiction over contract claims and thus impliedly forbids district courts from considering such claims. *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992); *see also Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017).[47] But the Tucker Act does not provide jurisdiction over Plaintiffs' claims, and a federal district court cannot "be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006).

---

[46] *Statement of NSF Priorities* [https://perma.cc/Z68M-CMKK] ("[Q:] Did NSF terminate every award that no longer effectuates priorities, or are more still being identified? [A:] NSF continues to examine awards to ensure they align to agency priorities.").

[47] This line of cases conflicts with statements by the Supreme Court recognizing that the Tucker Act contains no language about exclusivity. The Court of Federal Claims' jurisdiction is "'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims." *Bowen*, 487 U.S. at 910 n.48; *Maine Cmty.*, 590 U.S. at 323 ("The Tucker Act yields . . . when the Administrative Procedure Act provides an avenue for relief."). The D.C. Circuit has thus recognized the "strong case" that "the Tucker Act should not be read to 'impliedly forbid' under the APA the bringing in district court of contract actions for specific relief." *Transohio*, 967 F.3d at 612. The D.C. Circuit has also stated that "[i]f a separate waiver of sovereign immunity and grant of jurisdiction exist, district courts may hear cases over which, under the Tucker Act alone, the Court of Federal Claims would have exclusive jurisdiction." *Auction Co. of Am. v. FDIC*, 132 F.3d 746, 753 n.4 (D.C. Cir. 1997). Plaintiffs reserve the right to seek reconsideration of circuit precedent in an appropriate forum.

As a threshold matter, the grants at issue are not contracts within the meaning of the Tucker Act. *Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126, 132–34 (D.D.C. 2023). For Tucker Act jurisdiction, a contract must provide consideration that confers a "tangible" and "direct" benefit on the government, rather than one that is "generalized or incidental." *Id.* at 132; *St. Bernard Par. v. United States*, 134 Fed. Cl. 730, 735 (2017). NSF grants do not provide such consideration because the purpose of a grant is "to carry out a public purpose," not to "acquir[e] . . . property or services or the direct benefit or use of the United States Government." 31 U.S.C. § 6304(1).

Even if NSF grants were contracts for Tucker Act purposes, Plaintiffs' claims are not contract claims. Under the D.C. Circuit's test in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), a claim belongs in the Court of Federal Claims when it is "at its essence a contract claim," which "depends both on [1] the source of the rights upon which the plaintiff bases its claims, and upon [2] the type of relief sought (or appropriate)." *Id.* at 968. The "mere existence of . . . contract-related issues" does not make a claim a contract claim. *Id.* at 969; *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) ("explicitly reject[ing] the broad notion that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act" (cleaned up)).

As to the first prong of the *Megapulse* test, "when a case turns entirely on the terms of a contract, then only the Court of Federal Claims may entertain the suit." *Cemex Inc. v. Dep't of the Interior*, 560 F. Supp. 3d 268, 276 (D.D.C. 2021) (cleaned up). "But when claims stem from something more than just a contract, say the Constitution or the APA, then the litigant may bring the claims in federal district court even when the claims depend on the existence and terms of a contract with the government." *Id.* (cleaned up).

The source of rights underlying Plaintiffs' claims are not contractual. Instead, the claims are based on the Constitution, the APA, and other statutes. Plaintiffs' challenge to the Change in Priorities Decision does not raise contract issues at all. Rather, Plaintiffs challenge an agency's change in policy through a quintessential APA claim. Plaintiffs' challenges to the Mass Termination Action also do not turn on the terms and conditions of grants. The requirement that NSF engage in reasoned decisionmaking is an APA requirement, not a term or condition of a grant agreement, and the contrary-to-law claim is based on statutory provisions that govern NSF and the Constitution. As Judge Pillard explained in a dissent later endorsed by the en banc D.C. Circuit: "What matters is what the court must examine to resolve the case: If a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual." *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting), *on reconsideration en banc*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) (finding no likelihood of success on government's Tucker Act argument for "substantially for the reasons explained by Judge Pillard").

