UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN ASSOCIATION OF PHYSICS TEACHERS, INC., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-1923 (JMC) |
| NATIONAL SCIENCE FOUNDATION, et al., | |
| Defendants. | |

**DEFENDANTS' COMBINED MOTION TO DISMISS,
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION, AND
<u>MEMORANDUM IN SUPPORT THEREOF</u>**

# TABLE OF CONTENTS

Table of Contents ........................................................................................................ i

Table of Authorities ................................................................................................... ii

Background ................................................................................................................2

    I.     The National Science Foundation.........................................................2

    II.    Factual Allegations ...........................................................................4

Legal Standards .........................................................................................................7

    I.     Motion to Dismiss for Lack of Subject-Matter Jurisdiction....................7

    II.    Motion to Dismiss for Failure to State a Claim....................................8

    III.   Preliminary Injunction. ......................................................................8

Argument...................................................................................................................8

    I.     Plaintiffs Lack Standing. ....................................................................8

    II.    Plaintiffs' Claims Fail. .....................................................................15

    III.   Plaintiffs Have Not Shown That They Will Suffer Irreparable Harm. ................38

    IV.   Plaintiffs Have Not Shown That the Balance of the Equities Favors Injunctive Relief. ................................................................................................40

    V.    Any Injunctive Relief Must Be Narrowly Tailored to Plaintiffs. .........................41

    VI.   Any Preliminary Injunction Should Be Stayed. ..................................41

    VII.  The Court Should Order that Plaintiffs Post a Bond as a Condition of Preliminary Relief. ................................................................................................42

Conclusion ..............................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
  840 F. Supp. 2d 327 (D.D.C. 2012) .......................................................................39

*Am. Meat Inst. v. Dep't of Agric.*,
  968 F. Supp. 2d 38 (D.D.C. 2013) .........................................................................40

*Am. Nat'l Ins. Co. v. FDIC*,
  642 F.3d 1137 (D.C. Cir. 2011) ...............................................................................7

*Amica Ctr. for Imm. Rts. v. Dep't of Just.*,
  Civ. A. No. 25-0298 (RDM), 2025 WL 1852762 (D.D.C. Jun. 6, 2025) .........................32, 33

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .....................................................................................4, 8, 26

*\* Assoc. for Ed. Finance & Policy, Inc., v. McMahon*,
  Civ. A. No. 25-0999 (TNM), 2025 WL 1568301 (D.D.C. Jun. 3, 2025)...........................17, 18

*Aviles-Wynkoop v. Neal*,
  978 F. Supp. 2d 15 (D.D.C. 2013) .........................................................................38

*Bagherian v. Pompeo*,
  442 F. Supp. 3d 87 (D.D.C. 2020) .........................................................................29

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972) ...........................................................................................35

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ......................................................................... 19, 21, 22, 23

*California v. Texas*,
  141 S. Ct. 2104 (2021) .......................................................................................13

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006).........................................................................8, 38

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984)...........................................................................................23

*Clark v. Feder Semo & Bard, P.C.*,
  527 F. Supp. 2d 112 (D.D.C. 2007) .......................................................................20

*Clevinger v. Advoc. Holdings, Inc.*,
  134 F.4th 1230 (D.C. Cir. 2024) ................................................................38

*Cobell v. Kempthorne*,
  455 F.3d 301 (2006) ...............................................................................16, 19

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ..................................................................................14, 15

*Cornish v. Dudas*,
  540 F. Supp. 2d 61 (D.D.C. 2008) .............................................................38

*Ctr. for Biological Diversity v. Trump*,
  453 F. Supp. 3d 11 (D.D.C. 2020) ........................................................33, 34

*Dalton v. Specter*,
  511 U.S. 462 (1994) ..............................................................................33, 34

*Dastagir v. Blinken*,
  557 F. Supp. 3d 160 (D.D.C. 2021) ...........................................................28

*Davis v. FEC*,
  554 U.S. 724 (2008) ..................................................................................9

* *Department of Education v. California*,
  145 S. Ct. 966 (2025) ......................................................................20, 23, 24

*Dep't of Homeland Sec. v. New York*,
  140 S. Ct. 599 (2020) ...............................................................................41

*Didban v. Pompeo*,
  435 F. Supp. 3d 168 (D.D.C. 2020) ...........................................................29

*East Texas Motor Freight System, Inc. v. Rodriguez*,
  431 U.S. 395 (1977) ..................................................................................14

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ..................................................................................36

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ..................................................................................9

*Forsyth Cnty. v. Army Corp. of Eng'rs*,
  633 F.3d 1032 (11th Cir. 2011) .................................................................24

*Ghadami v. Dep't of Homeland Sec.*,
  Civ. A. No. 19-0397 (ABJ), 2020 WL 1308376 (D.D.C. Mar. 19, 2020) ........................29, 31

*Gill v. Whitford*,
  585 U.S. 48 (2018) .............................................................................................41

*Gizzo v. Ben-Habib*,
  44 F. Supp. 3d 374 (S.D.N.Y. 2014) ..........................................................................35

*Goldberg v. Kelly*,
  397 U.S. 254 (1970) ............................................................................................35

*Gong v. Duke*,
  282 F. Supp. 3d 566 (E.D.N.Y. 2017).........................................................................31

* *Great-W. Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002) .....................................................................................passim

*Gulf Coast Mar. Supply, Inc. v. United States*,
  867 F.3d 123 (D.C. Cir. 2017)...................................................................................8

*Haase v. Sessions*,
  835 F.2d 902 (D.C. Cir. 1987)...................................................................................8

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) .......................................................................................11, 12

* *Heckler v. Chaney*,
  470 U.S. 821 (1985) ...................................................................................24, 25, 40

*Holbrook v. Tenn. Valley Auth.*,
  48 F.4th 282 (4th Cir. 2022) ...................................................................................25

*Hospitality Staffing Sols., LLC v. Reyes*,
  736 F. Supp. 2d 192 (D.D.C. 2010) .............................................................................8

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) .............................................................................................9

*In re Am. Rivers & Idaho Rivers United*,
  372 F.3d 413 (D.C. Cir. 2004)..................................................................................28

*In re Barr Labs.*,
  930 F.2d 72 (D.C. Cir. 1991)...............................................................................31, 32

*In re Core Commc'ns, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008) .................................................................27

*In re United Mine Workers of Am. Int'l Union*,
    190 F.3d 545 (D.C. Cir. 1999) .................................................................28

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) .................................................................18

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985) ...................................................................19

*Janay v. Blinken*,
    743 F. Supp. 3d 96 (D.D.C. 2024) ...........................................................16

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*,
    402 F.3d 1249 (D.C. Cir. 2005) .................................................................7

*Jibril v. Mayorkas*,
    101 F.4th 857 (D.C. Cir. 2024) ...............................................................19

*John Doe Co. v. CFPB*,
    849 F.3d 1129 (D.C. Cir. 2017) ...............................................................39

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) .................................................................36

*Kim v. FINRA*,
    698 F. Supp. 3d 147 (D.D.C. 2023) .........................................................40

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ...................................................................................7

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) .................................................................................37

*Liberty Fund v. Chao*,
    394 F. Supp. 2d 105 (D.D.C. 2005) ...................................................30, 31

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .................................................................................25

*Liu v. Blinken*,
    544 F. Supp. 3d 1 (D.D.C. 2021) .............................................................28

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................7

* *Lujan v. Nat'l Wildlife Fed'n.*,
    497 U.S. 871 (1990) ...................................................................................17, 18

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ......................................................................................41

*Mallinckrodt Chem. Works v. Missouri ex rel. Jones*,
    238 U.S. 41 (1915) ...................................................................................12, 14

*Mashpee Wampanoag Tribal Council v. Norton*,
    336 F.3d 1094 (D.C. Cir. 2003) ................................................................28, 30

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ......................................................................................12

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ..........................................................................37

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) .......................................................................25

*Milligan v. Pompeo*,
    502 F. Supp. 3d 302 (D.D.C. 2020) ................................................................28

*Mohammad v. Blinken*,
    548 F. Supp. 3d 159 (D.D.C. 2021) ................................................................28

* *Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1988) ...................................................................................36, 37

*Nat'l Urban League v. Trump*,
    Civ. A. No. 25-0471 (TJK), 2025 WL 1275613 (D.D.C. May 2, 2025) ............................34, 36

*Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*,
    435 F.3d 326 (D.C. Cir. 2006) .......................................................................41

*New Vision Photography Program, Inc. v. District of Columbia*,
    54 F. Supp. 3d 12 (D.D.C. 2014) ...................................................................35

*Nken v. Holder*,
    556 U.S. 418 (2009) .....................................................................................8, 40

\* *Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................................... 17, 18, 26

*People for Ethical Treatment of Animals v. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ........................................................................9

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ........................................................................................35

*Pol'y & Rsch., LLC v. Dep't of Health & Hum. Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) .................................................................25

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
    421 F.3d 1 (1st Cir. 2005) ..............................................................................35

\* *Richards v. Delta Air Lines, Inc.*,
    453 F.3d 525 (D.C. Cir. 2006) ..................................................................19, 20

*Sanchez-Mercedes v. Bureau of Prisons*,
    453 F. Supp. 3d 404 (D.D.C. 2020) .................................................................7

*Santos v. Collins*,
    Civ. A. No. 24-1759 (JDB), 2025 WL 1823471 (D.D.C. Feb. 26, 2025) ...............................38

*Sarlak v. Pompeo*,
    Civ. A. No. 20-0035 (BAH), 2020 WL 3082018 (D.D.C. June 10, 2020) ................. 29, 30, 31

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ........................................................................................36

*Shen v. Pompeo*,
    Civ. A. No. 20-1263 (ABJ), 2021 WL 1246025 (D.D.C. Mar. 24, 2021) ...............................28

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) .......................................................................10

*Skalka v. Kelly*,
    246 F. Supp. 3d 147 (D.D.C. 2017) .........................................................29, 32

*Spectrum Leasing Corp. v. United States*,
    764 F. 2d 891 (D.C. Cir. 1985) ......................................................................20

*Tate v. Pompeo*,
    513 F. Supp. 3d 132 (D.D.C. 2021) ........................................................ 28, 30, 32

