## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF PHYSICS TEACHERS, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL SCIENCE FOUNDATION, *et al.*, <br><br> Defendants. | Case No. 25-cv-1923 (JMC) |

## <u>MEMORANDUM OPINION</u>

For decades, the National Science Foundation (the Foundation) has supported programs aimed at increasing the participation of women and other underrepresented groups in science and engineering. *See* 42 U.S.C. § 1862s-5(c), (d). But this spring, the Foundation abruptly shifted course. First, on April 18, 2025, the Foundation published a statement on its website announcing "updated guidance" on the Foundation's priorities (the Change in Priorities Decision). NSF, *Statement of NSF Priorities*, https://perma.cc/D4K4-69AQ [hereinafter April 2025 Change in Priorities Statement]. The announcement stated that the Foundation would not fund projects that "preference some groups at the expense of others" and would no longer support "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics." *Id*. Next, over the course of two months, the Foundation sent large waves of grant termination notices to existing grantees, ultimately terminating approximately 1,600 grants worth more than $1 billion (the Mass Termination Action).

Plaintiffs are one union and five associations of scientists and academics. They received NSF awards or represent members who worked on projects supported by NSF awards, many of which the Foundation has terminated. ECF 2-1 ¶ 13. Their work—and that of their members—has

been severely impaired as a result. *Id.* ¶¶ 18–23. They brought this suit to challenge the Change in Priorities Decision and the Mass Termination Action, bringing three categories of claims. First, Plaintiffs allege that the Foundation's cancellation of their grants was both arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act (APA). *See id.* ¶¶ 151–70. Second, Plaintiffs bring APA claims against the prospective application of the Change in Priorities Decision to the award consideration process. *See id.* Finally, Plaintiffs allege that the Foundation's actions are unconstitutional because they violate the separation of powers, procedural due process, and void for vagueness doctrines. *Id.* ¶¶ 176–87, 188–96, 197–201.

After filing suit, Plaintiffs moved for preliminary injunctive relief to bar the Foundation from "[e]nforcing, implementing, or giving effect to" the Change in Priorities Decision or the Mass Termination Action. ECF 3-2 at 1. They also asked the Court to "enjoin NSF's withholding of congressionally appropriated funding and order NSF to timely process award applications using lawful criteria." ECF 2-1 at 58. To obtain such relief, Plaintiffs must satisfy the classic four-factor test by showing (1) a substantial likelihood of success on the merits of their claims, (2) they would suffer irreparable harm absent a preliminary injunction, (3) the balance of equities tips in their favor, and (4) a preliminary injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As the Supreme Court has observed, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted).

After carefully considering the Parties' arguments, the Court finds that Plaintiffs have not met their burden. First, Plaintiffs have not established that this Court is likely to have jurisdiction over their retrospective APA challenges to the loss of their grant funding. Recent Supreme Court

2

decisions confirm that such claims likely belong in the Court of Federal Claims, not this Court. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n* (*APHA*), 606 U.S. ---, 2025 WL 2415669, at *1 (Aug. 21, 2025); *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). And while this Court likely has jurisdiction over Plaintiffs' prospective APA and constitutional claims, Plaintiffs have not met the other requirements for a preliminary injunction to issue. They have failed to demonstrate irreparable harm to justify a preliminary injunction on their prospective APA claims and have not established that they are likely to succeed on their constitutional claims. As such, the Court will **DENY** Plaintiffs' motion for a preliminary injunction, ECF 3.[1]

## I.    BACKGROUND

### A. Statutory and Regulatory Background

Congress established NSF in 1950 and tasked the agency with "initiat[ing] and support[ing] basic scientific research and programs to strengthen scientific research potential and science education programs at all levels in the mathematical, physical, medical, biological, social, and other sciences." 42 U.S.C. § 1862(a)(1). By statute, the Foundation is authorized to "support specific scientific and engineering activities" by "making contracts or other arrangements (including grants, loans, and other forms of assistance) for the conduct of such activities." *Id*. § 1862(b); *see also id*. § 1870(c) (providing that the Foundation also has authority to "enter into contracts or other arrangements" to fund "scientific or engineering activities as the Foundation deems necessary to carry out" its purposes.). The Foundation is also authorized to "utilize appropriations . . . in such manner as will in its discretion best realize" congressional objectives. *Id.* § 1873(e).

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

NSF "fulfill[s] [its] mission chiefly by making grants." NSF, *About NSF*, https://perma.cc/V2WM-D92D. In fiscal year 2024, NSF's budget was over $9 billion, and 93% of that budget was committed to supporting research, education, and related activities. NSF, *NSF at a Glance*, https://perma.cc/AWG9-CTUC. In an average year, the Foundation awards approximately 11,000 grants. Those grants support 1,900 institutions and 353,000 people. *Id*.

To govern the awards process, Congress has established certain criteria and objectives. For example, the Foundation must consider both "intellectual merit" and the "broader impacts" of the proposal in "evaluating grant proposals in the merit review process." 42 U.S.C. § 1862s(b). The "broader impacts" criteria assess a project's effect on congressionally mandated goals, including "[i]ncreasing the economic competitiveness of the United States" and "[d]eveloping an American STEM workforce that is globally competitive." *Id*. § 1862p–14(a). As an additional, express goal under the "broader impacts" review, the statute requires the Foundation to consider a grant proposal's impact on "[e]xpanding participation of women and individuals from underrepresented groups in STEM." *Id*.

Other statutory provisions also require the Foundation to support underrepresented groups in STEM fields. Congress mandates that the Foundation "use" certain "core strategies," including "[d]eveloping intellectual capital . . . with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." 42 U.S.C. § 1862k(b)(1). Accordingly, Congress has ordered that the Director of the Foundation "shall continue to support programs designed to broaden participation of underrepresented populations in STEM fields." *Id*. § 1862s–5(c). The Director also "shall award grants on a competitive, merit-reviewed basis to eligible entities to increase the participation of underrepresented populations in STEM fields." *Id*. § 1862s–5(d)(1); *see also id*. § 19017(a) (providing that "[t]he Director shall

make awards on a competitive, merit-reviewed basis, to institutions of higher education or non-profit organizations . . . to enable such entities to increase the participation of women and underrepresented minorities in STEM studies and careers"). The relevant statutes also include various appropriation provisions to enable the Foundation to carry out these mandates. *See, e.g.*, *id*. § 19017(d) (authorizing appropriations to carry out 42 U.S.C. § 19017 at $5 million for fiscal years 2023 through 2027); *id*. § 1862s–5(e)(5) (authorizing appropriations of $8 million per year for fiscal years 2023 through 2027 to support increasing diversity among STEM faculty at institutions of higher education); *id*. § 1862s–5(f)(6) (providing $15 million in annual appropriations for fiscal years 2023 through 2027 for broadening participation of underrepresented groups in undergraduate STEM education).

By statute, the Foundation must also implement and support specific programs that are in line with its aim of increasing broader participation in the sciences. The Foundation, for example, is required to "support the Historically Black Colleges and Universities Undergraduate Program, the Louis Stokes Alliance for Minority Participation program, the Tribal Colleges and Universities Program, and Hispanic-serving institutions." *Id.* § 1862p–4. Congress also created the Eddie Bernice Johnson INCLUDES Initiative, through which NSF "shall make awards" to institutions of higher education or nonprofit organizations to "carry out a comprehensive national initiative" in service of the "broadening of participation in STEM studies and careers of groups historically underrepresented in such studies and careers." *Id*. § 19012(a).

The process for termination of NSF grants is governed by 2 C.F.R. § 200.340, which provides that a grant "may be terminated" by the Foundation "pursuant to the terms and conditions" of the grant, "including, to the extent authorized by law, if [a grant] no longer

effectuates the program goals or agency priorities." *See id.* § 2500.100 (NSF adopting the Uniform Guidance for federal awards).

### B. Factual Background

#### 1. The Change in Priorities Decision

On April 18, 2025, the Foundation published a "Statement of NSF priorities" on its website. April 2025 Change in Priorities Statement. In that statement, the Foundation acknowledges that its "priorities are . . . modulated by statutory directives and administration priorities" and reiterates that it "uses two statutory criteria," intellectual merit and broader impacts, to evaluate "every award." *Id*. But in the next few paragraphs, the Foundation goes on to describe its revised view of the broader impacts analysis:

> NSF's broadening participation activities, including activities undertaken in fulfillment of the Broader Impacts criterion, and research on broadening participation, must aim to create opportunities for all Americans everywhere.

> These efforts should not preference some groups at the expense of others, or directly/indirectly exclude individuals or groups. Research projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities.

> NSF will continue to support research with the goal of understanding or addressing participation in STEM, in accordance with all applicable statutes and mandates, with the core goal of creating opportunities for all Americans.

> NSF will continue to support basic and use-inspired research in [science and engineering] fields that focus on protected characteristics when doing so is intrinsic to the research question and is aligned with Agency priorities.