Indeed, many of Plaintiffs' members could not even bring contract claims. Plaintiffs and their members are harmed by terminations of various grants for which they themselves are not the grantees. Some Plaintiffs or their members are third parties harmed by NSF's unlawful actions, such as Principal Investigators identified in the grant as carrying out the project, but they are not themselves privy to any contract with NSF. *E.g.*, Quan Decl. ¶¶ 7, 19 & Exs. A, C; Adams Decl. ¶ 7; Cunningham Decl. ¶¶ 22–26; Núñez Decl. ¶ 9. No relief is available to them in the Court of Federal Claims, and the Tucker Act cannot be read to deprive them of the redress ordinarily available to them through an APA claim. *Tootle*, 446 F.3d at 176; *Katz v. Cisneros*, 16

F.3d 1204, 1210 (Fed. Cir. 1994) (privity required for Tucker Act claim); *U.S. Enrichment Corp. v. United States*, 117 Fed. Cl. 548, 553 (2014) ("Subcontractors and other third parties are generally not permitted to raise [contract] claims directly against the government.").

As to the second prong of the *Megapulse* test, the equitable relief sought by Plaintiffs confirms that Plaintiffs' claims are not essentially contract claims. *Supra* Argument I.C.1. "The crux of this inquiry [is] . . . whether the plaintiff effectively seeks to attain monetary damages in the suit. *Crowley*, 38 F.4th at 1107. Plaintiffs do not seek the ordinary contractual remedy of money damages. Instead, Plaintiffs seek equitable relief that is not available in the Court of Federal Claims under the Tucker Act. *Maine Cmty.*, 590 U.S. at 327.

### 3)    The emergency stay order in *California v. Department of Education* does not compel a different result.

The Supreme Court's short emergency order in *Department of Education v. California*, 145 S. Ct. 966 (2025), does not compel a different result. In that case, the Court held in a preliminary posture that the district court "likely" lacked jurisdiction under the APA's waiver of sovereign immunity to enter an order "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Id.* at 968.

The emergency stay order has limited precedential value, and it does not purport to overrule *Bowen*. *See California*, 145 S. Ct. at 968. This Court remains bound by *Bowen*. In any case, the order that Plaintiffs seek is unlike the order in *California* because it would not require paying past-due sums. Plaintiffs' claims are also different because they do not seek "to enforce a contractual obligation to pay money." *Id.* (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). And it is not the case, as in *California*, that "the terms and conditions of each individual grant award are at issue." *California v. Dep't of Educ.*, 132 F.4th 92, 96–97

(1st Cir. 2025). Further, unlike in *California*, there are constitutional claims here. *See Am. Bar Ass'n v. DOJ*, No. 1:25-cv-01263, 2025 WL 1388891, at *6 (D.D.C. May 14, 2025).

Post-*California* case law confirms that constitutional and statutory challenges to agency actions still belong in federal district court, and not the Court of Federal Claims.[48] In sum, jurisdiction is proper in this Court and not in the Court of Federal Claims.

## II.    Plaintiffs are likely to suffer irreparable harm absent preliminary relief.

Paintiffs and their members are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20 (2008). Without reinstatement of terminated grant funding, many Plaintiffs and their members will be unable to continue their projects. Levine Decl. ¶¶ 16, 18; Mack Decl. ¶ 38; Williams Decl. ¶ 36; Franklin Decl. ¶ 16; Quan Decl. ¶ 17; Litzler Decl. ¶ 26; Núñez Decl. ¶ 19; Bang Decl. ¶ 18; Thompson Decl. ¶¶ 6-12. Many have already paused their projects. Levine Decl. ¶ 16, 18; Mack Decl. ¶ 38; Franklin Decl. ¶ 16; Quan Decl. ¶ 17; Williams Decl. ¶ 36; Litzler Decl. ¶ 26. And although many are trying to secure replacement funding, most do not expect to be able to raise enough to allow their projects to continue without drastic cuts in their project's scope, if at all. Mack Decl. ¶ 38; Cunningham Decl. ¶ 28; Franklin Decl. ¶ 16; Quan Decl. ¶ 17; Williams Decl. ¶ 39; Litzler Decl. ¶ 26. The