\* *Telecomm'cns Rsch.& Action Ctr.  v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ......................................................................... 27, 28, 32

*Taylor v. Clark*,
   821 F. Supp. 2d 370 (D.D.C. 2011) ............................................................................ 7

*Theint Win Htet v. Trump*,
   Civ. A. No. 24-1446 (RC), 2025 WL 522033 (D.D.C. Feb. 18, 2025) ................... 16

*Town of Castle Rock v. Gonzalez*,
   545 U.S. 748 (2005) .................................................................................................. 35

\* *Trump v. CASA, Inc.*,
   606 U.S. ---, 2025 WL 1773631 (Jun. 27, 2025) ........................................... passim

*United States v. Texas*,
   599 U.S. 670 (2023) .................................................................................................... 8

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
   259 F.2d 921 (D.C. Cir. 1958) .................................................................................. 39

*Varol v. Radel*,
   420 F. Supp. 3d 1089 (S.D. Cal. 2019) ..................................................................... 31

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
   714 F.3d 186 (4th Cir. 2013) .................................................................................... 18

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .................................................................................................. 14

*Webster v. Doe*,
   486 U.S. 592 (1988) .................................................................................................. 24

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) ................................................................................................... 8, 39

*Wis. Gas Co. v. F.E.R.C.*,
   758 F.2d 669 (D.C. Cir. 1985) ............................................................................ 39, 40

*Xu v. Cissna*,
   434 F. Supp. 3d 43 (S.D.N.Y. 2020) ................................................................... 30, 31

*Yavari v. Pompeo*,
   Civ. A. No. 19-02524, 2019 WL 6720995 (C.D. Cal. Oct. 10, 2019) ..................... 30

**Statutes**

5 U.S.C. § 701(a)(1) ....................................................................................................24

5 U.S.C. § 702 ......................................................................................................19, 20

5 U.S.C. § 703 .............................................................................................................13

5 U.S.C. § 706 .....................................................................................................passim

20 U.S.C. § 954(d)(1) .................................................................................................36

28 U.S.C. § 2342 ........................................................................................................13

42 U.S.C. § 1870(c) ..............................................................................................24, 25

42 U.S.C. §§ 1862(a)(1) .........................................................................................2, 26

42 U.S.C. §§ 1862p-4 .................................................................................................26

**Rules**

Fed. R. Civ. P. 12(b)(1) ...........................................................................................7, 15

Fed. R. Civ. P. 12(b)(6) ...............................................................................................8

Fed. R. Civ. P. 23 ..................................................................................................14, 15

Fed. R. Civ. P. 65(c) ...................................................................................................42

**Regulations**

* 2 C.F.R. § 200.340 ..........................................................................................4, 34, 36

2 C.F.R. § 200.412 .......................................................................................................3

**Other Authorities**

National Science Foundation Act of 1950,
  Pub. L. No. 81-507, Pub. L. No. 81-507, 64 Stat. 149 (1950) ...................................2

Exec. Order 14,158: Establishing and Implementing the President's "Department of Government
  Efficiency,"
  90 Fed. Reg. 8441 (Jan. 20, 2025) ...........................................................................4

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,
  131 HARV. L. REV. 417 (2017) ...............................................................................12

John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 YALE J. ON REG. BULL. 37 (2020) ................................................................................12

Defendants the National Science Foundation and Brian Stone, Acting Director of the National Science Foundation (collectively, the "Foundation") respectfully move this Court to dismiss the Complaint ("Compl.," ECF No. 2-1).

Through this action, Plaintiffs, several associations and a labor union, challenge the termination of approximately 1,600 Foundation grants and ask this Court for an order to restore those grants. But Plaintiffs lack associational standing to obtain any relief for parties not before the Court. And to the extent Plaintiffs seek to assert various claims of their own under the Administrative Procedure Act ("APA") and the Constitution, those claims fail. Plaintiffs cannot obtain relief under the APA because Plaintiffs have not identified a final agency action subject to judicial review and Plaintiffs seek the impermissible remedy of money damages. More fundamentally, the APA is an inappropriate tool for Plaintiffs' broad programmatic attack on the Foundation. Plaintiffs' Fifth Amendment claims also fail because Plaintiffs have not identified a constitutionally protected property interest. And their other constitutional claims fail because those claims impermissibly recast Plaintiffs' legally deficient APA claims.

Even if the Court finds that Plaintiffs may succeed on a claim, the Court should deny Plaintiffs preliminary injunction motion. Pls.' Mot. (ECF No. 3). Plaintiffs' economic damages are insufficient to establish irreparable harm. And the equities weigh in favor of the Foundation. Finally, any injunction should be stayed pending appeal and should be accompanied by a reasonable bond.

In short, the Foundation respectfully requests that the Court dismiss the Complaint and deny the motion for a preliminary injunction as moot.

**BACKGROUND**

## I.    <u>The National Science Foundation</u>

The National Science Foundation Act of 1950 (the "Act"), Pub. L. No. 81-507, 64 Stat. 149, established the Foundation as an independent agency "[t]o promote the progress of science; to advance the national health, prosperity, and welfare; to secure the national defense; and for other purposes."  To that end, the Act gave the Foundation broad grant-making authority.  The Act "authorized and directed" the Foundation to "initiate and support basic scientific research" in a range of scientific and mathematical fields through "contracts or other arrangements (including grants, loans, and other forms of assistance)."  *Id.* § 3(a)(2).  The Act gave the Foundation latitude to fund any research the Foundation "deem[ed] necessary to carry out" its mission.  *Id.* § 11(c).  And the Act authorized the Foundation to use "its discretion" to use appropriations in whatever way would "best realize" four objectives: (1) having qualified persons perform the research; (2) "strengthening the research staff of organizations" in the United States; (3) "aiding institutions, agencies, or organizations which, if aided, will advance basic research"; and (4) "encouraging independent basic research by individuals."  *Id.* § 14(g).  The Act otherwise provided no limitations on how to make or fund grants.  The Act's original grant-making authorities continue, in effect, substantially unchanged today.  *See* 42 U.S.C. §§ 1862(a)(1), 1870(c), 1873(e).

In an average year, the Foundation awards approximately 12,000 grants.  Nat'l Sci. Found., *2022-2026 Strategic Plan* at 11, available at https://nsf-gov-resources.nsf.gov/pubs/2022/nsf22068/nsf22068.pdf?VersionId=QeimX_s5IrCTtRsHVInSet1iQjahFwNG (last visited Jul. 9, 2025).  In doing so, it provides funding to more than 2,000 academic and other private and public institutions, accounting for twenty-four percent of all federally funded research at academic institutions.  *Id.*  The Foundation's funding reaches roughly 350,000 researchers, entrepreneurs, students and teachers across all fifty states.  *Id.*  The Foundation is

"responsible to Congress and taxpayers for carrying out its mission in a manner that not only facilitates research but does so cost-effectively." Ex. 1, Declaration of Brian Stone ("Stone Decl."), *New York v. NSF*, Civ. A. No. 25-4452 (S.D.N.Y.) (ECF No. 54) ¶ 14 (attached hereto).

Foundation grant funds are generally disbursed in installments. A grantee draws down its grants on a periodic, as-needed basis, based on costs it incurred or expects to incur during the relevant period. *Id.* ¶ 10. These grants generally cover two types of expenses: direct costs and indirect costs. *See* 2 C.F.R. § 200.412. "Direct costs" are costs "identified specifically with" a particular research project or activity—*i.e.*, the specific research that the Foundation intends to support with the grant. *Id.* § 200.413(a). Direct costs include, for example, the "proportion of employee compensation" expended on the research, related "fringe benefits," and the costs of "supplies needed to achieve the award's objectives." *Id.* § 200.413(b). They may also include more general costs that are "directly related to a specific award," such as "extraordinary utility consumption," "integrated data systems," or certain "cost of materials." *Id.*

Foundation grants may also cover certain "indirect costs," also known as "F&A" costs. 2 C.F.R. § 200.414(a). These costs support "more than one" research project or activity and are "not readily assignable" to specific research "without effort disproportionate to the results achieved." *Id.* § 200.1. Indirect costs are "classified within two broad categories: 'Facilities' and 'Administration.'" *Id.* § 200.414(a). "Facilities" costs include "depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." *Id.* "Administration" costs, in turn, include "general administration and general expenses such as the director's office, accounting, personnel and all other types of expenditures not listed" elsewhere. *Id.* Indirect costs

generally are paid based on an "indirect cost rate." Stone Decl. ¶ 12. The higher the indirect cost

rate, the more the Foundation will reimburse. *Id.*

  Foundation "awards are subject to terms and conditions specified in the award notice." *Id*.

¶ 15. Both the pre- and post-October 1, 2024, terms and conditions "provide [the Foundation] the

authority to terminate awards that no longer effectuate program goals or are not in alignment with

agency priorities." *Id.* This is consistent with the applicable federal regulations the Foundation

invoked for the terminations plaintiffs here complain. *See* 2 C.F.R. § 200.340.

## II. <u>Factual Allegations</u>

  The following factual assertions, taken from Plaintiffs' complaint, are presumed to be true

for purposes of evaluating the complaint's sufficiency. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-

79 (2009). Should the case continue, Defendants will dispute certain factual allegations.