*Id*. As of the date of this opinion, the statement remains live on the NSF website. The Foundation also includes a link to the "updates on NSF priorities" at the top of its homepage. NSF, *U.S. National Science Foundation*, https://perma.cc/ZVN4-7WDV.

The Change in Priorities Statement is also accompanied by a series of FAQs that further expand on the Foundation's new priorities. For example:

**[Q] Can I still propose broadening participation activities (e.g., outreach) in fulfillment of the Broader Impacts criterion?**

[A] Investigators should prioritize the first six broader impacts goals as defined by the America COMPETES Reauthorization Act of 2010. Investigators wishing to address goal seven—expanding participation in STEM for women and underrepresented groups—must ensure that all outreach, recruitment, or participatory activities in NSF projects are open and available to all Americans. . . . [E]ngagement activities aimed at these characteristics cannot indirectly preference or exclude individuals or groups based on protected characteristics.

April 2025 Change in Priorities Statement. In the same section, the Foundation also states that it will "continue to operate legally mandated programs that aim to expand participation in STEM for individuals of protected characteristics so long as the projects submitted to these programs do not preference or limit participation based on these protected characteristics." *Id*. The Foundation makes clear that "[t]he NSF guidance on broadening participation applies to all current and future NSF awards." *Id*.

Other FAQs state that grant applications may be "Returned Without Review" if they "do not align with the agency's priorities." April 2025 Change in Priorities Statement. Additionally, the Foundation acknowledges that "[a]wards that are not aligned with program goals or agency priorities have been terminated, including but not limited to those on diversity, equity, and inclusion (DEI), environmental justice, and misinformation/disinformation." *Id*. The FAQs also provide that such terminations are ongoing and cannot be appealed:

**[Q] My award was terminated on the basis that it "no longer effectuates the program goals or agency priorities." Can I appeal or seek alternative dispute resolution?**

[A] *Appeals for terminated awards will not be reviewed or considered*. Terminations of awards on the basis that they no longer effectuate program goals or agency priorities are the final agency decision and are not appealable to NSF. In these instances, NSF does not allege a deficiency occurred (e.g., noncompliance with award terms and conditions or research misconduct of the awardee). Because there are no allegations of deficiencies by the awardee to dispute, there are no grounds for agency appeal. Similarly, alternative dispute resolution is not available where terminations were based on effectuation of program goals or agency priorities.

. . .

**[Q] Did NSF terminate every award that no longer effectuates priorities, or are more still being identified?**

[A] NSF continues to examine awards to ensure they align to agency priorities.

*Id*.

### 2. The Mass Termination Action

Plaintiffs allege that as a result of its Change in Priorities Decision, the Foundation undertook a "massive purge of previously awarded grants and other funding assistance," which Plaintiffs refer to as the "Mass Termination Action." ECF 2-1 ¶ 63. At this stage, the Foundation does not dispute that, beginning on April 18, 2025, and continuing in the weeks that followed, the Foundation abruptly terminated over 1,600 grants worth over $1 billion collectively. *Id*. ¶¶ 66–68 (describing waves of grant terminations on April 25, May 2, May 9, and May 15, 2025). It is also undisputed that NSF sent emails to the grant recipients terminating their awards with mostly identical language:

> The U.S. National Science Foundation (NSF) has undertaken a review of its award portfolio. Each award was carefully and individually reviewed, and the agency has determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities.
>
> . . .
>
> NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal.

ECF 3-9, Franklin Decl. at 22.

### 3.   The Parties and Procedural History

Plaintiffs are five professional associations and one union. Each represents scientists and academic researchers whose grant funding has been terminated by the Foundation.

Three Plaintiffs are organizations who were the direct recipients of now-terminated NSF grants. The American Association of Physics Teachers, Inc. (AAPT) is "a professional association of scientists dedicated to enhancing the understanding and appreciation of physics through education." ECF 2-1 ¶ 18. In addition to its own grants being terminated, its members' grants have been canceled. *Id.* AAPT also has a pending award application that the Foundation has not acted on. *Id*. AAPT sues on its own behalf and on behalf of its members. *Id.* The American Association of Colleges and Universities (AAC&U) is "a global membership organization dedicated to advancing the democratic purposes of higher education by promoting equity, innovation, and excellence in liberal education." *Id*. ¶ 19. AAC&U was the recipient of four NSF grants that have been terminated because, "according to [] NSF, the grants no longer effectuate agency priorities." *Id.* Its members also worked on projects funded by now-cancelled NSF grants. *Id*. AAC&U sues on its own behalf. Finally, Women in Engineering ProActive Network (WEPAN) is "a non-profit educational organization that is dedicated to advancing cultures of inclusion and diversity in engineering education and professions." *Id*. ¶ 23. WEPAN has received NSF grants that the Foundation terminated and has members who worked on projects funded by cancelled grants. *Id.* WEPAN also has pending applications for awards that NSF has not acted on and has members who are principal investigators on pending grant applications. *Id*. WEPAN sues on its own behalf and on behalf of its members.

The three other Plaintiff organizations represent members who have been affected by the grant terminations. Two of these organizations also sue on their own behalf, citing the impact the

Foundation's actions have had on their activities. The American Association of University Professors (AAUP) is a "nonprofit membership association of faculty and other academic professionals." ECF 2-1 ¶ 20. AAUP has approximately 44,000 members around the country. *Id*. AAUP includes "members who work or worked on projects funded by NSF grants that have been cancelled" and has other members who are "principal investigators" on "pending NSF grant applications that NSF has not acted upon." *Id*. AAUP sues on its own behalf and on behalf of its members. The American Educational Research Association (AERA) is "a leading national research society . . . concerned with improving the educational process," with approximately 25,000 members working in higher education, research organizations, and more. *Id*. ¶ 21. AERA's activities include "publish[ing] seven leading peer-reviewed journals and hold[ing] an annual scientific conference of well over 14,000 participants." *Id*. AERA's members have similarly worked on projects funded by now-cancelled NSF grants or are principal investigators on pending NSF grants that the agency has not acted upon. *Id*. AERA sues on its own behalf and on behalf of its members. Finally, the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) is a union that "represents approximately 120,000 workers in higher education," including graduate students, postdoctoral scientists, and researchers. *Id*. ¶ 22. UAW alleges that thousands of its members "rely on NSF grant funding for their jobs and training," including members who work on projects that were funded by now-cancelled grants. *Id*. UAW also represents members who have "pending NSF grant and fellowship applications" before the Foundation and who "depend for their continuing employment on pending NSF applications." *Id*. UAW sues on behalf of its members.

Defendant NSF is an independent agency of the federal government established by the National Science Foundation Act of 1950. 81 Pub. L. No. 507, 64 Stat. 149, 149–57 (May 10,

1950). The office of NSF Director and Deputy Director are currently vacant. Defendant Brian Stone is NSF Chief of Staff and performs the duties of the Director. NSF, *Leadership*, https://perma.cc/2F8K-MZW9. Plaintiffs sue Stone in his official capacity.

Plaintiffs filed their Complaint on June 18, 2025, challenging the Change in Priorities Decision and Mass Termination Action under the APA and the Constitution. ECF 1. They filed their motion for a preliminary injunction on June 23, 2025. ECF 3. The Foundation filed its motion to dismiss on July 11, 2025, which is pending. ECF 15. The Court held a hearing on Plaintiffs' preliminary injunction motion on August 7, 2025. On August 18 and August 25, 2025, Defendants submitted supplemental authority concerning recent D.C. Circuit and Supreme Court rulings relevant to Plaintiffs' motion.[2] ECF 32, 33.

## II.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. The party moving for a preliminary injunction must establish (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable harm without preliminary injunctive relief, (3) that the balance of equities tips in its favor, and (4) that an injunction serves the public interest. *Id.* at 20; *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The third and fourth prongs—the balance of equities and the public interest—merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Notably, if the moving party fails to carry its burden of showing

---

[2] Defendants' August 18 and August 25 filings ask this Court to consider the D.C. Circuit's decision in *Global Health Council v. Trump*, 2025 WL 2326021 (D.C. Cir. Aug. 13, 2025), and the Supreme Court's decision in *APHA*, 2025 WL 2415669, respectively. ECF 32, 33. The D.C. Circuit later revised and re-issued its panel decision in *Global Health Council v. Trump*, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025). Plaintiffs also submitted a notice of supplemental authority to the Court on July 24, 2025, asking the Court to consider the First Circuit's decision in *Am. Pub. Health Ass'n v. Nat'l Insts. Health*, 145 F.4th 39 (1st Cir. 2025), which was stayed in part by the Supreme Court's August 21 order. ECF 24. Plaintiffs also filed a response to the Foundation's notice of the Supreme Court's *APHA* stay decision. ECF 34.

a likelihood of success on the merits or irreparable injury, a court may deny a motion for a preliminary injunction without considering the other factors. *See, e.g., Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1089 (D.C. Cir. 2011); *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