---

[48] *See Maryland v. Corp. for Nat'l & Cmty. Serv.*, No. CV DLB-25-1363, 2025 WL 1585051, at *22–28 (D. Md. June 5, 2025); *Cmty. Legal Servs. in E. Palo Alto v. HHS*, No. 25-2808, 2025 WL 1393876, at *3 (9th Cir. May 14, 2025); *S. Educ. Found. v. Dep't of Educ.*, No. 1:25-cv-01079, 2025 WL 1453047, at *8 (D.D.C. May 21, 2025); *Ass'n of Am. Univs. v. Dep't of Energy*, No. 1:25-cv-10912, 2025 WL 1414135, at *7 (D. Mass. May 15, 2025); *Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1426226, at *6–9 (D.R.I. May 16, 2025); *Widakuswara v. Lake*, No. 1:25-cv-01015, 2025 WL 1166400, at *9–10 (D.D.C. Apr. 22, 2025); *Climate United Fund v. Citibank, N.A.*, No. 1:25-cv-00698, 2025 WL 1131412, at *9–12 (D.D.C. Apr. 16, 2025); *Woonasquatucket River Watershed Council v. USDA*, No. 1:25-cv-00097, 2025 WL 1116157, at *12–15 (D.R.I. Apr. 15, 2025); *Chi. Women in Trades v. Trump*, No. 1:25-cv-02005, 2025 WL 1114466, at *8–10 (N.D. Ill. Apr. 14, 2025); *New York v. Trump*, No. 1:25-cv-00039, 2025 WL 1098966, at *1–3 (D.R.I. Apr. 14, 2025); *Maine v. USDA*, No. 1:25-cv-00131, 2025 WL 1088946, at *14–15 (D. Me. Apr. 11, 2025); *Am. Bar. Ass'n*, 2025 WL 1388891, at *5.

grant terminations will also result in lost salaries, as well as the termination of project staff,

indeed, some have already been laid off as a result. Mack. Decl. ¶ 39; Cunningham Decl. ¶ 30;

Quan Decl. ¶ 17(c); Williams Decl. ¶ 38; Litzler Decl. ¶ 27; Thompson Decl. ¶¶ 6-12. This loss

of funding will make it more difficult for Plaintiffs and members to accomplish their missions.

Mack Decl. ¶ 37; Cunningham Decl. ¶ 29; Williams Decl. ¶¶ 37, 38, 43; Levine Decl. ¶ 17-18.

And it threatens the very existence of at least one Plaintiff, WEPAN, for which NSF funding is

80% of its budget. Williams Decl. ¶ 8, 37. Moreover, the loss of funding poses a risk to the

career progression of many Plaintiffs' members, as NSF grants not only fund their research but

are critical to securing faculty positions by demonstrating the scientific rigor and impact of their

work. Cunningham Decl. ¶ 32(d); Levine Decl. ¶ 16; Williams Decl. ¶ 40; Thompson Decl. ¶12.

These harms are irreparable. *See S. Educ. Found. v. U.S. Dep't of Educ.*, No. 1:25-cv-

01079, 2025 WL 1453047, at *15 (D.D.C. May 21, 2025) (irreparable harm where agency's

termination of grant threatened existence of grant program and livelihoods of individuals

working on it); *Climate United Fund*, 2025 WL 1131412, at *17 (irreparable harm where lack of

grant funds threatened "Plaintiffs' existence and their business operations, including the

financing for their projects"); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir.

2016) (Plaintiffs suffer "injury for purposes of ... irreparable harm" where the challenged action

"unquestionably make[s] it more difficult for [plaintiffs] to accomplish their primary mission");

*Woonasquatucket*, 2025 WL 1116157, at *22 (irreparable harm where grant freeze "resulted in a

delay in the progress" on project because grantee could "never get this time back"); *Am. Ass'n of

Colls.*, 2025 WL 833917, at *23 (agency action affecting existence of programs and livelihoods

of individuals within them constituted irreparable harm); *New York v. Trump*, 769 F. Supp. 3d

119, 143 (D.R.I. Mar. 6, 2025) (irreparable harm where grantees may be "forced to stop ...

research projects"); *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 322 (D. Mass. 2025) ("loss of direct research" was irreparable harm); *Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025 WL 368852, at *13 (D.D.C. Feb. 3, 2025) (irreparable harm where Plaintiffs would be forced to shutter funded programs); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (irreparable harm where plaintiffs showed "ongoing harms to their organizational missions"). Plaintiffs and their members will suffer these irreparable harms and, in addition, absent preliminary injunctive relief the funds to which they are entitled may become unrecoverable if they expire or are reallocated. *See Climate United Fund*, 2025 WL 1131412, at *17 *cf. id*. ("Any transfer, re-allocation, or re-obligation of these funds would be an irreparable loss—one that threatens the very existence of Plaintiffs' businesses.").

Moreover, Plaintiffs identify abundant and serious harm from Defendants' constitutional violations that is sufficient on its own to warrant immediate relief. *See Karem v. Trump,* 960 F.3d 656, 667 (D.C. Cir. 2020) ("'a prospective violation of a constitutional right constitutes irreparable injury'").

Finally, Plaintiffs' monetary harm here, where damages are unavailable and the agency may obligate the funds elsewhere, is irreparable. *See District of Columbia v. USDA*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020) (recognizing that although economic harm does not generally constitute irreparable injury, economic loss caused by federal agency action is exception because APA waiver of sovereign immunity does not extend to damages claims); *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 59 (D.D.C. 2020) (same).