  Plaintiffs allege that on April 18, 2025, three members of the Department of Government

Efficiency ("DOGE")[1] arrived at the Foundation. Compl. (ECF No. 2-1) ¶ 7. On the same day,

Plaintiffs say, the Foundation "published a statement on its website announcing 'updates'" to

Foundation "priorities." *Id.* ¶ 54. Plaintiffs define those updates as the "Change in Priorities

Decision." *Id.* According to Plaintiffs, the Foundation "reaffirm[ed] existing practices" and "a

small part of [the Foundation's] statement acknowledged a change in policy." *Id.* ¶¶ 56, 57. That

change broadly stated that the Foundation's "broadening participation activities . . . must aim to

create opportunities for all Americans everywhere" and that efforts "should not preference some

---

[1] For ease of reference, the Foundation adopts Plaintiffs' naming convention in characterizing their allegations. The Foundation clarifies that "Department of Government Efficiency" is not an entity; it is an agenda, carried out by teams who are agency personnel with advice and consultation from the United States DOGE Service in the Executive Office of the President. Exec. Order 14,158: Establishing and Implementing the President's "Department of Government Efficiency," 90 Fed. Reg. 8441 (Jan. 20, 2025).

groups at the expense of others." *Id.* ¶ 57. A statement on the Foundation's website also announced that certain "Awards that are not aligned with program goals or agency priorities have been terminated, including but not limited to those on diversity, equity, and inclusion (DEI), environmental justice, and misinformation/disinformation." *Id.* ¶ 60 (citation modified). Over the following four weeks, the Foundation terminated approximately 1,600 grants. *Id.* ¶¶ 66-68. According to Plaintiffs, the "mass grant terminations were based on the same boilerplate, cursory, nonspecific rationale," with each notice stating that the Foundation "has undertaken a review of its award portfolio" and that "each award was carefully and individually reviewed, and the agency has determined that termination of certain awards is necessary because they are not in alignment with current [Foundation] priorities." *Id.* ¶ 69. Plaintiffs call these terminations the "Mass Termination Action." *Id.* ¶ 63.

Plaintiffs in this case are five associations and a union. Compl. (ECF No. 2-1) ¶¶ 18-23. They allege that each is the recipient or has a member who is the recipient of a Foundation grant that was terminated pursuant to the April 18, 2025, changed priorities. *Id.* As a result of the grant terminations, they say, grantees and third-party beneficiaries of grants are suffering a variety of economic injuries. *Id.* ¶¶ 75-137.

Plaintiff the American Association of Physics Teachers, Inc. ("AAPT") is "a professional association." *Id.* ¶ 18. AAPT alleges that it was the recipient of grants that the Foundation terminated. *Id.* AAPT also alleges that it "has members who work on projects funded by [the Foundation] grants that have been cancelled." *Id.* AAPT "sues on its own behalf and on behalf of its members." *Id.*

Plaintiff the American Association of Colleges and Universities ("AAC&U") "is a global membership organization dedicated to advancing the democratic purposes of higher education."

*Id.* ¶ 19.  AAC&U alleges that it "received four [Foundation] grants that have been terminated by the [Foundation]."  *Id.*  AAC&U also alleges that it "has members who work on projects funded by [Foundation] grants that have been cancelled by the [Foundation]."  *Id.*  "AAC&U sues on its own behalf."  *Id.*

Plaintiff the American Association of University Professors ("AAUP") "is a nonprofit membership association of faculty and other academic professionals."  *Id.* ¶ 20.  AAUP alleges that it has members "who work or worked on projects funded by [Foundation] grants that have been cancelled by the [Foundation]."  *Id.*  AAUP sues on its own behalf and on behalf of its members.  *Id.*

The American Educational Research Association ("AERA") "is a leading national research society."  *Id.* ¶ 21.  AERA alleges that its members "work on projects funded by [Foundation] grants that have been cancelled by the [Foundation]" or "who are named as principal investigators or co-principal investigators on pending [Foundation] grant applications that [the Foundation] has not acted upon."  *Id.*  "AERA sues on its own behalf and on behalf of its members."  *Id.*

The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") "is one of the largest and most diverse unions in North America, with members . . . in virtually every sector of the economy."  *Id.* ¶ 22.  UAW allegedly has "approximately 120,000 workers in higher education—graduate students, postdoctoral scientists, researchers, university staff, and faculty—at institutions across the country."  *Id.*  UAW alleges that "[t]housands of UAW members rely on [Foundation] grant funding for their jobs and training."  *Id.* ¶ 22.  "UAW sues on behalf of its members."  *Id.*

Women in Engineering ProActive Network ("WEPAN") "is a non-profit educational organization."  *Id.* ¶ 23.  WEPAN alleges that it "received [Foundation] grants that have been

terminated" and that it "also has pending applications for awards that [the Foundation] has not acted on." *Id*. WEPAN also alleges that it "has members who work on projects funded by [Foundation] grants that have been cancelled by the [Foundation]" or "who are named as principal investigators or co-principal investigators on pending [Foundation] grant applications that [the Foundation] has not acted upon." *Id*. "WEPAN sues on its own behalf and on behalf of its members." *Id*.

## LEGAL STANDARDS

### I.    Motion to Dismiss for Lack of Subject-Matter Jurisdiction.

A complaint must be dismissed where there is "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Established law requires the Court to "determine whether it has subject matter jurisdiction in the first instance." *Taylor v. Clark*, 821 F. Supp. 2d 370, 372 (D.D.C. 2011) (cleaned up). Federal courts are courts of limited jurisdiction, and the law "presume[s]" that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "To survive a Rule 12(b)(1) motion, a plaintiff must establish the Court's jurisdiction over his claims." *Sanchez-Mercedes v. Bureau of Prisons*, 453 F. Supp. 3d 404, 414 (D.D.C. 2020). "The Court must 'assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Id*. (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)). The court may consider materials outside the pleadings in determining whether it has jurisdiction. *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). "If the Court determines that it lacks jurisdiction as to any claim, it must dismiss that claim." *Sanchez-Mercedes*, 453 F. Supp. 3d at 414.

## II.    <u>Motion to Dismiss for Failure to State a Claim.</u>

A complaint must be dismissed if it fails to "state a claim upon which relief can be granted."
Fed. R. Civ. P. 12(b)(6).   "To survive a motion to dismiss, a complaint must contain sufficient
factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Iqbal*, 556
U.S. at 678 (citation modified).   The Court must "take as true all well-pled factual allegations
within [a plaintiff's] complaint" while also "disregard[ing] any legal conclusions, legal contentions
couched as factual allegations, and unsupported factual allegations within the complaint."   *Gulf
Coast Mar. Supply, Inc. v. United States*, 867 F.3d 123, 128 (D.C. Cir. 2017).

## III.    <u>Preliminary Injunction.</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right."   *Winter
v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).   "A plaintiff seeking a preliminary injunction
must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable
harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4]
that an injunction is in the public interest."   *Id.* at 20.   The last two factors "merge when the
Government is the opposing party."   *Nken v. Holder*, 556 U.S. 418, 435 (2009).   The moving party
bears the burden of persuasion and must make "a clear showing" that the requested relief is
warranted.   *Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D.D.C. 2010)
(quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

## ARGUMENT

## I.    <u>Plaintiffs Lack Standing.</u>

A motion to dismiss for lack of standing is properly considered under Rule 12(b)(1), as
"the defect of standing is a defect in subject matter jurisdiction."   *Haase v. Sessions*, 835 F.2d 902,
906 (D.C. Cir. 1987).   Standing is a "bedrock constitutional requirement."   *United States v. Texas*,
599 U.S. 670, 675 (2023).   It requires that a plaintiff "possess a personal stake" in the outcome,

which "helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). The standing doctrine thus "serves to protect the 'autonomy' of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *Id.* at 379–80. "By limiting who can sue, the standing requirement implements the Framers' concept of the proper— and properly limited—role of the courts in a democratic society." *Id.* at 380 (citation modified). Importantly, standing is "not dispensed in gross." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation modified). "Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (citation modified).

Plaintiffs here are five associations and a union. All but UAW sue on their own behalf. Compl. (ECF No. 2-1) ¶¶ 18-23. All but AAC&U sue on behalf of their members. *Id.* Membership-based associations like Plaintiffs here traditionally could establish standing in one of two ways: they could assert "associational standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (citation modified).

As an initial matter, AAUP, AERA, and UAW cannot establish standing to sue on their own behalf because they cannot establish an injury-in-fact. AAUP, AERA, and UAW have not alleged to be the recipient of a grant or that such grant was terminated. Compl. (ECF No. 2-1) ¶¶ 20, 21, 22. Thus, they may only rely on associational standing, which as discussed further below, fails. *Id.*

To show associational standing, an organization must demonstrate that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to

- 9 -

protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

Plaintiffs cannot establish the third element of associational standing because the relief they seek requires the participation of every grantee whose grant was terminated but not all grantees are parties to this lawsuit. Plaintiffs' ask the Court to order the Foundation to restore the terminated grants and to discontinue implementation of the changed policy. Compl. (ECF No. 2-1) at 57-58. Plaintiffs' proposed order is breathtaking: they ask this Court (i) to enjoin the Foundation from "Enforcing, implementing, or giving effect to the 'Change in Priorities Decision' issued in April 2025, and the 'Mass Termination Action' resulting in the termination of over 1,600 previously awarded grants, cooperative agreements, and other financial awards" and (ii) to order "Enforcing, implementing, or giving effect to the 'Change in Priorities Decision' issued in April 2025, and the 'Mass Termination Action' resulting in the termination of over 1,600 previously awarded grants, cooperative agreements, and other financial awards." Pls.' Proposed Order (ECF No. 3-2) at 1, 2 (citation modified).

The Court cannot issue that relief without the participation in this lawsuit of every grantee whose grant was terminated because "universal injunction . . . falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Trump v. CASA, Inc.*, 606 U.S. ---, 2025 WL 1773631, at *8 (Jun. 27, 2025). The Supreme Court most recently explained that "suits in equity were brought by and against individual parties" and "as a general rule, an injunction could not bind one who was not a party to the cause." *Id*. at *6 (citation modified).

"Neither declaratory nor injunctive relief," moreover, "can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal

plaintiffs." *Id*. at *7 (citation modified). *CASA* concerned Executive Order 14160, which "identifies circumstances in which a person born in the United States is not subject to the jurisdiction thereof and is thus not recognized as an American citizen." *Id.* at *4. Three district courts "concluded that the Executive Order is likely unlawful and entered a universal preliminary injunction barring various executive officials from applying the policy to anyone in the country." *Id*. at *5 (citation modified). The Supreme Court rejected that shotgun approach because "federal courts do not exercise general oversight of the Executive Branch." *Id*. at *15. Rather, courts "resolve cases and controversies consistent with the authority Congress has given them" and "when a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too." *Id.* (citation modified).

Plaintiffs invoke Section 706 to ask the Court to vacate the changed priorities and terminations. Compl. (ECF No. 2-1) at 57 (citing 5 U.S.C. § 706). Plaintiffs might argue that *CASA* did not address "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *CASA*, 2025 WL 1773631 at *8 n.10. That *CASA* arose under the Judiciary Act is of no moment because Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).