"Under the [APA], a court may set aside an agency's final decision only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ams. for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (quoting 5 U.S.C. § 706(2)(A)). In APA cases, the Court can grant a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 or "issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings" when doing so is "necessary to prevent irreparable injury." 5 U.S.C. § 705. The same factors governing the issuance of a preliminary injunction govern the issuance of relief under section 705. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

## III.    ANALYSIS

Plaintiffs move for a preliminary injunction based on three categories of claims in their complaint. First, they move for preliminary relief on their APA challenges to the Foundation's cancellations of their grant funding. Among other relief they seek for those claims, Plaintiffs ask this Court to preliminarily "set aside" the Mass Termination Action. ECF 2-1 at 58; ECF 3-2 at 2 (asking the Court to "reinstate all grants terminated as part of the Mass Termination Action"). In short, Plaintiffs want this Court to immediately undo the Foundation's waves of grant cancellations in April and May 2025, thereby restoring grant funding, while the litigation proceeds. Second, with respect to their APA challenges to the Foundation's use of its new agency priorities in assessing award applications going forward, they ask this Court to "order NSF to timely process

award applications using lawful criteria"—in effect, to stop the agency from applying its new priorities to grant applications during the course of this litigation. ECF 2-1 at 58. And finally, Plaintiffs move for a preliminary injunction on three constitutional claims alleging that the Foundation has (1) violated the separation of powers and the Spending and Appropriations Clauses, (2) violated their procedural due process rights in the grant termination process, and (3) violated their due process rights through an unconstitutionally vague application of the grant termination regulation.[3] *Id.* at 52–57; *see* ECF 3-1 at 38–46. For these claims, they seek preliminary relief that would "enjoin NSF's withholding of congressionally appropriated funding" and "bar[]" the Foundation from "carry[ing] out" the Change in Priorities Decision and the Mass Termination Action. ECF 2-1 at 58.

For the reasons the Court will explain in greater detail below, the Court must deny Plaintiffs' motion. For each of the three types of claims at issue, a dispositive factor weighs against granting any preliminary relief. In Section III.A, the Court finds that Plaintiffs have not established a likelihood that this Court has jurisdiction over their retrospective APA claims seeking restoration of cancelled grant funding. The Court concludes, however, that it can hear Plaintiffs' prospective APA and constitutional claims, which seek declaratory or injunctive relief from unlawful agency action. In Section III.B, the Court finds that Plaintiffs have standing to proceed on their remaining claims. But, as the Court explains in Sections III.C and III.D, respectively, Plaintiffs have failed to demonstrate irreparable harm flowing from their prospective APA claims and have also failed to show a likelihood of success on the merits of their constitutional claims.

---

[3] Plaintiffs bring two other counts in their complaint, but the Court does not address them at this time because Plaintiffs do not rely on those counts in their preliminary injunction motion. *See* ECF 2-1 ¶¶ 171–75 (arguing that the Foundation has unlawfully withheld agency action under 5 U.S.C. § 706(1)); *id.* ¶¶ 202–05 (alleging that Defendant Stone's actions are ultra vires).

### A. Jurisdiction

Before deciding whether Plaintiffs are substantially likely to succeed on the merits of both their APA and constitutional claims, the Court must assess whether a "substantial likelihood of jurisdiction" exists to hear those claims. *Church v. Biden*, 573 F. Supp. 3d 118, 133 (D.D.C. 2021); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). This section begins by analyzing this Court's jurisdiction as delineated by the APA and the Tucker Act.

As a starting point, the "United States and its agencies are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Sovereign immunity is "jurisdictional in nature" and "the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "Waivers of sovereign immunity must be strictly construed to protect the prerogatives of the government and to ensure the courts stay within the jurisdiction provided by Congress." *Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881, at *4 (D.C. Cir. Sept. 2, 2025). In the APA, Congress provided a limited waiver of sovereign immunity for claims against the United States by persons "adversely affected . . . by agency action" if they "seek[] relief other than money damages." 5 U.S.C. § 702. However, the APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id*.

The Tucker Act grants the United States Court of Federal Claims jurisdiction over suits involving "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The D.C. Circuit has "interpreted the Tucker Act 'to confer exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of

Federal Claims.'" *Crowley*, 38 F.4th at 1106 (quoting *Hammer v. United States*, 989 F.3d 1, 2, (D.C. Cir. 2021)).

Applying these standards, the Court considers below whether it has jurisdiction to hear each category of Plaintiffs' claims at issue.

### 1. Retrospective APA Claims

Plaintiffs' complaint does not overtly seek monetary relief, nor expressly invoke contractual claims. *See* ECF 2-1 at 45–58. But despite how Plaintiffs attempt to frame their causes of action, this Court nonetheless lacks jurisdiction over Plaintiffs' retrospective APA claims because they are "at [their] essence" contract actions "over which the Court of [Federal] Claims has exclusive jurisdiction." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982). The Court comes to that conclusion for several reasons that it will explain below. First, Plaintiffs' grants satisfy all the requirements for a contract under the Tucker Act, including that they involve consideration. *See Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 414 (1995). Second, Plaintiffs' rights stem from the cancelled grant agreements and they seek specific performance of those agreements—just like a plaintiff would in a breach of contract action. In other words, "the substance of the[ir] claims may be understood 'as entirely contained within the terms of the contract' or in principles of contract law." *Climate United Fund*, 2025 WL 2502881, at *5 (quoting *Ingersoll-Rand Co. v. United States*, 780 F.2d 72, 78 (D.C. Cir. 1985)). Finally, the Supreme Court has recently made clear that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" which forecloses Plaintiffs' claims. *Dep't of Educ.*, 145 S. Ct. at 968; *see also APHA*, 2025 WL 2415669, at *2 (Barrett, J., concurring).

### a. Plaintiffs' NSF Grants are Contracts Under Court of Federal Claims Precedent.

To constitute a contract under the Tucker Act, an agreement with the government must meet four requirements: (1) "mutual intent to contract," (2) "an offer and acceptance," (3) "consideration," and (4) "a Government representative who had actual authority to bind the Government." *Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (quoting *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997)). Plaintiffs argue that their grants lack the necessary element of "consideration" because they do not provide the government with a "tangible" or "direct" benefit. ECF 3-1 at 50 (citing *St. Bernard Par. v. United States*, 134 Fed. Cl. 730, 735 (2017)). They do not dispute that the grant agreements at issue meet the other requirements for a contract. *See id.* Whether grant agreements involve adequate consideration to qualify as contracts is not clear cut. Indeed, courts in this district have disagreed about whether there is consideration in various government grant agreements. *Compare Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*, No. 25-cv-1775 (BAH), 2025 WL 2374528, at *16 (D.D.C. Aug. 14, 2025) (concluding that the USDA grants at issue "lack[ed] consideration" to constitute contracts because they did not confer "direct benefit[s]" onto the government), *with Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-cv-1643 (APM), 2025 WL 1865160, at *10–11 (D.D.C. July 7, 2025) (holding that certain DOJ grants included consideration because grant recipients "agreed to comply with an array of requirements attached to the receipt, use, and distribution of the grant money").

Without drawing any sweeping conclusions about whether *every* grant agreement involves consideration, this Court finds that the NSF agreements at issue in this case likely do. The Court of Federal Claims, addressing similar NSF grant agreements, has persuasively explained why these agreements contain all the "required elements for a binding contract with the United States,"

including consideration. *Thermalon Indus.,* 34 Fed. Cl. at 414. The Court of Federal Claims concluded that "the terms of the offer and acceptance, . . . the 'Grant General Conditions,' and the other terms and conditions specified by NSF in the award, provide for the passage of consideration between the parties." *Id*. at 415. That is because the Foundation receives several benefits from grantees, including the "publication of [their] research results, title to any equipment [they] selected and then purchased with grant funds, and a royalty-free license to the intellectual property resulting from the research, including a license under a patent." *Id*. Plaintiffs' NSF grants include similar provisions. For example, Plaintiffs whose grants are covered by the October 2024 Grant General Conditions are subject to conditions, including a royalty-free license, that mirror those discussed in *Thermalon*. NSF, *Grant General Conditions* (*GC-1*) at 23, https://perma.cc/T6HX-YP3L. This Court finds *Thermalon* persuasive. Accordingly, the grant agreements at issue likely satisfy the consideration requirement for a contract under the Tucker Act.[4]

### b.  Plaintiffs' Claims are Contractual Under *Megapulse*'s Two-Prong Test.

Not every legal claim that involves a government contract is outside of a district court's jurisdiction. Claims based on "truly independent legal grounds," such as statutes or the

---

[4] Other grants that are the subject of Plaintiffs' claims are not governed by the Grant General Conditions but are instead subject to cooperative agreement terms or a prior set of grant conditions known as the Research Terms & Conditions. *See* ECF 3-1 at 22 n.20 (recognizing that some of Plaintiffs' grants were subject to the Research Terms & Conditions or the terms and conditions governing cooperative agreements); ECF 3-3, Williams Decl. ¶¶ 20–21 (WEPAN had a grant governed by a cooperative agreement, not the Grant General Conditions); ECF 3-5, Mack Decl. ¶¶ 11–12, 19–20, 26–27, 33–34 (Vice President of AAC&U discusses grants governed by the Research Terms & Conditions); ECF 3-4, Cunningham Decl. ¶¶ 11–12, 19–20 (CEO of AAPT discussing grants governed by the Research Terms & Conditions).