## III.    **The balance of equities and public interest weigh in Plaintiffs' favor.**

The third and fourth prongs—balance of equities and public interest—merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "It is well established that the Government cannot suffer harm from an injunction that merely ends an

unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (cleaned up). "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. That is especially true where, as here, constitutional rights are at stake. The Constitution "is the ultimate expression of the public interest," so "government actions in contravention of the Constitution are always contrary to the public interest." *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (cleaned up); *see also Archdiocese of Washington v. WMATA*, 897 F.3d 314, 335 (D.C. Cir. 2018) ("The public interest favors the protection of constitutional rights."). Plus, "[t]he public interest is served . . . by ensuring that government agencies conform to the requirements of the APA." *Gulf Coast Mar. Supply, Inc. v. United States*, 218 F. Supp. 3d 92, 101 (D.D.C. 2016). Thus, for the same reasons that Plaintiffs are likely to succeed on the merits, equity and the public interest require relief.

Preliminary relief is also in the public interest because NSF funding advances scientific research and education of future scientists. As Congress found, federally funded science is "essential to our national security, and to our health, economic welfare, and general well-being." 42 U.S.C. § 1862a(a)(1). Ensuring our future requires developing STEM talent, and "historically, underrepresented populations are the largest untapped STEM talent pools in the United States." *Id.* § 1862s–5(b)(3). Public investment in science yields significant long-term economic benefits[49] and avoids a brain drain of American scientists seeking careers abroad.[50] Congress has

---

[49] John Drake, *Trump's NIH And NSF Cuts Estimated To Cost The U.S. Economy $10 Billion Annually*, Forbes (May 19, 2025), https://www.forbes.com/sites/johndrake/2025/05/19/trumps-nih-and-nsf-cuts-could-cost-the-us-economy-10-billion-annually [https://perma.cc/H29E-GCQV].

[50] John Drake, *The NSF Is Being Dismantled—With Broad Implications For The American Economy*, Forbes (May 9, 2025), https://www.forbes.com/sites/johndrake/2025/05/09/the-national-science-foundation-is-being-dismantled-what-the-economy-needs-is-more-investment/ [https://perma.cc/V2AE-E88E].

already appropriated money to support these policies, and NSF is not harmed by spending money for purposes that Congress has appropriated. *Am. Fed'n of Gov't Emps. v. Trump*, No. 25-3293, 2025 WL 1541714, at *2 (9th Cir. May 30, 2025).

## IV.    <u>The Court should not require a bond.</u>

The Court has "broad discretion . . . to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999); Fed. R. Civ. P. 65(c). The Court may "require no bond at all." *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (cleaned up). A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases).

In enjoining unlawful funding terminations, courts in this district and across the country have declined to require plaintiffs to post bond. *See, e.g.*, *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19; *Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1017775, at *6 (D.R.I. Apr. 5, 2025); *Cmty. Legal Servs. in E. Palo Alto v. HHS*, No. 3:25-cv-02847, 2025 WL 973318, at *4 (N.D. Cal. Apr. 1, 2025); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-cv-00333, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025). "[W]here the Government is alleged to have unlawfully withheld [large sums] of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion—to hold Plaintiffs hostage for the resulting harm." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19; *see also Woonasquatucket*, 2025 WL 1116157, at *24. Plaintiffs thus request that the Court not require a bond, or alternatively, require a nominal bond.

## CONCLUSION

The Court should grant the motion for a preliminary injunction and provide the preliminary relief described in the attached proposed order.

June 23, 2025

Respectfully submitted,

_____/s/ Steven Y. Bressler_____
Steven Y. Bressler (D.C. Bar No. 482492)
Tsuki Hoshijima (*pro hac vice* forthcoming)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
sbressler@democracyforward.org
thoshijima@democracyforward.org

Nathan L. Walker (*pro hac vice* forthcoming)
Celine Purcell (*pro hac vice* forthcoming)
Emily Kirk (*pro hac vice* forthcoming)
Heather C. Bates (*pro hac vice* forthcoming)
THE NORTON LAW FIRM PC
300 Frank H. Ogawa Plaza, Suite 450
Oakland, CA 94612
Telephone: (510) 906-4900
nwalker@nortonlaw.com
cpurcell@nortonlaw.com
ekirk@nortonlaw.com
hbates@nortonlaw.com

*Attorneys for Plaintiffs*