And *CASA* confirms that "neither the universal injunction nor any analogous form of relief was available in the High Court of Chancery in England at the time of the founding," "nor did founding-era courts of equity in the United States chart a different course." *CASA*, 2025 WL 1773631, at *6-7 (citation modified). In fact, "the D. C. Circuit issued what some regard as the first universal injunction in 1963," nearly two decades after the passage of the APA. *Id*. at *8 (citation modified). Even so, "such injunctions remained rare until the turn of the 21st century,

when their use gradually accelerated." *Id.* "If Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made." *Hecht Co.*, 321 U.S. at 329.

Indeed, nothing in APA text indicates a grant of authority to the courts greater than which was available at equity in 1946. Section 706(2), on which Plaintiffs rely, provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary [and] capricious," "without observance of procedure required by law," or "otherwise not in accordance with law." 5 U.S.C. § 706(2). When used in the context of judicial review, "set aside" can refer to vacating an order—for example, that an appellate court "sets aside" a lower-court judgment. *See* John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 YALE J. ON REG. BULL. 37, 42 (2020). But "[t]hose words can also refer to a court's decision to regard a purportedly valid juridical act as ineffective." *Id.* at 43.

Statutes and judicial opinions often use the phrase in the latter sense when they refer to courts' "setting aside" unconstitutional legislation. *See, e.g.*, *Mallinckrodt Chem. Works v. Missouri ex rel. Jones*, 238 U.S. 41, 54 (1915); *see also* Harrison at 43-45 (discussing other examples). The phrasing in that context means that courts disregard unconstitutional statutes when deciding the cases before them, not that they vacate the statutes. Courts "have no power per se to review and annul acts of Congress on the ground that they are unconstitutional." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). Instead, judicial review "amounts to little more than the negative power to disregard an unconstitutional enactment." *Id.*

Properly understood, then, Section 706(2)'s instruction to "set aside" unlawful agency action does not dictate any particular remedy. *See* Samuel L. Bray, *Multiple Chancellors:*

*Reforming the National Injunction*, 131 HARV. L. REV. 417, 452 (2017).  When a court declines to apply an agency action to the case before it on the ground that the action is unlawful, it may issue relief to give effect to that decision.  But a different provision, Section 703, points outside the APA for the available remedies.  As Section 703 recognizes, some cases are governed by a "special statutory review proceeding," 5 U.S.C. § 703, which may authorize a court to vacate an order or rule, *see* Harrison 39-40; *see also*, *e.g*., 28 U.S.C. § 2342.  Where no such proceeding is available, Section 703 provides that "[t]he form of proceeding" under the APA is a traditional "form of legal action," such as "actions for declaratory judgments or writs of prohibitory or mandatory injunction."  5 U.S.C. § 703.  "As the legislative history of the APA discloses," moreover, "the APA essentially adopted the common law standard for review of agency action." *U.S. Capitol Police v. Off. Of Compl.*, 908 F.3d 748, 756 (Fed. Cir. 2018).

Interpreting Section 706 to require the universal vacatur that Plaintiffs seek is precisely the kind of remedial innovation that Congress disclaimed.  Remedies "ordinarily operate with respect to specific parties," rather than "on legal rules in the abstract," *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (citation modified).  Plaintiffs ask the Court to vacate the Foundation's changed priorities and reinstate all canceled grants, but that universal relief runs head-on into the bedrock principle that "suits in equity were brought by and against individual parties, and the . . . remedies were generally party specific."  *CASA*, 2025 WL 1773631, at *2 (citation modified).  In other words, reading Section 706(2) to authorize the universal relief Plaintiffs seek in this case cannot be squared with the Supreme Court's reasoning in *CASA* or the text and history of the APA.  For Plaintiffs to obtain the relief they seek, each grantee whose grant was terminated must be a plaintiff in this lawsuit.  And because necessary members are missing, Plaintiffs lack associational standing to bring this action in the first place.

By seeking a universal injunction, Plaintiffs also impermissibly seek to bypass the rules governing class actions. *See* Fed. R. Civ. P. 23. Rule 23 is the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation modified). It requires the putative class representative to demonstrated that "(1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The Supreme Court has "repeatedly [] . . . emphasized that it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast Corp.*, 569 at 33 (citation modified). For example, "commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (citation modified). But it is not sufficient to "merely" allege, as Plaintiffs do here, "that they have all suffered a violation of the same provision of law." *Id.* at 50. And "that common contention [] . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* (citation modified).

Moreover, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citation modified). Here AAUP, AERA, and UAW cannot serve as representatives because they have not alleged to be the recipient of a grant or that their

respective grant were terminated, so they could not have suffered the same injury as grant recipients whose grants were terminated. Compl. (ECF No. 2-1) ¶¶ 20, 21, 22. It is also questionable whether these organizations "possess the same interests and suffer the same injuries" as persons who similarly had grants revoked. These Plaintiffs, for example, allege that some recipients may lose immigration status "and will be at risk of deportation if their positions end." *Id*. ¶ 131. As organizations, none of the Plaintiffs is at risk of losing immigration status or being deported. Are their interests truly aligned? That is what a court's "rigorous analysis" is supposed to determine. *Comcast Corp.*, 569 U.S. at 33. On Plaintiffs theory here, "Why bother with a Rule 23 class action when the quick fix of a universal injunction is on the table?" *CASA*, 2025 WL 1773631, at *10.

In sum, Plaintiffs lack standing to the extent they assert associational standing to vindicate rights of grantees who are not parties to this case. Thus properly formulated, this case concerns the individual grants to AAPT, AAC&U, and WEPAN. Compl. (ECF No. 2-1) ¶¶ 18, 19, 23. More specifically, the grants in question are: (1) awards 2300609, 2212807, and 1841687 made to AAPT, *id*. ¶ 77; (2) awards 2017953 and 2121468 to WEPAN, *id*. ¶ 91; and (3) awards 2121858, 2102910, 2334406, and 2309126 made to AAC&U, *id*. ¶¶ 106-09. The Court should dismiss from this case all other claims and plaintiffs.

## II.    **Plaintiffs' Claims Fail.**

Plaintiffs' claims fail and should be dismissed for lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). For the same reasons, Plaintiffs are unlikely to succeed on the merits, precluding them from obtaining a preliminary injunction.

### 1.    Plaintiffs' APA Claims Fail.

Plaintiffs bring three APA claims. Count I alleges that the April 18, 2025, change in priorities and resulting grant terminations were arbitrary and capricious actions in violation of 5

U.S.C. § 706(2)(A) because they were "not reasonable nor reasonably explained," "adequately display awareness that it is changing position," and "did not consider the substantial reliance interests of award recipients." Compl. (ECF No. 2-1) ¶¶ 159, 162, 163. Count II alleges that the alleged actions were not in accordance with law in violation of 5 U.S.C. § 706(2)(A) because they "are contrary to the statutory provisions that govern" the Foundation, the Foundation "unlawfully interpreted" relevant guidance and award terms and conditions, and the alleged actions are unconstitutional. *Id*. ¶¶167, 169, 170.[2]

Plaintiffs' APA claims fail for four reasons: (1) Plaintiffs' claims are an impermissible programmatic challenge; (2) Plaintiffs fail to identify a discrete agency action; (3) Plaintiffs cannot maintain an APA action for money damages; and (4) Plaintiffs cannot obtain judicial review for agency actions committed to agency discretion by statute. Each reason independently warrants dismissal of Plaintiffs' complaint and denial of their motion for a preliminary injunction.[3]

*First*, Plaintiffs' claims and requested relief are a textbook example of a programmatic challenge unavailable under the APA. Instead of presenting the court with a "narrow question to resolve," *Cobell v. Kempthorne*, 455 F.3d 301, 307 (2006), Plaintiffs challenge a host of individual actions and seek broad relief, Compl. (ECF No. 2-1) at 57-58. Plaintiffs' allegations reveal that they do not seek judicial review of a discrete agency action. They simply disagree with a what

---

[2]      The Foundation addresses Plaintiffs third APA claim, Count III, separately further below.

[3]      The requirement of the local rules to produce an administrative record with the filing of this dispositive motion does not apply because Plaintiffs have not challenged a specific final agency action. *See* LCvR 7(n) (requirement applies "[i]n cases involving the judicial review of administrative agency *actions*" (emphasis added)). Moreover, the production of an administrative record at this stage is unnecessary because the Foundation seeks to dismiss this case not based on an administrative record but instead based on the allegations in the complaint; "'the administrative record is unnecessary to decide the threshold legal questions presented by the pending motion to dismiss.'" *Theint Win Htet v. Trump*, Civ. A. No. 24-1446 (RC), 2025 WL 522033, at *9 (D.D.C. Feb. 18, 2025) (quoting *Janay v. Blinken*, 743 F. Supp. 3d 96, 105 (D.D.C. 2024)).

they say was a "single policy decision." Pls.' Br. (ECF No. 3-1) at 10. They identify two alleged agency actions: (1) the April 18, 2025, Foundation priorities update, Compl. (ECF No. 2-1) ¶¶ 54-62; (2) the resulting grant terminations, *id*. ¶¶ 63-74. Plaintiffs complain the Foundation "does not explain how the change in policy is consistent with the Broader Impacts Criterion or other statutory mandates to support STEM education for underrepresented groups." *Id*. at ¶ 57. Plaintiffs similarly complain the termination notices "were based on the same boilerplate, cursory, nonspecific rationale." *Id*. ¶ 69. They assert that the "boilerplate termination notices did not explain why any individual awards failed to align with [Foundation] priorities." *Id*. ¶ 73. In other words, they seek "'wholesale' improvement to agency operations under the APA by bundling together a collection of discrete actions, presenting them as facets of a single event, and then challenging that event instead of the individual actions." *Assoc. for Ed. Finance & Policy, Inc.*, *v. McMahon*, --- F. Supp. 3d ---, Civ. A. No. 25-0999 (TNM), 2025 WL 1568301, at *5 (D.D.C. Jun. 3, 2025) (citation modified).