It is unclear on the record before this Court if those agreements are materially different from the NSF grant agreements at issue in *Thermalon* such that they lack the requisite consideration to be considered contracts. The Parties have not (1) identified how many of each type of grant are at issue nor (2) made any specific arguments about whether those agreement types provide consideration to the federal government. Given the posture of this analysis, the Court concludes that NSF grants are likely to be contracts for the reasons already discussed. To the extent that Plaintiffs' individual grants have terms and conditions that differ from those at issue in *Thermalon*, they have not pointed to specific terms that they believe clearly demonstrate that those agreements do not include any consideration. They have thus failed to meet their burden to demonstrate a likelihood of the Court's jurisdiction on the basis of any individual grants. *Food & Water Watch, Inc.*, 808 F.3d at 913.

Constitution, can be heard in district court, while those that "sound[] genuinely in contract" belong in the Court of Federal Claims. *Megapulse*, 672 F.2d at 969–70. Under the D.C. Circuit's decision in *Megapulse, Inc. v. Lewis*, the Court must inquire into the "essence" of a particular claim to ascertain whether it "presents a disguised contract action." 672 F.2d at 967–68; *see also Kidwell v. Dep't of the Army*, 56 F.3d 279, 284 (D.C. Cir. 1995) ("The plain language of a complaint . . . does not necessarily settle the question of Tucker Act jurisdiction."). To do so, the Court applies a two-prong test, examining (1) "the source of rights upon which [Plaintiffs] base[] [their] claims" and (2) "the type of relief sought (or appropriate)." *Megapulse,* 672 F.2d at 968.

The Court begins with the "source of the rights" upon which Plaintiffs base their retrospective APA claims. *Id.* Having found that the grant agreements at issue are "contracts" for purposes of the Tucker Act, the Court easily concludes that the source of rights upon which Plaintiffs' retrospective APA claims arise is based in contract. Plaintiffs' briefing emphasizes that their claim is about their right to cancelled NSF grant funding. *See, e.g.*, ECF 3-1 at 35 (NSF failed to "provide a workable, sensible, or meaningful reason or basis for the termination of awards" (internal quotations omitted)). But Plaintiffs' rights to these payments are grounded in the canceled grant agreements, which the Court has already concluded are contracts. *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (noting that the right in question "arose only upon creation and satisfaction of its contract with the government; in no sense did it exist independently of that contract"). Tellingly, the thrust of Plaintiffs' claim that NSF's action was arbitrary and capricious under the APA is that NSF previously promised grant funding and then withdrew that funding without explanation, which sounds like a complaint about breach. *See, e.g.*, ECF 3-1 at 33 (arguing that "NSF changed the rules in the middle of the game" by issuing and then terminating grants); *see also Climate United Fund*, 2025 WL 2502881, at *8 ("Claims of

arbitrary grant termination are essentially contractual."). Plaintiffs' retrospective APA claims thus "complain[] of wrongful termination" of their government contracts and are "founded upon the contract[s]." *Ingersoll-Rand Co.*, 780 F.2d at 77–79.

Next, the Court examines the "type of relief" Plaintiffs seek. *Megapulse*, 672 F.2d at 968. Plaintiffs request that this Court "set aside" the Mass Termination Action and "reinstate all grants terminated as part of the Mass Termination Action," including by "resum[ing] administering these reinstated grants." ECF 2-1 at 58; ECF 3-2 at 2. Plaintiffs emphasized at the hearing before this Court that they are not seeking any money damages, but instead are asking for "a restoration of the grant relationship," which is equitable relief the Court of Federal Claims cannot order. Rough Draft Tr. of Hr'g on Mot. for Prelim. Inj. (Aug. 7, 2025) (Rough Hr'g Tr.) at 6:13–18.  According to Plaintiffs, a "reinstatement" of the grant funding would come with terms and conditions attached, identifying the projects the funding must be used for, in contrast to money damages that come "free and clear." ECF 3-1 at 48 (recognizing that money damages can be "used for any purpose").

Plaintiffs' arguments do not persuade the Court that the relief they seek is not contractual. While Plaintiffs do not ask for money damages, they nonetheless seek a contract-based remedy: specific performance. And specific performance is a "'typical contract remedy' that indicates a claim is 'founded upon a contract for purposes of the Tucker Act.'" *Climate United Fund*, 2025 WL 2502881, at *7 (quoting *Spectrum Leasing*, 764 F.2d at 894–95). In *Ingersoll-Rand Company v. United States*, the D.C. Circuit analyzed a similar situation involving a plaintiff's "request [for] an order directing the Air Force to reinstitute the award of [a] contract." 780 F.2d at 79–80. The Circuit held that issuing an injunction in such a case "would mean that the government must perform" the terms of the contract and that a complaint seeking that relief must therefore "be

resolved by" the Court of Federal Claims. *Id*. at 80. Thus, according to Circuit precedent, a request for relief that seeks the reinstatement of the original award, like what Plaintiffs seek, "amount[s] to a request for specific performance." *Id*. Plaintiffs are correct that the Tucker Act provides money damages as the exclusive remedy for contractual actions against the federal government, foreclosing courts from ordering specific performance. *Megapulse*, 672 F.2d at 971 (recognizing the general rule that "a plaintiff cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract"). But that limitation does not transform Plaintiffs' contract claim into one that this Court has jurisdiction over; it is another reason to bar its entry. That is because Congress established a scheme that included a "deliberate limitation on certain types of remedies," which was "intended to foreclose specific performance of government contracts." *Ingersoll-Rand*, 780 F.2d at 80; *see also Climate United Fund*, 2025 WL 2502881, at *4 ("Because Congress has limited the forum and the remedies for contract claims against the government, a litigant whose claim is essentially contractual cannot avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by simply asking for injunctive relief in district court."). That of course means that sometimes a "plaintiff cannot receive all its requested remedies," but the Court cannot relax jurisdictional requirements because available remedies may seem inadequate. *Ingersoll-Rand*, 780 F.2d at 80. Because "the relief sought is a typical contract remedy," the Court concludes that Plaintiffs' retrospective APA claims are "founded upon a contract for purposes of the Tucker Act." *Spectrum Leasing*, 764 F.2d at 895.

Finally, Plaintiffs argue that there must be jurisdiction over their claims in district court because some of them cannot sue in the Court of Federal Claims. ECF 3-1 at 51. Some of Plaintiffs' members are staff members who work on NSF-funded projects but are not the direct recipients of the grants. Accordingly, they may lack privity with the federal government and cannot bring a

contract suit in the Court of Federal Claims. *See Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (to maintain a cause of action under the Tucker Act, "there must be privity of contract between the plaintiff and the United States"). That fact does not, however, create jurisdiction in this Court over their contract claims. As an initial matter, it is likely that *someone* can sue in the Court of Federal Claims based on the grant terminations at issue. *See Thermalon Indus.*, 34 Fed. Cl. at 414. This Court cannot exercise jurisdiction where it does not otherwise have it because there are aggrieved parties who lack other options to seek relief. While it may be true that some Plaintiffs or their members cannot bring their own contractual suits in the Court of Federal Claims, the Court cannot expand the bounds of its jurisdiction to fill that gap.

       **c.**  *Department of Education v. California* **and** *NIH v. APHA* **Confirm that Plaintiffs' Retrospective APA Claims are Contractual.**

Finally, the Supreme Court's recent decisions in *Department of Education v. California* and *National Institutes of Health v. American Public Health Association* (*APHA*) further confirm the Court's conclusion that Plaintiffs' retrospective APA claims belong in the Court of Federal Claims. 145 S. Ct. 966; 2025 WL 2415669. While the Supreme Court's analysis has been issued in stay orders, the reasoning in those decisions is decidedly instructive. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases.").