Addressing these types of claims would require the Court to supervise all the agency's activities and determine how the agency accomplishes each statutorily-mandated function—an even more extreme kind of supervisory claim than was at issue and rejected in *Lujan*. *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 892-93 (1990). "But the challenges here bundle together broad lists of grievances and seek wholesale modifications to agency operations writ large." *Assoc. for Ed. Finance & Policy*, 2025 WL 1568301, at *1. Such claims entirely circumvent the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004). Plaintiffs certainly may direct their grievances

to "the offices of the [Foundation] or the halls of Congress." *Lujan*, 497 U.S. at 891 (citation modified).  But "it is not this Court's place to breathe life back into wide swathes of the [Foundation's terminated grants] and then monitor the agency's day-to-day statutory compliance; essentially what Plaintiffs seek." *Assoc. for Ed. Finance & Policy*, 2025 WL 1568301, at *1 (citation modified).

*Second*, the closest Plaintiffs come to identifying a final agency action is each grant termination.  Compl. (ECF No. 2-1) ¶ 157.  To the extent they allege that the "Mass Termination Action" or "each wave of terminations" is a reviewable final agency action, Plaintiffs' claims fail.  *Id*. ¶¶ 155-56.  Courts "have long recognized that the term [agency action] is not so all-encompassing as to authorize judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (citation modified).  Plaintiffs, therefore, must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan*, 497 U.S. at 891, 899 (citation modified).  The APA limits judicial review to "circumscribed, discrete agency actions." *Norton*, 542 U.S. at 62.  These final agency actions must be "circumscribed [and] discrete." *Id.*

The APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013).  Plaintiffs assert that the Foundation's public statements "reveal a significant change in [Foundation] policy" and complaint that the Foundation "does not explain how the change in policy is consistent" with statutory requirements.  Compl. (ECF No. 2-1) ¶¶ 57, 60.  That change in policy, according to Plaintiffs, "had immediate and drastic consequences" because "as a direct result of the Change in Priorities Decision, [the Foundation] initiated a massive purge of

previously awarded grants and other funding assistance." *Id.* ¶ 63. "Because an on-going program or policy is not, in itself, a final agency action under the APA, [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell*, 455 F.3d at 307 (citation modified).

*Third*, Plaintiff's APA claims fail because they seek impermissible money damages. The APA does not waive sovereign immunity to a suit for "money damages." 5 U.S.C. § 702; *accord Jibril v. Mayorkas*, 101 F.4th 857, 870 (D.C. Cir. 2024) ("the APA does not authorize suits seeking 'money damages' against the Government"). "Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 918-19 (1988) (Scalia, J., dissenting)); *accord Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 531 (D.C. Cir. 2006) (same). That description fits this suit—in which Plaintiffs seeks to compel the Foundation to pay them sums of money—to a T. By asking the Court to "set aside the" the fund terminations and to "timely process award applications," Plaintiffs seek "to compel [the Foundation] to pay a sum of money" and their suit is "for 'money damages.'" *Knudson*, 534 U.S. at 210. Accordingly, the APA's limited waiver of sovereign immunity does not extend to this suit. *See* 5 U.S.C. § 702; *Jibril*, 101 F.4th at 870.

Recognizing APA's prohibition on suits for money damages, Plaintiffs argue that they "do not seek a judgment for any sum of money" or "an order mandating that any payment be made" but rather a declaration that the alleged actions are unlawful. Pls.' Br. (ECF No. 3-1) at 35. That the "complaint seeks only a declaratory and injunctive order . . . does not decide the issue." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79-80 (D.C. Cir. 1985) (citation modified).

Suits that seek "to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages'" even if styled as seeking an "injunction." *Knudson*, 534 U.S. at 210. "Though framed in terms of declaratory and injunctive relief," a suit nonetheless can be one that in substance "is for monetary damages." *Richards*, 453 F.3d at 530. "No matter how [Plaintiffs] phrase it, what they want is a judicial decree directing [the Foundation] to pay [them] the damages [that they say are] due." *Id.* at 531. "Yet the rule has long been that a plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money." *Id.* (citation modified). "A court must look past the label applied by the plaintiff to determine if the relief is appropriately framed in equity." *Clark v. Feder Semo & Bard, P.C.*, 527 F. Supp. 2d 112, 117 n.1 (D.D.C. 2007) (citation modified). Plaintiffs here concede that the only result of the relief they seek is "payment" they say "would follow from the government carrying out its remaining obligations under the original terms of the grants." Pls.' Br. (ECF No. 3-1) at 35. In other words, they "seek[] an injunction requiring the government to pay monies owed" pursuant to the terminated grants. *Spectrum Leasing Corp. v. United States*, 764 F. 2d 891, 894 (D.C. Cir. 1985). Looking beyond Plaintiffs' artful pleading, what Plaintiffs seek is "to compel the defendant to pay a sum of money"; that is an impermissible "money damages" claim. *Knudson*, 534 U.S. at 210.

Recent Supreme Court precedent confirms that Plaintiffs seek money damages within the APA's meaning. In *Department of Education v. California*, the district court "enjoined the Government from terminating various . . . grants" and required "the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." 145 S. Ct. 966, 968 (2025) (citation modified). The Supreme Court stayed the order, explaining that the agency was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money

under the APA" because the APA's sovereign immunity waiver does not "apply to claims seeking 'money damages.'"  *Id.* (citing 5 U.S.C. § 702).  As the Supreme Court put it, "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here."  *Id.* (quoting *Knudson*, 534 U.S. at 212).

Plaintiffs argue that *California* "has limited precedential value, and it does not purport to overrule *Bowen*."  Pls.' Br. (ECF No. 3-1) at 40.  Indeed, Plaintiffs rely principally on *Bowen* to argue that the relief they seek is not "money damages" and that "this Court remains bound by *Bowen*."  *Id.* at 35, 40 (citing *Bowen*, 487 U.S. at 893, 895).  Plaintiffs argue they merely seek "an order that would 'give [Plaintiffs] the very thing to which [they were] entitled,' *Bowen*, 487 U.S. at 895, by restoring the remainder of the funding that [the Foundation] previously awarded."  *Id.* at 36.

But the aspect of *Bowen* that Plaintiffs cite no longer is good law in light of subsequent Supreme Court precedent.  Under *Bowen,* "Damages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled."  487 U.S. at 895 (citation modified).  Accordingly, *Bowen* reasoned, when money is the specific thing a plaintiff claims it is owed, rather than a mere substitute for a plaintiff's claimed loss, the plaintiff does not seek "money damages" within the APA's meaning, and the APA's sovereign immunity waiver thus applies. *Id.*

Justice Scalia disagreed.  In dissent, he argued that the majority's reason for concluding that the claims at issue did not seek money damages "is simply wrong."  *Bowen*, 487 U.S. at 917 (Scalia, J., dissenting).  Justice Scalia acknowledged that the claims "fit a general description of a suit for specific relief, since the award of money undoes a loss by giving respondent the very thing (money) to which it was legally entitled," but rejected the relevance of the specific versus substitute

relief dichotomy on which the majority relied. *Id.* He explained that "damages" is a term of art that has "been used in the common law for centuries" and had a meaning "well established by tradition." *Id.* "Part of that tradition," Justice Scalia wrote, "was that a suit seeking to recover a past due sum of money that does no more than compensate a plaintiff's loss is a suit for damages, not specific relief." *Id.* at 918.

Justice Scalia concluded by setting forth the following rule: "Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied." *Bowen*, 487 U.S. at 918-19 (Scalia, J., dissenting). He identified only a single "rare" exception to this general rule, one that plainly does not encompass Plaintiffs' suit: suits "to prevent future losses that were either incalculable or would be greater than the sum awarded." *Id.* at 918.[4]

Fourteen years later, *Knudson* made Justice Scalia's dissenting opinion in *Bowen* the law. Directly quoting Justice Scalia's *Bowen* dissent, the Court held that "[a]lmost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied." *Knudson*, 534 U.S. at 210 (quoting *Bowen*, 487 U.S. at 918-19 (Scalia, J., dissenting)). That is so because "[t]he 'substance' of a money judgment is a compelled transfer of money." *Id.* at 216.

*Knudson* distinguished *Bowen* on the ground that there, "the suit was not merely for past due sums, but for an injunction to correct the method of calculating payments going forward." 534 U.S. at 212. In other words, *Knudson* explained, the APA waived sovereign immunity in *Bowen*

---

[4]     Examples of such suits are suits "to enforce a promise to loan a sum of money when the unavailability of alternative financing would leave the plaintiff with injuries that are difficult to value; or to enforce an obligor's duty to make future monthly payments, after the obligor had consistently refused to make past payments concededly due, and thus threatened the obligee with the burden of bringing multiple damages actions." *Bowen*, 487 U.S. at 918 (Scalia, J., dissenting).

not because the plaintiff sought specific rather than substitute monetary relief, but because the plaintiff sought prospective injunctive relief separate and apart from the sums of money it sought to compel the government to pay. *Id.* One can debate whether that is the fairest reading of *Bowen* on its own terms, but that is immaterial; what matters is that it is what *Knudson* said *Bowen* now means.

  *Knudson* therefore reformulated and limited *Bowen*. Post-*Knudson*, the test no longer is whether a plaintiff seeks specific or substitute monetary relief. Now, all that matters is whether a suit "seek[s] . . . to compel the defendant to pay a sum of money to the plaintiff." *Knudson*, 534 U.S. at 210 (quoting *Bowen*, 487 U.S. at 918-19 (Scalia, J., dissenting)). If so, the suit is for "money damages," regardless of whether the plaintiff characterizes the sum of money it seeks as specific rather than substitute relief. *Id.* In short, the Supreme Court decided *Knudson* after *Bowen*; it expressly adopted the *Bowen* dissent's position; and it distinguished *Bowen* in a manner that narrowed *Bowen* considerably. Accordingly, in *Knudson*'s aftermath, a plaintiff seeking to compel an agency to pay it a sum of money is seeking "money damages," and cannot rely on *Bowen* to overcome sovereign immunity. In *California*, the Supreme Court reaffirmed *Knudson*'s holding that a suit seeking to compel a federal agency to pay a sum of grant funds is for "money damages." *See California*, 145 S. Ct. at 968. In doing so, the Supreme Court distinguished *Bowen* by citing *Knudson*. *Id.*

  In short, intervening Supreme Court precedent has overtaken the aspect of *Bowen* on which Plaintiffs rely and rendered it no longer good law. After *Knudson*, citing *Bowen* to argue that a plaintiff does not seek "money damages" within the APA's meaning because it seeks a sum of money as the specific rather than substitute relief, is like citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enters. v.*

*Raimondo*, 603 U.S. 369 (2024), to argue that a court must defer to an agency's reasonable interpretation of an ambiguous statute that it administers.  And were there any lingering doubt after *Knudson* that a suit seeking to compel an agency to pay a plaintiff grant funds is a suit for "money damages," *California* has now settled it conclusively.  145 S. Ct. at 968.  The Supreme Court's lesson is clear: when a plaintiff, like Plaintiffs here, seeks to compel an agency to pay grant funds, the relief that it seeks constitutes money damages and the APA does not waive sovereign immunity.  Plaintiffs' reliance on *Bowen* fails.