Start with *Department of Education*. In March 2025, a number of states sued the Department of Education, challenging the Department's termination of education-related grants. Similar to what Plaintiffs seek here, the *Department of Education* plaintiffs sought a temporary restraining order from a district court "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations." 145 S. Ct. at 968. The Supreme Court held that the government was "likely to succeed in showing

the District Court lacked jurisdiction to order the payment of money under the APA" because the Tucker Act "impliedly forbids" APA relief in this context and the APA does not waive sovereign immunity for "claims seeking 'money damages." *Id*. (quoting 5 U.S.C. § 702). The Court reiterated that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money.'" *Id*. (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

And like Plaintiffs do here, the plaintiffs in *APHA* challenged both (1) NIH's internal "guidance documents" describing its new agency priorities concerning grant funding and (2) individual grant terminations, which those plaintiffs similarly alleged were a result of the new guidance. *APHA*, 2025 WL 2315669, at *1 (Barrett, J., concurring). After holding a bench trial, the district court issued orders vacating both the challenged agency guidance and the resulting grant terminations. *APHA v. NIH*, No. 25-cv-10787 (WGY), 2025 WL 1747128, at *1–2 (D. Mass. June 23, 2025); *Massachusetts v. Kennedy*, No. 25-cv-10814 (WGY), 2025 WL 1747213, at *1–2 (D. Mass. June 23, 2025). The district court held that both NIH actions were arbitrary and capricious because the agency terminated grants on the basis of "DEI," a concept that the agency offered no definition nor reasoned explanation of. *Massachusetts v. Kennedy*, No. 25-cv-10814, ECF 163 at 87–96.

The government asked the Supreme Court to stay the district court decision pending appeal, and the justices split over which aspects of the lower court decision should be stayed. Four justices voted to deny NIH's stay application in full, while four justices voted to grant the application in full. *Id*. In concurring with the decision to partially stay the order, Justice Barrett, explaining her deciding vote, stated that the district court likely lacked jurisdiction to hear the challenges to the grant terminations, which belonged in the Court of Federal Claims. The district court's decision,

despite being styled as vacatur, "ordered the Government to pay plaintiffs sums due under the agreements" and such claims are "founded upon" contract. *Id*. at *2. In contrast, the district court was "likely correct to conclude it had jurisdiction to entertain an APA challenge to the guidance" because that claim is "legally distinct" and "[v]acating the guidance does not reinstate terminated grants." *Id*. Based on Justice Barrett's concurrence, claims contesting past grant terminations— and seeking the reinstatement of grant funding—belong in the Court of Federal Claims, not district court.

Plaintiffs initially tried to distinguish their claims from those at issue in *Department of Education* by pointing to how their requested relief "would not require paying past-due sums" and the "terms and conditions of each individual grant award" are not at issue. ECF 3-1 at 52–53. But those arguments are far less convincing after *APHA*, in which the district court only ordered vacatur of agency action, not the direct restoration of any grant. *Compare California v. U.S. Dep't of Educ*., 769 F. Supp. 3d 72, 80 (D. Mass. Mar. 10, 2025) (ordering the government to "immediately restore" plaintiffs to the status quo prior to grant terminations), *with Massachusetts v. Kennedy*, 2025 WL 1747213, at *2 ("vacat[ing]" the grant terminations because they are "arbitrary and capricious"). Plaintiffs must have recognized their uphill battle because they made two new arguments in *APHA*'s wake: (1) that *APHA* does not apply to their APA contrary-to-law claim because that case only discussed an arbitrary-and capricious claim and (2) that the stay decision in *APHA* does not overrule *Bowen v. Massachusetts*, 487 U.S. 879 (1988), which this Court remains bound by. ECF 34 at 2.

The Court finds both arguments unconvincing. Plaintiffs are correct that *APHA* does not bar their APA contrary-to-law claim insofar as that claim challenges agency guidance. *APHA*, 2025 WL 2415669, at *3 (Barrett, J., concurring) (noting that those plaintiffs' "APA challenges to

the guidance belong in district court"). But if Plaintiffs are suggesting that they can use their APA contrary-to-law claim to vacate the Mass Termination Action or otherwise seek the reinstatement of grant funding, that claim would fail the *Megapulse* test for the reasons stated above. *See supra* Section III.A.1.a. Plaintiffs' claims to restored grant funding come from their grant awards, not from any statutory provision. As such, Plaintiffs have cited no authority for applying the *Megapulse* inquiry differently for APA contrary-to-law claims, as opposed to arbitrary-and-capricious claims. Nor could they, given that the limits on APA relief apply to both. *See* 5 U.S.C. § 702 (APA cannot provide relief if any other statute "impliedly forbids the relief which is sought" or if the plaintiffs seek "money damages").

Plaintiffs' reliance on *Bowen* is also unavailing. In *Bowen v. Massachusetts*, Massachusetts brought a suit against the Department of Health and Human Services challenging the Department's refusal to reimburse the State for some expenditures under its Medicaid program. 487 U.S. at 882. The Supreme Court held that the district court's ordered relief in that case did not constitute "money damages" under the APA because Massachusetts was "seeking funds to which a statute allegedly entitles it, rather than money in compensation for . . . losses," and such a claim was based in statute, not contract. *Id*. at 901. The district court corrected "the Secretary's interpretation of federal law," which potentially caused funds to be paid to Massachusetts, but did not "find[] that the Federal Government owed Massachusetts that amount, or indeed, any amount of money." *Id*. at 909–10. Justice Barrett reaffirmed this distinction by citing *Bowen* in her *APHA* concurrence. *APHA*, 2025 WL 2415669, at *2. Applying that principle, if this Court vacated the Change in Priorities Decision and that caused funds to flow to Plaintiffs, such relief would be permissible under *Bowen* and *APHA*. But Plaintiffs offer no explanation for how *Bowen* allows this Court to

order the reinstatement of the already-terminated grant relationships, which would direct the Foundation to award funds to Plaintiffs.

In sum, applying the D.C. Circuit's *Megapulse* test and the Supreme Court's *Department of Education* and *APHA* analysis, Plaintiffs' retrospective APA claims fall within the Court of Federal Claims' exclusive jurisdiction. Plaintiffs seek relief that in effect enforces the Foundation's obligation to pay their cancelled grant money. That is, in essence, a contract action. Accordingly, this Court lacks jurisdiction over those claims.

### 2. Prospective APA Claims

This Court likely does have jurisdiction over Plaintiffs' other claims at issue here, namely: (1) their APA claims challenging prospective agency action and (2) their constitutional claims.[5] The Court begins with their prospective APA claims.

Distinct from Plaintiffs' APA challenges to the cancellation of their grant funding, Plaintiffs also seek prospective reform of agency behavior—*i.e.*, to change how NSF will consider their grants going forward. Plaintiffs ask this Court to find that the Change in Priorities Decision was arbitrary and capricious and contrary to law, and thus set it aside under 5 U.S.C. § 706(2). ECF 2-1 at 58; ECF 3-1 at 48 (arguing that setting aside the Change in Priorities Decision under the APA "will ensure that NSF does not apply its unlawful policy" in "future decisions").

As the Court has already recognized, Plaintiffs can only bring an action under the APA if they "seek[] relief other than money damages." 5 U.S.C. § 702; *Vietnam Veterans of Am. v. Sec'y*

---

[5] It is unclear if the Foundation is even contesting the Court's jurisdiction over these claims. In its motion to dismiss, the Foundation argues that "Plaintiff[s'] APA claims fail because they seek impermissible money damages." ECF 15 at 30. Such an argument appears only to contest the Court's jurisdiction to order backwards-looking monetary relief and does not affect the Court's analysis of prospective APA claims through which Plaintiffs seek declaratory or injunctive relief. Additionally, the Foundation does not seem to contest that this Court has jurisdiction to hear Plaintiffs' constitutional claims. The Court engages in the following jurisdictional analysis to satisfy its "independent obligation to assure [itself] that jurisdiction is proper before proceeding to the merits." *Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 324 (2008).

*of the Navy*, 843 F.2d 528, 535 (D.C. Cir. 1988) (Congress only waived sovereign immunity under the APA "for non-monetary claims"). Even though this case arises, at its core, from the Foundation's conduct related to grant funding, the Court can nonetheless hear Plaintiffs' remaining APA claims if the relief they seek has significant value independent of any monetary recovery. *Vietnam Veterans of Am.*, 843 F.2d at 535–36 (assessing the merits of plaintiffs' APA claims because they "pursu[ed] only [their] non-monetary claims"); *Kidwell*, 56 F.3d at 284 (finding jurisdiction over plaintiff's APA claim because "the sole remedy [he] requested is declaratory or injunctive relief that is not negligible in comparison with the potential monetary recovery"). Plaintiffs' declarations support their position that setting aside the Change in Priorities Decision has significant, independent value separate from any money that may flow to them through restored grant funding. For instance, a court order setting aside the Decision would allow Plaintiffs' members to plan future project submissions and understand how NSF will evaluate them. *See, e.g.*, ECF 2-1 ¶¶ 60, 89 (describing Plaintiffs' difficulties in understanding NSF's new priorities and planning for the future). Vacating the Decision could require the agency to re-visit how it approaches the "broader impacts" review criterion and mandate greater consideration of "[e]xpanding participation of women and individuals from underrepresented groups in STEM," as the Foundation previously prioritized. ECF 2-1 ¶ 167 (quoting 42 U.S.C. § 1862p-14(a)(7)). Plaintiffs' members have also described the value of receiving fair consideration for their projects under a review process that incorporates the Foundation's prior broader impacts analysis. *See* ECF 3-9, Franklin Decl. ¶ 19 ("I am extremely concerned that other NSF grant applications I have submitted . . . will not be fairly considered or considered at all under NSF's changed priorities."); *id.* ("NSF's changed priorities also create[] significant uncertainty for future grant applications that I am considering submitting."); ECF 3-10, Litzler Decl. ¶¶ 30–31 (discussing future grant

applications and noting that "[the declarant] and many others have put an extraordinary amount of time and effort into writing these grants in line with NSF's prior expectations and guidelines"). The Foundation does not contest that such relief would have value to Plaintiffs and their members. The Court can thus exercise jurisdiction to evaluate the agency's policies and priorities under the APA. *See APHA*, 2025 WL 2415669, at *2 (Barrett, J., concurring) (finding that the district court "was likely correct to conclude that it had jurisdiction to entertain an APA challenge to the guidance").