    *Fourth*, Plaintiffs cannot obtain judicial review of funding actions committed by statute to agency discretion.  5 U.S.C. § 701(a)(1).  An action is committed to agency discretion when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  In other words, agency action is not subject to APA review if the governing statute gives courts no "law to apply."  *Id*.

    The Act authorizes the Foundation to issue grants the Foundation "deems necessary to carry out" its mission.  42 U.S.C. § 1870(c).  To that end, the Foundation has "discretion" to "utilize appropriations" however will "best realize" four congressional objectives, none of which concern any funding mechanism or direct or indirect costs.  *Id*. § 1873(e).  Statutory language that empowers action the agency head "'shall deem . . . necessary or advisable'" commits the action to agency discretion as it "fairly exudes deference to the" agency head.  *Webster v. Doe*, 486 U.S. 592, 600 (1988) (quoting section 102(c) of the National Security Act with added emphasis).  And statutory language giving an agency "discretion" to act creates no law to apply.  *See Forsyth Cnty. v. Army Corp. of Eng'rs*, 633 F.3d 1032, 1040-41 (11th Cir. 2011).  Thus, nothing in the Act provides the "law to apply" to an analysis of any particular grant terminated by the Foundation.

Plaintiffs attempt to overcome these principles by pointing to Congressional expressions of policy. Compl. (ECF No. 2-1) ¶¶ 38, 39. But nothing indicates a Congressional intent to limit the Foundation's discretion. While the Act requires the Foundation to award grants to eligible entities to increase the participation of underrepresented populations in science and technology, it allows the agency significant discretion in doing so. *See* 42 U.S.C. § 1870(c); *id.* § 1873(e). Where a decision is presumptively non-reviewable, as with funding allocations, "Congress may overcome the presumption against review by providing 'guidelines for the agency to follow in exercising its enforcement powers,' by 'setting substantive priorities, or by otherwise circumscribing an agency's power.'" *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 293 (4th Cir. 2022) (quoting *Heckler*, 470 U.S. at 833. Even assuming that the Congress mandated the Foundation allocates funds to the specific programs, "allocation of funds" is an "administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). *Lincoln*'s logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). In fact, the Foundation continues to fund grants supporting the participation of women, minorities, and people with disabilities in science and engineering. Stone Decl. ¶ 21. More broadly, the Foundation continues to fund grants that generally encourage participation in science, mathematics, and engineering, which will necessarily have the effect of encouraging the participation of the populations addressed in the statutes. *Id.* Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Milk Train*, 310 F.3d at 752 (citation modified); *see also Pol'y & Rsch., LLC v. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75–76 (D.D.C. 2018). The Act squarely permits the

Foundation to exercise discretion in deciding which grants among categories to approve and renew to effectuate its goals. That is what the Foundation has done and the APA does not authorize review.

          2.     <u>Plaintiffs' Unreasonable Delay Claim Fails.</u>

Count III alleges that the Foundation unlawfully withheld agency action in violation of 5 U.S.C. § 706(1) when it "froze all new awards, first across the board and then to institutions of higher education." Compl. (ECF No. 2-1) ¶ 175. Plaintiffs do not rely on this claim for their preliminary injunction motion. *See generally* Pls.' Br. (ECF No. 3-1).

As an initial matter, Plaintiffs cannot identify a clear, nondiscretionary duty requiring the Foundation to make a specific award. Under the APA, "federal courts may order agencies to act only where the agency fails to carry out a mandatory, nondiscretionary duty." *Norton*, 542 U.S. at 61 (2004). Plaintiffs point to statutory requirements requiring the Foundation "to support" specific programs. Compl. (ECF No. 2-1) ¶ 174 (citing 42 U.S.C. §§ 1862p-4; 1862s-5(e); 1862s-5(e); 19012). Federal law directs the Foundation to fulfill its responsibilities "by making contracts or other arrangements (including grants, loans, and other forms of assistance)." 42 U.S.C. § 1862(a)(1). But nothing in the statutory language dictates that the Foundation make specific awards or the size of those awards. Plaintiffs' claims are even more attenuated because they have not alleged that they are entitled to the specific grants for which they have applied.

To the extent Plaintiffs assert that the Foundation "has withheld these required actions" because "it categorically froze all new awards" those conclusory allegations are simply unsupported by allegations in the complaint and "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. In fact, Plaintiffs concede that the Foundation continues to make grants. Compl. (ECF No. 2-1) ¶ 11. The internet is replete with recent announcements about Foundation grants across the Nation. *See*, *e.g.*, Wali Pitt, *HBCU Creates Research Foundation to Power Itself to R2*

*Status*, HBCU GAMEDAY (Jul. 4, 2025) (discussing a seven million-dollar grant from the National Science Foundation to Grambling State University), available at https://hbcugameday.com/2025/07/04/hbcu-creates-research-foundation-to-power-itself-to-r2-status/ (last visited Jul. 10, 2025); *National Science Foundation Grant Funds Launch of Innovative Engineering Research Program Supporting Neurodivergent Students*, Univ. of New Haven (Jun. 11, 2025), available at https://www.newhaven.edu/news/releases/2025/national-science-foundation-grant-funds.php (last visited Jul. 10, 2025); Hannah Buchanan, *UT Tyler Engineering Faculty Awarded Prestigious National Science Foundation Grant*, Univ. of Texas at Tyler (Jun. 16, 2025), available at https://www.uttyler.edu/about/news/pressrelease/2025/06162025.php (last visited Jul. 10, 2025); Brian Miller, *App State awarded $367,088 National Science Foundation grant for telescope upgrades at Dark Sky Observatory*, APPALACHIANTODAY (Jun. 6, 2025), available at https://today.appstate.edu/2025/06/06/dso (last visited Jul. 10, 2025). The Court should dismiss this claim for failure to state a claim under Rule 12(b)(6) and need not proceed further.

Even if the Foundation were obliged to award the specific grants for which Plaintiffs allegedly applied, Plaintiffs have not made out a claim for unreasonable delay. "The central question in evaluating 'a claim of unreasonable delay' is 'whether the agency's delay is so egregious as to warrant mandamus.'" *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *Telecomm'cns Rsch. & Action Ctr. ("TRAC") v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984)). Courts in this Circuit apply a six-factor test to determine whether agency action has been unreasonably delayed:

> (1)    the time agencies take to make decisions must be governed by a rule of reason;

(2)    where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3)    delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4)    the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5)    the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6)    the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed."

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting *TRAC*, 750 F.2d at 80) (citation modified). Applying these factors here makes clear that any delay is not unreasonable.

The first and second *TRAC* factors weigh in Defendants' favor.  *See Dastagir v. Blinken*, 557 F. Supp. 3d 160, 164-67 (D.D.C. 2021); *Mohammad v. Blinken*, 548 F. Supp. 3d 159, 164-67 (D.D.C. 2021); *Liu v. Blinken*, 544 F. Supp. 3d 1, 11-13 (D.D.C. 2021); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 318-19 (D.D.C. 2020); *Shen v. Pompeo*, Civ. A. No. 20-1263 (ABJ), 2021 WL 1246025, at *8 (D.D.C. Mar. 24, 2021).  These factors ask whether the length of time for the agency to act is governed by a "rule of reason" as informed by any specific timetable established by Congress. *Dastagir*, 557 F. Supp. 3d at 165.  "Whether a 'rule of reason' exists for agency action . . . depend[s] in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Tate v. Pompeo*, 513 F. Supp. 3d 132, 148 (D.D.C. 2021) (quoting *Mashpee Wampanoag Tribal Council v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003)).  Nevertheless, the Circuit has concluded that "a reasonable time for agency action is typically counted in weeks or months[.]" *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004).

Relevant to this case, Plaintiffs do not allege that there is any statutory or regulatory timeframe within which the Foundation must adjudicate grant applications. Plaintiffs simply allege that the application process "can take up to six months." Compl. (ECF No. 2-1) ¶ 44; *see also id.* ¶ 146. "Absent a congressionally supplied yardstick, courts typically turn to case law as a guide" to determine whether a delay is reasonable. *See Sarlak v. Pompeo*, Civ. A. No. 20-0035 (BAH), 2020 WL 3082018, at *6 (D.D.C. June 10, 2020).

Plaintiffs appear to allege delays of six to about twelve months. AAPT alleges that it submitted "a new grant proposal to the [Foundation's] ADVANCE program," that its application has not been approved, and that "as of June 9, 2025, [the Foundation's] website indicates that the [Foundation] has 'archived' the ADVANCE program altogether." Compl. (ECF No. 2-1) ¶ 147. WEPAN similarly alleges that it submitted grant proposals in October and November 2024, and that both proposals remain pending "for over seven months." *Id.* ¶ 148. And the Center for Evaluation & Research for STEM Equity, a non-party to this lawsuit, allegedly has eighteen "grants undergoing review" with one grant pending since "March 2024." *Id.* ¶ 149.