### 3. Constitutional Claims

The Court also has jurisdiction to hear Plaintiffs' constitutional claims challenging the Change in Priorities Decision and Mass Termination Action under the separation of powers, procedural due process, and void for vagueness doctrines. The Court's prior jurisdictional analysis was based on Plaintiffs' need to rely on a statutory waiver of sovereign immunity to bring their APA claims. *See* 5 U.S.C. § 702; 28 U.S.C. § 1491(a)(1). But Plaintiffs can bring their constitutional claims under non-statutory review pursuant to the *Larson-Dugan* exception. Under that exception, Plaintiffs do not need a waiver of sovereign immunity to bring claims against executive officers acting outside the bounds of the Constitution or their statutory authority. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963). As the Supreme Court explained in *Larson*, such a waiver is unnecessary because, when an officer acts beyond the limits set by statute or the Constitution, "his actions beyond those limitations are considered individual and not sovereign actions." 337 U.S. at 689; *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) ("Under this exception, suits for specific relief against officers of the sovereign allegedly acting beyond statutory authority or unconstitutionally are not barred by sovereign immunity."). Plaintiffs' constitutional claims are thus properly before this

27

Court. *See Urb. Sustainability Dirs. Network*, 2025 WL 2374528, at *20 n.9 (reiterating that "constitutional and other nonstatutory claims need not rely on any waiver of sovereign immunity because where an officer is not doing the business which the sovereign has empowered him to do such immunity did not attach in the first place").

***

Finally, the Court observes that it is likely not only permitted, but required, to split Plaintiffs' claims with the Court of Federal Claims. *APHA*, 2025 WL 2415669, at *3 (Barrett, J., concurring) (noting that this "[t]wo-track litigation results from the jurisdictional scheme governing actions against the United States"). This Court can retain jurisdiction over Plaintiffs' claims that are properly before it, while the claims that sound in contract can be transferred to the Court of Federal Claims. In *TransOhio Savings Bank v. Director, Office of Thrift Supervision*, the D.C. Circuit instructed district courts to "consider . . . claims individually." 967 F.2d 598, 609 (D.C. Cir. 1992). In doing so, the Circuit held that "litigants may bring common-law contract claims only as actions for money damages in the Claims Court, but they may bring statutory and constitutional claims for specific relief in federal district court." *Id.* at 610. This Court notes, however, that under 28 U.S.C. § 1500, the Court of Federal Claims lacks jurisdiction over "claims pending in other courts when those claims arise from substantially the same operative facts." *APHA*, 2025 WL 2415669, at *3 (Barrett, J., concurring); *see also id.* at *15 n.4 (Jackson, J., concurring in part and dissenting in part) (citing *United States v. Tohono O'odham Nation*, 563 U.S. 307, 317 (2011)). Neither this Court's analysis today nor the Supreme Court's stay order in *APHA* address whether "the challenges to the guidance and grant terminations have the requisite factual overlap," but if so, Plaintiffs "will have to proceed sequentially rather than simultaneously." *Id.* at *3 (Barrett, J., concurring).

28

In sum, the Court lacks jurisdiction to hear Plaintiffs' retrospective APA claims because they sound in contract. *See supra* Section III.A.1. The Court thus denies the instant motion as it relates to those portions of Plaintiffs' APA claims outright. The Court does, however, have jurisdiction to consider Plaintiffs' prospective APA and constitutional claims. *See supra* Section III.A.2, A.3.

Now turning to those continuing claims, the Court will (1) address Plaintiffs' standing to bring those claims, (2) conclude that Plaintiffs have failed to demonstrate irreparable harm stemming from their prospective APA claims, and (3) find that Plaintiffs are unlikely to succeed on the merits of their constitutional claims. Having found that Plaintiffs have not met their burden on any claim, the Court will deny the motion for preliminary relief.

### B. Plaintiffs Have Standing to Bring Their Constitutional and Prospective APA Claims.

An organization can establish standing "by showing either an injury to itself" (organizational standing) or "a cognizable injury to one or more of its members" (associational standing). *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39 (D.C. Cir. 2016). An association has standing to sue on behalf of its members only if "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

The Court concludes that, at a minimum, WEPAN has associational standing to bring this suit and the Court can thus properly consider Plaintiffs' preliminary injunction motion with respect to their prospective APA and constitutional claims. *See Murthy v. Missouri*, 603 U.S. 43, 57 (2024) ("A proper case or controversy exists only when at least one plaintiff establishes that she has

29

standing to sue."). WEPAN has satisfied the requirements of associational standing. First, WEPAN member Elizabeth Litzler would have standing to sue in her own right. As the Director for the Center for Evaluation & Research for STEM Equity at the University of Washington, Litzler is involved in sixteen grant proposals that are currently under review at the Foundation. ECF 3-10, Litzler Decl. ¶¶ 2, 30. She stated in her declaration that "all of these under review grants . . . as well as future grants . . . will not be fairly considered or considered at all under NSF'[s] changed priorities." *Id.* ¶ 31. And she testified that she has "put an extraordinary amount of time and effort into writing these grants." *Id.* These expenditures of time and effort—and the potentially lost opportunity to compete for funding—suffice to demonstrate standing. *See Global Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *5 (D.C. Cir. Aug. 28, 2025) (being deprived of the opportunity to "compete for [] funds even if not guaranteed to obtain them" is a form of injury); *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 132–33 (D.C. Cir. 2006) (finding that a significant "drain on . . . resources and time" constitutes an injury for standing purposes).

Additionally, WEPAN seeks to protect interests that are germane to its purpose, namely "advancing cultures of inclusion and diversity in engineering education and professions." ECF 2-1 ¶ 23. Its interest is undoubtedly affected by the Foundation's Change in Priorities Decision, which altered the Foundation's approach to diversity-related programming. *See supra* Section I.B.2. And the remedy that Plaintiffs seek—vacatur of or an injunction reforming the Change in Priorities Decision—does not require that any of WEPAN's individual members participate in this suit. As the D.C. Circuit has explained, "[m]ember participation is not required where a 'suit raises a pure question of law' and neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization." *Ctr.*

*for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015). Plaintiffs ask the Court to "invalidat[e]" an NSF policy because they allege that the Foundation failed to "compl[y] with its statutory [and constitutional] obligations." *Id.* Resolving that claim does not require the Court to consider "the individual circumstances" of the members. *Id.*

The Foundation argues that Plaintiffs fail to satisfy the third prong of the associational standing test because "the relief they seek requires the participation of every grantee whose grant was terminated but not all grantees are parties to this lawsuit."[6] ECF 15 at 21. The Foundation cites the Supreme Court's recent decision in *Trump v. CASA, Inc.* as foreclosing "the universal vacatur that Plaintiffs seek." *Id.* at 24 (citing 145 S. Ct. 2540 (2025)). The Court rejects the Foundation's *CASA* arguments for two reasons. First, the Court need not address the Foundation's arguments for why it cannot vacate each individual grant termination—it has already acknowledged that it lacks the jurisdiction to do so. *See supra* Section III.A.1 (discussing the Court's lack of jurisdiction over claims retrospectively challenging individual grant terminations). Second, the Court does not have to resolve all questions about the scope of relief at this stage. After *CASA*, it still has the authority to vacate or order the Foundation to revise the Change in Priorities Decision if it is found to be unlawful. As the *CASA* court noted, APA relief setting aside unlawful agency action is not a universal injunction but is instead one of the core remedies employed by courts in cases challenging agency action. *See CASA*, 145 S. Ct. at 2554 n.10 ("Nothing we say today resolves the distinct question whether the [APA] authorizes federal courts to vacate federal agency action."); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020) ("[V]acatur is the normal remedy under the APA."). Such a remedy would redress Plaintiffs' harm in satisfaction of the standing doctrine. *See Automobile Workers v. Brock*, 477

---

[6] The Foundation also accuses Plaintiffs of "impermissibly seek[ing] to bypass the rules governing class actions," but it is unclear how that factors into the associational standing analysis. ECF 15 at 25–26.

U.S. 274, 288 (1986) (noting that the requested relief, "if granted, will inure to the benefit of those members of the association actually injured").