A delay of six to about twelve months is not unreasonable as matter of law. Indeed, courts in this District and elsewhere have routinely concluded that delays in contexts such as the approval of immigration applications far longer than the delay here do not constitute unreasonable delay. *See Ghadami v. Dep't of Homeland Sec.*, Civ. A. No. 19-0397 (ABJ), 2020 WL 1308376, at *8 (D.D.C. Mar. 19, 2020) ("[M]any courts evaluating similar delays have declined to find a two-year period to be unreasonable as a matter of law."); *see also Bagherian v. Pompeo*, 442 F. Supp. 3d 87, 94 (D.D.C. 2020) (Bates, J.) (finding that "the roughly twenty-five-month delay to this point in adjudicating [plaintiff's] waiver eligibility is not unreasonable"); *Didban v. Pompeo*, 435 F. Supp. 3d 168, 177 (D.D.C. 2020) (Cooper, J.) (finding that the plaintiffs had "failed to establish

that the two-year delay in processing [a] waiver application is unreasonable"); *Skalka v. Kelly*, 246 F. Supp. 3d 147, 153-54 (D.D.C. 2017) (citing case law that even a five- to ten-year delay in the immigration context may be reasonable); *Xu v. Cissna*, 434 F. Supp. 3d 43, 55 (S.D.N.Y. 2020) (finding a three-year delay in adjudicating an asylum application to not be unreasonable under the APA); *Yavari v. Pompeo*, Civ. A. No. 19-02524, 2019 WL 6720995, at *8 (C.D. Cal. Oct. 10, 2019) ("District courts have generally found that immigration delays in excess of five, six, seven years are unreasonable, while those between three to five years are often not unreasonable."). Using this "case law as a guide," these initial *TRAC* factors weigh in the Foundation's favor. *See Sarlak*, 2020 WL 3082018, at *6.

The fourth *TRAC* factor—the effect of granting relief on the Foundation competing priorities—carries significant weight, *see Mashpee Wampanoag*, 336 F.3d at 1100, and weighs heavily in Defendants' favor. It is unclear what relief Plaintiffs seek for their unreasonable delay claim because they do not ask for specific, or any, grant applications to be processed at all. *See* Compl. (ECF No. 2-1) at 58-59. Even assuming that Plaintiffs request an order requiring the Foundation to process any specific grant application, such order would only move those specific grant applications ahead of other requests. "Relief that would simply 'reorder' a queue of applicants seeking adjudication is generally viewed as inappropriate when 'no net gain' in such adjudications is achieved." *Tate*, 513 F. Supp. 3d at 149-50 (quoting *Sarlak*, 2020 WL 3082018, at *6). Courts in this Circuit will not compel agency action where the result would be merely to expedite the consideration of a plaintiff's request ahead of others. *See Liberty Fund v. Chao*, 394 F. Supp. 2d 105, 117 (D.D.C. 2005) (Bates, J.) (courts will not compel agency action where result "would mean putting [plaintiff] at the head of the queue at the expense of others"); *see also Mashpee Wampanoag*, 336 F.3d at 1101 ("We agree with the Secretary that the district court erred

by disregarding the importance of there being 'competing priorities' for limited resources. The district court offered no legal justification for precluding the Secretary from relying upon her 'first-come' procedure, and we can conjure none."); *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991) ("The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."); *Sarlak*, 2020 WL 3082018, at *6 (finding that the fourth factor weighed in the government's favor because expediting the plaintiff's waiver would harm other agency activities of equal or greater priority); *Ghadami*, 2020 WL 1308376, at *9 (finding that "expediting review in [plaintiff's] case would merely direct government resources from the adjudication of other waiver applications"); *Fangfang Xu*, 434 F. Supp. 3d at 55 ("The effect of leapfrogging Plaintiff's application to the front of the line would do nothing to cure the deficiencies of the asylum application process; it would only harm other applicants, who are equally deserving of prompt adjudication."). Mandamus relief is inappropriate in this context. *See Liberty Fund*, 394 F. Supp. 2d at 117; *see also Gong v. Duke*, 282 F. Supp. 3d 566, 569 (E.D.N.Y. 2017) ("There are many other applicants who have waited even longer than plaintiff; to grant him priority is to push them further back in line when the only difference between them is that plaintiff has brought a federal lawsuit. That factor should not give him any advantage."); *Varol v. Radel*, 420 F. Supp. 3d 1089, 1098 (S.D. Cal. 2019) ("[G]ranting relief to the Plaintiff simply moves her to the front of the line at the expense of all other applicants who may not have filed an application for mandamus relief.").

"The third and fifth [*TRAC*] factors overlap—the impact on human health and welfare and economic harm, and the nature and extent of the interests prejudiced by the delay." *Liberty Fund*, 394 F. Supp. 2d at 118. These factors also weigh in Defendants' favor. Again, advancing Plaintiffs' requests to the front of the queue would simply benefit Plaintiffs to the detriment of

other grant applicants with pending applications, who may have experienced the same or worse impacts from a delay. Indeed, expediting review in this case over the requests of other applications would direct resources away from the decisions that the Foundation may have identified as more urgent or those pending for a far longer time, requiring this Court to overrule the Foundation's prioritization decisions and place Plaintiffs at the front of the line. *See Barr Labs*, 930 F.2d at 75-76 (observing that "a judicial order putting [the petitioner] at the head of the queue [would] simply move[ ] all others back one space and produce[ ] no net gain[,]" and that agencies are in the best position to allocate their own resources); *Skalka*, 246 F. Supp. 3d at 154 (noting that courts step outside of their "limited role" where they require "agencies to invest the high degree of resources that would be necessary to accurately investigate plaintiffs' visa petitions," because such a requirement "would presumably delay other adjudications" and make others "suffer in response").

The sixth and final *TRAC* factor provides that "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" *TRAC*, 750 F.2d at 80. Plaintiffs do not allege bad faith on the part of the Foundation and merely allege the Foundation has not processed their applications within the six-month period in which the Foundation "strives to be able to tell applicants whether their proposals have been declined or recommended for funding." Compl. (ECF No. 2-1) ¶ 146. While a lack of information on the status of their requests may be frustrating, it is not proof of impropriety or bad faith. *See Tate*, 513 F. Supp. 3d at 150 ("the good faith of the agency in addressing the delay weighs against relief") (citation modified).

In sum, the *TRAC* factors weigh in Defendants' favor, and Plaintiffs have failed to allege any unreasonable delay as matter of law.

3.    <u>Plaintiffs' Constitutional Claim Fails.</u>

Count IV is a mishmash of constitutional claims that "merit only brief discussion." *Amica Ctr. for Imm. Rts. v. Dep't of Just.*, Civ. A. No. 25-0298 (RDM), 2025 WL 1852762, at *17 (D.D.C. Jun. 6, 2025). Plaintiffs allege that the Foundation's refusal to spend Congressionally allocated funds violates "separation of powers" and Congress's "power of the purse." Compl. (ECF No. 2-1) ¶ 187. They allege that the Foundation "is not spending about $1 billion that Congress appropriated." Pls.' Br. (ECF No. 3-1) at 31.

Plaintiffs' separation of powers claim is barred at the outset because it is purely statutory. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review[.]" *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. at 472. The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the executive officers rely on an unconstitutional statute. *Id*. at 473, n.5. Neither of those situations applies here. "Plaintiffs, accordingly, may not circumvent the Tucker Act or the APA's reviewability bar by reframing an alleged statutory violation as a constitutional claim." *Amica*, 2025 WL 1852762, at *17; *see also Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51–54 (D.D.C. 2020) (dismissing constitutional claims challenging border wall construction based on *Dalton*).

Contending that the challenged actions violate the separation of powers, Plaintiffs advance the similar arguments the Supreme Court rejected in *Dalton*. Plaintiffs' alleged separation-of-powers claims hinge entirely on whether Defendants acted in accordance with statutory obligations. *See* Compl. (ECF No. 2-1) ¶¶ 182-85; Pls.' Br. (ECF No. 3-1) at 32. The outcome of the issues Plaintiffs raise depends on resolution of contractual, or statutory at best, claims rather

than any unique separation-of-powers principles. If Plaintiffs' argument were accepted, then every garden-variety action by a federal agency alleged to be in violation of a contractual or statutory provision could also for the same reason be alleged to violate the constitutional separation of powers. "Under *Dalton*, [Plaintiffs] cannot recast these types of claims as constitutional." *Ctr. for Biological Diversity*, 453 F. Supp. 3d at 53; *see also Dalton*, 511 U.S. at 474 (stating that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration.").

Count IV of the Complaint fails and should be dismissed. For the same reasons, Plaintiffs are unlikely to succeed on the merits of Count VI and it cannot serve as a basis for a preliminary injunction.

4. Plaintiffs' Procedural Due Process Claim Fail

Plaintiffs raise two Due Process claims. Count V is a procedural due process claim alleging that the grant terminations deprived them of fair notice and due process. Compl. (ECF No. 2-1) ¶¶ 188-96. Count VI appears to be an as-applied challenge to 2 C.F.R. § 200.340(a)(4). Plaintiffs assert that the change in policy and the grant terminations, to the extent those actions relied on 2 C.F.R. § 200.340(a)(4), were "unconstitutionally vague" and "an arbitrary exercise of authority." Compl. (ECF No. 2-1) ¶ 200. Plaintiffs' claims fail because they fail to identify a constitutionally protected property interest.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in liberty or property." *Nat'l Urban League v. Trump*, --- F. Supp. 3d ---, Civ. A. No. 25-0471 (TJK), 2025 WL 1275613, at *17 (D.D.C. May 2, 2025) (citation modified). Plaintiffs assert that grantees "have a protected property interest in their grant funding." Compl.

(ECF No. 2-1) ¶ 191.  No such property right exists.  *See Nat'l Urban League*, 2025 WL 1275613, at *18.

"The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation modified).  There is only a narrow set of government benefits, so-called "new property," that receive Due Process protection.  *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573-74 (1972) (collecting cases).  Examples include tenured teaching positions and welfare benefits.  *See Perry v. Sindermann*, 408 U.S. 593, 596 (1972); *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).  The Due Process protections do not apply to "'ordinary' or 'routine' government contracts."  *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014).  "The Supreme Court has never held that government contracts for goods and services create property interests protected by due process."  *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) (citation modified); see also *Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) (holding that a "simple breach of contract does not amount to an unconstitutional deprivation of property").

Notably, *Roth* involved a tenured-employment contract.  As a district court in this jurisdiction has already explained, "outside of the employment context, courts have resisted application of due-process principles to government contracts because with scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract."  *New Vision*, 54 F. Supp. 3d at 29 (citation modified) (collecting cases).