### C.  Plaintiffs Do Not Demonstrate Irreparable Harm for Their Prospective APA Claims.

As the Court has already recognized, the APA claims over which this Court has jurisdiction challenge the Change in Priorities Decision as arbitrary and capricious and contrary to law. ECF 3-1 at 32–38. Plaintiffs allege that, in undertaking the Decision, the Foundation "failed to adequately explain its changes," "to consider serious reliance interests," or "to consider significant consequences of its actions." *Id* at 32. Plaintiffs also argue that the Change in Priorities Decision violates statutes in which Congress required the Foundation to support the increased participation of underrepresented populations in STEM, including through the funding of certain programs. *Id.* at 35–36. The Court does not need to address the merits of these claims at this time because Plaintiffs have not demonstrated any irreparable harm stemming from the Change in Priorities Decision, which is fatal to their request for preliminary relief.[7] *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").

To constitute irreparable injury, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present

---

[7] This section focuses on the injury inquiry for Plaintiffs' APA claims. Plaintiffs have also asserted constitutional injuries, which would constitute irreparable harm. *See Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) ("[A] prospective violation of a constitutional right constitutes irreparable injury for purposes of seeking equitable relief."). But as discussed below, the Court finds that Plaintiffs are not likely to succeed on the merits of their constitutional claims. In a single sentence, Plaintiffs gestured at incorporating their alleged constitutional violations into their request for APA relief. ECF 3-1 at 38 ("NSF's constitutional violations are a basis for APA relief."). But any such argument is woefully under-explained and therefore forfeited. *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997) ("Because the [Plaintiffs] raise[] this issue in such a cursory fashion, we decline to resolve it."); *Ry. Lab. Execs. Ass'n v. U.S. R.R. Ret. Bd.*, 749 F.2d 856, 859 n.6 (D.C. Cir. 1984) ("We decline to resolve this issue on the basis of briefing which consisted of only three sentences . . . and no discussion of . . . relevant case law.").

need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy*, 454 F.3d at 297). As the D.C. Circuit has recognized, "[t]he key word in this consideration is *irreparable*." *Chaplaincy*, 454 F.3d at 297. Plaintiffs have focused their briefing and declarations on showing irreparable harm from the termination of past grants, which has deprived them of the money they need to sustain their work pending litigation. *See* ECF 3-1 at 53–55 (discussing the need for funding so that Plaintiffs and their members can continue their projects); Rough Hr'g Tr. at 31:15–19 (arguing that "the termination of the grants itself is what ultimately results in the harm"). The Court, though, lacks jurisdiction to redress those harms. *See supra* Section III.A.1.

Plaintiffs' declarations provide support for the claim that they are likely to be injured by the Foundation's continued adherence to the Change in Priorities Decision—the conduct this Court *does* have jurisdiction to address. Plaintiffs and their members, for example, may spend needless time and energy on grants that will not receive fair consideration in the grant selection process. *See* ECF 3-9, Franklin Decl. ¶ 19; ECF 3-10, Litzler Decl. ¶¶ 30–31. But the D.C. Circuit has held that, "however substantial, . . . money, time and energy necessarily expended in the absence of a stay are not enough." *Chaplaincy*, 454 F.3d at 297. Additionally, while the Circuit has recognized the lost opportunity to "compete for [] funds" as a form of injury, "if the later opportunity to compete for additional grants could fix the harm, it would not be irreparable." *Global Health Council*, 2025 WL 2480618, at *5, *13. In this case, Plaintiffs' only demonstrated harms from their prospective APA claims can be remedied at the end of this litigation if Plaintiffs win. If the Court vacates or enjoins the Decision at a later date, Plaintiffs would then have the opportunity to have their grant applications considered under a different set of agency priorities. *See id.* at *13. And "the possibility that adequate . . . relief will be available at a later date, in the ordinary course

of litigation weighs heavily against a claim of irreparable harm." *Chaplaincy*, 454 F.3d at 297–98.[8]

Plaintiffs have not shown that they face any injury stemming from ongoing or future application of the Change in Priorities Decision that is "of such imminence that equitable relief is urgently necessary." *Id.* at 298; *see also Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("[T]he movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin."). As a result, the Court cannot issue a preliminary injunction on the basis of Plaintiffs' prospective APA claims, which it finds can be adequately remedied in the normal course of litigation.

### D. Plaintiffs Are Not Substantially Likely to Succeed on the Merits of Their Constitutional Claims.

The Court now turns to Plaintiffs' constitutional claims and finds that Plaintiffs are not likely to succeed on the merits of those claims. Plaintiffs' constitutional claims fall in two buckets: (1) challenging the Foundation's withholding of grant funding under the separation of powers and the Spending and Appropriations Clauses and (2) challenging the Foundation's actions as violating their procedural due process rights and as applying an unconstitutionally vague regulation under the Due Process Clause. For the reasons that the Court will discuss in greater detail below, the Court finds that Plaintiffs "lack a cause of action to bring their freestanding constitutional claim" alleging a violation of the separation of powers. *Global Health Council*, 2025 WL 2480618, at *9. Similarly, Plaintiffs' procedural due process claim fails because they lack a protected property

---

[8] Defendants argue that Plaintiffs' harms are purely economic and by definition are not irreparable. *See Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("It is also well settled that economic loss does not, in and of itself, constitute irreparable harm."). The Court does not address those arguments because it is not evaluating the pecuniary harms that Plaintiffs have alleged, as those harms are tied to claims outside of this Court's jurisdiction. The Court is also not evaluating whether the loss of NSF funding would pose an existential threat to WEPAN. While it is also well established that economic losses that "threaten[] the very existence of the movant[]" constitute irreparable harm, *id.*, this Court does not have jurisdiction to order the Foundation to restore WEPAN's grants.

interest in the grants at issue. And Plaintiffs' void for vagueness claim fails for the same reason and also because "economic regulation is subject to a less strict vagueness test." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).

### 1. Plaintiffs' Separations of Power Claim is Statutory, not Constitutional, and Plaintiffs Lack a Cause of Action to Bring Such a Claim.

Plaintiffs assert a "non-statutory right of action" to seek a preliminary injunction against the Foundation's violation of the separation of powers and the Spending and Appropriations Clauses. ECF 2-1 ¶¶ 177, 187. They argue that NSF has "refused to spend funds as Congress directed" and contravened "the purposes Congress chose" in violation of the Constitution's requirements. *Id.* ¶¶ 181–82. But under the framework established by the Supreme Court in *Dalton v. Specter* and applied by the D.C. Circuit's recent decision in *Global Health Council v. Trump*, Plaintiffs "lack a cause of action to bring their freestanding constitutional claim." *Global Health Council*, 2025 WL 2480618, at *9.

Plaintiffs here, like those in *Global Health Council*, attempt to "assert a non-statutory right to vindicate separation of powers principles but [] are foreclosed from doing so by *Dalton v. Specter*." *Id.* at *6 (citing 511 U.S. 462 (1994)). In *Dalton*, the Supreme Court analyzed the distinction "between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." 511 U.S. at 472. The plaintiffs in *Dalton* sought to enjoin the Secretary of Defense from carrying out the President's decision to close a naval shipyard pursuant to a process governed by statute. *Id.* at 464. The court of appeals had held that the President's actions "in excess of his statutory authority"—i.e., his violations of the requirements of the base closure statute—also "violate[d] the constitutional separation-of-powers doctrine." *Id.* at 471. On review, the Supreme Court held that the plaintiffs' claims were statutory, not constitutional, citing the Court's long history of analyzing "unconstitutional and ultra vires conduct as separate

categories." *Id*. at 472–73 (citing, among others, *Larson*, 337 U.S. at 691 n.11). The Court distinguished *Youngstown Sheet & Tube Company v. Sawyer* on the basis that, in that case, the President had justified seizing steel mills solely based on his "inherent constitutional power" as the executive and commander in chief. *Id*. at 473 (citing 343 U.S. 579, 587 (1952)). The Supreme Court's inquiry in *Youngstown*, then, "necessarily turned on whether the Constitution authorized the President's actions" in the "conceded *absence* of *any* statutory authority." *Id*. The claim in *Dalton*, in contrast, hinged on the President's alleged "violat[ion] [of] the terms of the [statute]." *Id*. at 474.

The D.C. Circuit recently applied that distinction in another case involving cancelled federal grants, and the Court is bound to follow its reasoning. In *Global Health Council*, the recipients of cancelled foreign aid grants sued various executive branch defendants, alleging that the defendants had violated the separation of powers. 2025 WL 2480618, at *1. The Circuit held that the plaintiffs' claims were statutory, rather than constitutional as the plaintiffs claimed, because the "alleged statutory violations must be the predicate acts for the constitutional claims." *Id*. at *7. In other words, those plaintiffs' asserted constitutional claims—that the executive branch was unlawfully engaged in a "unilateral rescission" of congressionally appropriated funds "in violation of Congress's spending power"—actually just accused the executive of violating the agency's appropriations statute. *Id*. at *4. Without an underlying appropriations statute allocating funds for foreign assistance, "there could be no improper impoundment." *Id*. at *7.