The grants at issue here are nothing like "welfare benefits under statutory and administrative standards" or "public employment" subject to "tenure provisions." *Roth*, 408 U.S. at 576–77. These are "ordinary and routine" grants, "outside of the employment context," similar to "millions of government contracts in effect at any point in time to which courts seldom apply due process principles." *Nat'l Urban League*, 2025 WL 1275613, at *18. In short, Plaintiffs cannot show a constitutionally protected property interest in the grants.

Plaintiffs moreover improperly invoke the vagueness standard that pertains to government enforcement actions. *See* Compl. (ECF No. 2-1) ¶ 200. They argue that that the Foundation's "application of 2 C.F.R. § 200.340 in the Mass Termination Action is unconstitutionally vague and arbitrary." Pls.' Br. (ECF No. 3-1) at 29. The void-for-vagueness doctrine under the Fifth Amendment is inapplicable here.

"The void-for-vagueness doctrine guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155-56 (2018) (plurality). While courts have applied this doctrine outside of the statutory context, they have done so in limited circumstances, usually with respect to regulations of primary conduct subject to "civil penalties." *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (citation modified). In other words, "a conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation modified).

The Supreme Court has squarely rejected the application of that demanding vagueness standard to government funding decisions. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588-89 (1988). There, plaintiffs brought vagueness challenges under the First and Fifth

Amendments to a funding provision that required the National Endowment for the Arts to "take[] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id*. at 572 (quoting 20 U.S.C. § 954(d)(1)). The Supreme Court acknowledged that "[t]he terms of the provision are undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns." *Id*. at 588. But, the Court reasoned, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id*. at 589. "There is substantially more room for imprecision in regulations bearing only civil, or employment, consequences, than would be tolerated in a criminal code." *Meriwether v. Hartop*, 992 F.3d 492, 518 (6th Cir. 2021) (citation modified). This Court should similarly reject Plaintiffs' invitation to impose a demanding vagueness standard on the government even when it "is acting as patron rather than as sovereign." *Finley*, 524 U.S. at 589. "To accept [Plaintiffs'] vagueness argument would be to call into question the constitutionality of . . . valuable Government programs and countless others like them" that "award[] scholarships and grants on the basis of subjective criteria such as 'excellence.'" *Id*.

### 5.    Plaintiffs' *Ultra Vires* Claim Fails.

Count VII is an *ultra vires* claim alleging that the Foundation "lacked constitutional, statutory, and regulatory authority to issue or implement" the alleged policy change and resulting grant terminations. Compl. (ECF No. 2-1) ¶ 205. Plaintiffs do not appear to base their request for a preliminary injunction on that claim. *See generally* Pls.' Br. (ECF No. 3-1). Even if they were, that claim fails and should be dismissed.

"[S]uits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689, 693 (1949). The exception to sovereign immunity is based on the principle that such *ultra vires* action by a federal officer "is beyond the

officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 690.  Here, Plaintiffs

do not advance any *ultra vires* claim distinct from their APA claims.  *See* Compl. (ECF No. 2-1)

¶¶ 202-205.  Count VII alleges that the Foundation "lacked constitutional, statutory, and regulatory

authority" to change its priorities or to rescind the grants.  *Id.* ¶ 205.  This count is merely

duplicative of the APA claims in Counts I and II, which allege violations of statutory requirements

under the Act.  *Id.* ¶¶ 162, 164-70.  Plaintiffs' *ultra vires* claim fails for the same reasons as do the

APA claims.

## III.  **Plaintiffs Have Not Shown That They Will Suffer Irreparable Harm.**

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel*

*Churches*, 454 F.3d at 297.  And "while standing and irreparable harm overlap, they are far from

the same." *Santos v. Collins*, Civ. A. No. 24-1759 (JDB), 2025 WL 1823471, at *6 (D.D.C. Feb.

26, 2025).  The moving party must demonstrate an injury that is "'both certain and great'" and "of

such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable

harm." *Id.* (emphasis in original) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 298).

The injury must "be beyond remediation," meaning that where, as here, the "possibility that

adequate compensatory or other corrective relief will be available at a later date, in the ordinary

course of litigation, weighs heavily against a claim of irreparable harm." *Clevinger v. Advoc.*

*Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2024) (citation modified).  Plaintiffs have the

burden to put forth sufficient evidence to satisfy this high standard.  "The movant cannot simply

make 'broad conclusory statements' about the existence of harm. Rather, [the movant] must

'submit[ ] . . . competent evidence into the record . . . that would permit the Court to assess whether

[the movant], in fact, faces irreparable harm[.]'" *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21

(D.D.C. 2013) (quoting *Cornish v. Dudas*, 540 F. Supp. 61, 65 (D.D.C. 2008)).  In short,

"irreparable harm requires not only a concrete, particularized harm, but a harm that is sufficiently

serious and irremediable so as to warrant the extraordinary relief of a court's intervention in a case before factual and legal development." *Santos*, 2025 WL 1823471, at *6.

A loss of funding, standing alone, constitutes the very sort of economic harm that is not considered irreparable for purposes of obtaining preliminary relief.  "It is well settled that economic loss does not, in and of itself, constitute irreparable harm." *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017) (citation modified).  "The first hurdle Plaintiffs face is that the harms they identify are economic in nature and therefore not generally irreparable." *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012).  The essence of Plaintiffs claims is the termination of their and their members' grants.  They allege that, "educators, professors, researchers, graduate students, and organizations who have applied for and received [Foundation] awards for their projects, or worked on [Foundation]-awarded projects, and recently seen those awards terminated by the [Foundation]."  Compl. (ECF No. 2-1) ¶ 13.  But "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a" preliminary injunction "are not enough" to show irreparable harm.  *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).

The remaining alleged harms are speculative at best and comprised of "bare allegations." *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985).  This includes Plaintiffs' allegations regarding alleged reputational harms, withdrawal from job searches, career progression, or managing "the fallout of lost grants."  Pls.' Br. (ECF No. 3-1) at 27-28.  Instead, Plaintiffs must provide some evidence of irreparable harm: "the movant [must] substantiate the claim that irreparable injury is likely to occur" and "provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Wis. Gas Co.*, 758 F.2d at 674 (citation modified).  This is because "[i]ssuing a preliminary

injunction based only on a possibility of irreparable harm is inconsistent with [the court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citation modified).

The alleged harm moreover must "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674. When a harm is "based on independent market variables such as how [a company's] customers and/or retail consumers might react," such harm does not flow directly from the challenged action. *Am. Meat Inst. v. Dep't of Agric.*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013). In sum, Plaintiffs cannot show that absent emergency relief they will suffer irreparable harm.

## IV.    Plaintiffs Have Not Shown That the Balance of the Equities Favors Injunctive Relief.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. These factors tilt decisively against granting a preliminary injunction here. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), appeal dismissed, No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025). Granting a preliminary injunction would disrupt the Foundation's implementation of the President's directives, which Plaintiffs here have not challenged. The public has an interest in permitting the Administration, at the President's direction, to take decisive action when it comes to setting his policy priorities for the Foundation. Entering any sort of preliminary relief would displace and frustrate the President's decision about how to best address those issues. *Heckler*, 470 U.S. at 831–32. As discussed above, Plaintiffs will not suffer irreparable harm from the denial of their request for preliminary relief, because Plaintiffs

have not shown that their harm could not otherwise be mediated later, or they have asserted harms on behalf of parties not before this Court.

## V.    <u>Any Injunctive Relief Must Be Narrowly Tailored to Plaintiffs.</u>

If the Court concludes that Plaintiffs are entitled to a preliminary injunction, the relief granted "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation modified), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation modified).  Affording Plaintiffs the type of "universal injunction" they seek here "falls outside the bounds of a federal court's equitable authority."  *CASA*, 2025 WL 1773631, at *8.  As such, any preliminary injunction should do no more than necessary to alleviate the irreparable harm to any specific plaintiff that the Court finds to have established such irreparable harm.

Extending relief that is either broader in substance or scope (i.e., wholesale reinstatement of grants or reinstatement of grants for parties not before the Court) would violate the foundational Article III principle that judicial remedies "must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 585 U.S. 48, 73 (2018).  A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury."  *Id.* at 66 (citation modified).  Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice."  *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

## VI.    <u>Any Preliminary Injunction Should Be Stayed.</u>

To the extent the Court issues any injunctive relief, the Foundation respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor

General, or at a minimum, administratively stayed for a period of seven days to allow the United

States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

**VII.**    **The Court Should Order that Plaintiffs Post a Bond as a Condition of Preliminary Relief.**

The Foundation also respectfully requests that any injunctive relief be accompanied by a

bond.  "The court may issue a preliminary injunction or a temporary restraining order only if the

movant gives security in an amount that the court considers proper to pay the costs and damages

sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P.

65(c).  A bond is appropriate here given that any preliminary relief would potentially mandate that

the Executive spend money that may not be recouped once distributed.

*    *    *

## CONCLUSION

For these reasons, the Court should dismiss the Complaint and deny the motion for preliminary injunction as moot.

Dated: July 11, 2025     Respectfully submitted,

          JEANINE FERRIS PIRRO
          United States Attorney

          By: _____ /s/ *Dimitar P. Georgiev* _____
            DIMITAR P. GEORGIEV, D.C. Bar # 1735756
            Assistant United States Attorney
            601 D Street, NW
            Washington, DC 20530
            (202) 252-2500 (main)

          *Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN ASSOCIATION OF PHYSICS TEACHERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL SCIENCE FOUNDATION, et al., <br><br> Defendants. | Civil Action No. 25-1923 (JMC) |

## [PROPOSED] ORDER

UPON CONSIDERATION of Defendants' motion to dismiss, Plaintiffs' motion for preliminary injunction, and the entire record herein, it is hereby

ORDERED that Defendants' motion is GRANTED, and it is further

ORDERED that this case is dismissed in its entirety, and it is further

ORDERED that Plaintiffs' motion for preliminary injunction is DENIED as moot.


SO ORDERED:


_____          _____
Date                                              JIA M. COBB
                                                        United States District Judge