Because Plaintiffs' separation of powers claim is also predicated on statutory violations, this case falls squarely under *Global Health Council*, and Plaintiffs lack any constitutional cause

of action to bring that claim.[9] Plaintiffs allege that the Foundation has "no power to amend or rescind appropriations" and therefore violates the separation of powers when it withholds grant funding that Congress has "appropriated" and "directed NSF to expend." ECF 2-1 ¶ 180–81. Such an asserted violation relies on the existence of specific statutes that define the Foundation's funding levels and programs. *See* NSF, *Fiscal Year 2024 Appropriations,* https://perma.cc/353L-EAKG (describing how the Consolidated Appropriations Act of 2024 provided over $9 billion of funding for NSF); Consolidated Appropriations Act of 2024, Pub. L. No. 118-42, div. C, tit. III, 138 Stat. 25, 161–63 (Mar. 9, 2024). Because Plaintiffs' claim is based on alleged violations of an appropriations statute, without which "there could be no improper impoundment," Plaintiffs have no cause of action to bring their constitutional claim. *Global Health Council*, 2025 WL 2480618, at *7, *9.[10]

### 2. Plaintiffs Are Unlikely to Succeed on the Merits of Their Due Process Claims.

Finally, Plaintiffs bring two varieties of constitutional due process claims. They have not demonstrated that they are likely to succeed on the merits of either.

First, Plaintiffs argue that they have a "constitutionally protected property interest in NSF awards that they applied for, were awarded, and relied on." ECF 2-1 ¶ 190. They allege that the

---

[9] In their complaint, Plaintiffs only tied the withholding of appropriated funds to a constitutional injury and briefly referenced this harm under their APA claim. *See* ECF 2-1 ¶¶ 170, 181–87. They have not articulated any theory of harm that would justify the issuance of a preliminary injunction if the Court interpreted their claim as a statutory one. Insofar as Plaintiffs have challenged the Foundation's failure to spend congressionally appropriated funds as part of their APA contrary-to-law claim—a question that the Court does not decide today—they have failed to show irreparable harm stemming from that claim for the reasons described above. *See supra* Section III.C.

Alternatively, Plaintiffs could challenge the Foundation's withholding of funds as ultra vires, but Plaintiffs did not rely on their ultra vires claim in their preliminary injunction motion. *See supra* n.3. As a result, in deciding this motion, the Court does not need to address the merits of any remaining statutory claim premised on the Foundation's alleged violation of its appropriations statute.

[10] As the D.C. Circuit recognized in its opinion, *Global Health Council* has created a circuit split with the Ninth Circuit on the breadth of the "constitutional category of claims highlighted in *Dalton*." *Global Health Council*, 2025 WL 2480618, at *9 n.15 (discussing *Murphy Co. v. Biden*, 65 F.4th 1122 (9th Cir. 2023)).

Foundation violated their due process rights under the Fifth Amendment by depriving them of this protected property without notice or adequate process to challenge the terminations. ECF 3-1 at 40 ("Plaintiffs were not afforded any process before (or after) their grants were canceled."). But Plaintiffs have not persuaded the Court that they have any such protected property interest. *See NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in . . . 'property.'").

To have a property interest in a government benefit, an entity must have "more than a unilateral expectation of it" and instead have "a legitimate claim of entitlement." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The Supreme Court has recognized that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). The D.C. Circuit has similarly held that if the government retains "unfettered discretion" to withhold a benefit "even upon satisfaction of all eligibility criteria," "no constitutionally protected property interest exists." *NB ex rel. Peacock*, 794 F.3d at 41. The Due Process Clause only provides protection if the "statute or implementing regulations place 'substantive limits on official discretion.'" *Id*. at 41. To support the existence of a legitimate entitlement, a statute must therefore cabin a decisionmaker's discretion by containing "explicitly mandatory language, i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Tarpeh-Doe v. United States*, 904 F.2d 719, 723 (D.C. Cir. 1990).

As another court in this district recently concluded, federal grants governed by 2 C.F.R. § 200.340, like those at issue here, "still leave[] officials with far too much discretion to confer a constitutionally protected entitlement." *Urb. Sustainability Dirs. Network*, 2025 WL 2374528, at

*23. The regulation makes clear that a federal award "may be terminated in part or its entirety" for many broad reasons, including "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a). Such language explicitly gives the Foundation unfettered discretion to terminate NSF grants, even if grantees have met all substantive requirements, if it concludes, in its own judgment, that the grants are no longer consistent with the Foundation's goals or priorities. *See NB ex rel. Peacock*, 794 F.3d at 41 (finding that "no constitutionally protected property interest exists" when the government retains "unfettered discretion" to withhold a benefit "even upon satisfaction of all eligibility criteria"). Plaintiffs have failed to identify any provisions in the governing NSF statutes or regulations cabining the agency's discretion so dramatically as to confer a constitutional entitlement.

In response, Plaintiffs cite an out-of-circuit case to argue that federal grantees "have a legitimate property interest in federal funds that Congress has already appropriated and that the grantees have accepted." ECF 3-1 at 39 (citing *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part*, *vacated in part*, *remanded sub nom. City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018)). In *County of Santa Clara v. Trump*, two local governments sued the federal government after an executive order threatened to cut off their federal funding because of their alleged failure to comply with federal immigration enforcement policies. 275 F. Supp. 3d at 1201. The Northern District of California held that a "state or local government has a legitimate claim of entitlement to congressionally appropriated funds, which are akin to funds owed on a contract." *Id.* at 1218. The court's analysis of the property interest at issue cited to the existence of contracts between the federal and state governments, relying on *National Federation of Independent Business v. Sebelius*, 569 U.S. 519, 577 (2012). *See Cnty. of Santa Clara*, 275 F. Supp. 3d at 1214 ("The legitimacy of Congress's exercise of the spending power

thus rests on whether the state voluntarily and knowingly accepts the terms of the contract." (citing 569 U.S. at 577)). However, the Court is not persuaded to depart from the well-established procedural due process analysis in this Circuit on the basis of an inapposite precedent focused on inter-governmental relationships. As such, the Court cannot find that Plaintiffs have a constitutionally protected property interest in their NSF grant agreements. *See New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) (observing that "courts have resisted application of due-process principles to government contracts" writ large because of the "millions of government contracts in effect at any point in time"). Plaintiffs' procedural due process claim thus fails to clear its first hurdle.

Finally, Plaintiffs argue that the Foundation's actions in the Change in Priorities Decision and the Mass Termination Action applied 2 C.F.R. § 200.340(a)(4) to their grants "in a manner that is unconstitutionally vague." ECF 2-1 ¶ 200. They point out that the words "effectuate," "goals," and "priorities" are "not defined in the [termination] letters, law, or regulations." *Id*. But Plaintiffs have failed to show that the void for vagueness doctrine is even applicable here. As other courts in this district have recognized, a "void-for-vagueness challenge is, at bottom, a due process claim, so Plaintiffs must show that they were deprived of a constitutionally protected property or liberty interest." *Nat'l Urb. League v. Trump*, No. 25-cv-471 (TJK), 2025 WL 1275613, at *17 (D.D.C. May 2, 2025); *Urb. Sustainability Dirs. Network*, 2025 WL 2374528, at *24. As discussed, Plaintiffs have failed to show that the regulation's application to their grants impinged on any such property interest. Additionally, "economic regulation is subject to a less strict vagueness test." *Vill. of Hoffman Ests.*, 455 U.S. at 498. Plaintiffs cite a series of cases involving regulated parties or criminal defendants, which are of little value to the Court here. *See* ECF 3-1 at 41 (citing *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 734 (D.C. Cir. 2016); *United States v.*

*Williams*, 553 U.S. 285, 306 (2008); *Coates v. City of Cincinnati*, 402 U.S. 611, 611–14 (1971); *Smith v. Goguen*, 415 U.S. 566, 573–77 (1974)). In contrast to those cases, the Foundation "is acting as patron rather than as sovereign" and "the consequences of imprecision are not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). Accordingly, the Court also must deny Plaintiffs' request for preliminary relief based on their due process claims.

## IV.    CONCLUSION

The Court finds that it likely lacks jurisdiction over Plaintiffs' retrospective APA claims, so it must deny Plaintiffs' motion for preliminary relief as to those claims. In analyzing Plaintiffs' remaining claims, the Court concludes that Plaintiffs have failed to show irreparable harm flowing from their prospective APA claims and have not shown a likelihood of success on the merits of their constitutional claims. As a result, the Court will deny Plaintiffs' motion for a preliminary injunction without considering the other preliminary injunction factors.

Accordingly, Plaintiffs' Motion for a Preliminary Injunction, ECF 3, is **DENIED.**   A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: September 10, 2025

41