**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF PHYSICS TEACHERS, et al., <br><br>       *Plaintiffs*, <br><br>   v. <br><br> NATIONAL SCIENCE FOUNDATION, et al., <br><br>       *Defendants*. | Case No. 1:25-cv-01923 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Kate Talmor (D.C. Bar No. 90036191)
Gregory M. Cumming (D.C. Bar 1018173)
Steven Y. Bressler (D.C. Bar No. 482492)
Tsuki Hoshijima (D.C. Bar No. 90043312)
Robin F. Thurston (D.C. Bar No. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ktalmor@democracyforward.org
gcumming@democracyforward.org
sbressler@democracyforward.org
thoshijima@democracyforward.org

Nathan L. Walker (*pro hac vice*)
Gil Walton (*pro hac vice*)
Celine Purcell (*pro hac vice*)
THE NORTON LAW FIRM PC
300 Frank H. Ogawa Plaza, Suite 450
Oakland, CA 94612
 (510) 906-4900
nwalker@nortonlaw.com
gwalton@nortonlaw.com
cpurcell@nortonlaw.com

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................1

BACKGROUND .....................................................................................................................2

    I.      The National Science Foundation ........................................................................ 2

    II.    Law Directs NSF to Expand Participation in Science ........................................... 3

    III.   The Competitive NSF Grants Process ................................................................. 6

    IV.   NSF's April 2025 Change in Priorities Decision ...................................................... 6

    V.    The Impacts of NSF's Change in Priorities ............................................................ 8

PROCEDURAL HISTORY ......................................................................................................10

LEGAL STANDARDS ...........................................................................................................11

ARGUMENT ........................................................................................................................11

    I.      The Change in Priorities Decision Violates the APA. ...........................................11

          A.    NSF's decision violates numerous statutory commands.......................... 12

          B.    The Change in Priorities Decision is arbitrary and capricious. ................ 15

CONCLUSION.......................................................................................................................22

i

**TABLE OF AUTHORITIES**

**Cases**

*Am. Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001).................................................................................11

*Am. Fed. of State, Cnty., and Municipal Gov. Emps v. Office of Mgmt. and Budget*,
   807 F. Supp. 3d 1004 (N.D. Cal. 2025)..................................................................... 17

*Am. Wild Horse Pres. Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017).................................................................................... 17

*Amerijet Int'l, Inc. v. Pistole*,
   753 F.3d 1343 (D.C. Cir. 2014).................................................................................. 16

*Camp v. Pitts*,
   411 U.S. 138 (1973) ................................................................................................... 18

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ................................................................................................... 17

*DHS v. Regents of Univ. of Cal.*,
   591 U.S. 1 (2020)....................................................................................................... 19

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ................................................................................................... 19

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)...................................................................................... 16, 17, 19

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021)................................................................................................... 15

*FDA v. Wages & White Lion Invs.*,
   604 U.S. 542 (2025).................................................................................................. 16

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985)................................................................................................... 18

*Green & Healthy Home Initiatives, Inc. v. EPA*,
   788 F. Supp. 3d 676 (D. Md. 2025) .................................................................... 14, 20

*Health Ins. Ass'n of Am. v. Shalala*,
   23 F.3d 412 (D.C. Cir. 1994)..................................................................................... 12

*In re Aiken Cty.*,
   725 F.3d 255 (D.C. Cir. 2013)................................................................................... 15

*Judulang v. Holder*,
   565 U.S. 42 (2011) ......................................................................................................... 15

*Martin Luther King Cnty., Jr. v. Turner*,
   785 F. Supp. 3d 863 (W.D. Wash. 2025), *appeal pending*, No. 25-3664 (9th Cir. 2025) ........ 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................................................................. 15, 19

*Nat'l Council of Nonprofits v. OMB*,
   763 F. Supp. 3d 36 (D.D.C. 2025) ................................................................................. 21

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
   595 U.S. 109 (2022) ...................................................................................................... 12

*Nebraska v. Su*,
   121 F.4th 1 (9th Cir. 2024) ............................................................................................ 15

*New Jersey v. OMB*, No. 1:25-CV-11816-IT,
   2026 WL 2069832 (D. Mass. July 17, 2026) .................................................................... 7

*New York v. Kennedy*,
   789 F.Supp.3d 174 (D.R.I. 2025) ................................................................................... 14

*R.I. Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351 (D.R.I. 2025),
   *appeal pending*, No. 25-2113 (1st Cir. 2025) ................................................................. 21

*Scotts Valley Band of Pomo Indians v. Burgum*,
   808 F. Supp. 3d 1 (D.D.C. 2025) ................................................................................... 19

*Sierra Club v. Salazar*,
   177 F. Supp. 3d 512 (D.D.C. 2016) ............................................................................... 21

*Spirit Airlines, Inc. v. Dep't of Transp.*,
   997 F.3d 1247 (D.C. Cir. 2021) ..................................................................................... 21

*Stuttering Found. of Am. v. Springer*,
   498 F. Supp. 2d 203 (D.D.C. 2007) ................................................................................ 11

*Thrivent Fin. For Lutherans and Thrivent Invest. Mgmt. Inc. v. Sec. and Exch. Comm'n*,
   — F.4th —, 2026 WL 2095279 (D.C. Cir. July 21, 2026) ................................................ 16

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ...................................................................................................... 14

iii

**Statutes**

42 U.S.C. § 1862 ............................................................................................................... 2

42 U.S.C. § 1862i .............................................................................................................. 5

42 U.S.C. § 1862k .................................................................................................... 3, 4, 13

42 U.S.C. § 1862n ............................................................................................................. 5

42 U.S.C. § 1862n-1 .......................................................................................................... 5

42 U.S.C. § 1862n-10 ........................................................................................................ 5

42 U.S.C. § 1862n-1a ........................................................................................................ 5

42 U.S.C. § 1862n-2 .......................................................................................................... 5

42 U.S.C. § 1862n-8 .......................................................................................................... 5

42 U.S.C. § 1862o ............................................................................................................. 5

42 U.S.C. § 1862o-12 ........................................................................................................ 5

42 U.S.C. § 1862o-14 ........................................................................................................ 5

42 U.S.C. § 1862o-4 .......................................................................................................... 5

42 U.S.C. § 1862p-13 ........................................................................................................ 5

42 U.S.C. § 1862p-14 .............................................................................................. 6, 13, 14

42 U.S.C. § 1862p-2 .......................................................................................................... 5

42 U.S.C. § 1862p-4 .......................................................................................................... 5

42 U.S.C. § 1862p-6 .......................................................................................................... 5

42 U.S.C. § 1862q ............................................................................................................. 5

42 U.S.C. § 1862s ................................................................................................... 4, 5, 6, 13

42 U.S.C. § 1862s-5 ................................................................................................ 4, 5, 13

42 U.S.C. § 1862s-7 .......................................................................................................... 5

42 U.S.C. § 1869 ............................................................................................................... 5

42 U.S.C. § 1885 .................................................................................................... 3, 5, 12, 13

iv

42 U.S.C. § 1885a ...................................................................................................... 4, 5

42 U.S.C. § 1885b ......................................................................................................... 5

42 U.S.C. § 1885c ......................................................................................................... 5

42 U.S.C. § 18991 ......................................................................................................... 5

42 U.S.C. § 18992 ......................................................................................................... 5

42 U.S.C. § 18994 ......................................................................................................... 5

42 U.S.C. § 18997 ......................................................................................................... 5

42 U.S.C. § 19011 ......................................................................................................... 5

42 U.S.C. § 19012 ......................................................................................................... 5

42 U.S.C. § 19014 ......................................................................................................... 5

42 U.S.C. § 19015 ......................................................................................................... 5

42 U.S.C. § 19016 ......................................................................................................... 5

42 U.S.C. § 19017 ......................................................................................................... 5

42 U.S.C. § 19018 ......................................................................................................... 5

42 U.S.C. § 19084 ......................................................................................................... 5

42 U.S.C. § 19104 ......................................................................................................... 5

42 U.S.C. § 19108 ......................................................................................................... 5

42 U.S.C. § 19110 ......................................................................................................... 5

42 U.S.C. § 19112 ......................................................................................................... 5

42 U.S.C. § 19119 ......................................................................................................... 5

5 U.S.C. § 702 ..............................................................................................................11

5 U.S.C. § 706 ................................................................................................... 10, 12, 15

Pub. L. No. 105-207, 112 Stat. 869 (1998) .................................................................. 4

Pub. L. No. 107-368, 116 Stat. 3034 (2002) ................................................................ 3

Pub. L. No. 114-329, 130 Stat. 2969 (2017) ................................................................ 4

Pub. L. No. 115–6, 131 Stat. 11 (2017) .................................................................... 4

Pub. L. No. 117-167, 136 Stat. 1366 (2022) ........................................................... 4

Pub. L. No. 81-507, 64 Stat. 149 (1950)................................................................. 2

Pub. L. No. 96-516, 94 Stat. 3007 (1980)............................................................... 3

**Rules**

Fed. R. Civ. P. 56.................................................................................................11

**Other Authorities**

*About NSF*, NSF, https://perma.cc/93N7-3BF2 (last visited July 22, 2026) ............................... 2, 6

*History*, NSF, https://perma.cc/7DPZ-BF2A (last visited July 22, 2026) ........................................ 3

*Louis Stokes Alliances for Minority Participation (LSAMP)*, NSF,
    https://perma.cc/G8T3-5YAR (last visited July 22, 2026) ........................................................ 5

*NSF by the Numbers*, NSF, https://perma.cc/JW7S-2Y23 (last visited July 22, 2026).................... 6

*2022–2026 Strategic Plan*, https://perma.cc/29XS-752F ................................................................. 6

NSF, *Proposal and Award Policies and Procedures Guide*, NSF 16-1 (Jan. 2016),
    https://perma.cc/695W-D32Z ...................................................................................................... 6

NSF, *Proposal and Award Policies and Procedures Guide*, NSF 24-1 (May 20, 2024),
    https://perma.cc/DJD8-ZUG5 ............................................................................... 5, 6, 20

*Overview of the NSF Proposal and Award Process*, NSF,
    https://perma.cc/UT67-97ZC (last visited July 22, 2026) ........................................................ 6

**INTRODUCTION**

For more than seven decades the United States has led the world in cutting-edge scientific research and advancement—due, in large part, to sustained congressional investment through the National Science Foundation ("NSF"). Congress long has recognized that maintaining the United States's position as a global leader and incubator of scientific learning requires the support of early-career scientists and the education of young people in science, technology, engineering, and mathematics ("STEM"). And because STEM fields have often failed to reflect the diversity of our nation—thereby potentially omitting talent pools capable of meaningfully advancing the national interest—Congress has mandated NSF use its funds to increase participation in science and related fields by persons from underrepresented groups, including women, minorities, and persons with disabilities.

Now, however, NSF refuses to fulfill its statutory obligations and has taken actions that severely damage the United States's competitiveness while harming a generation of young scientists. Following a series of Executive Orders issued at the start of the current administration, NSF abruptly announced "changed priorities" under which it now refuses to fund projects related to diversity, equity, and inclusion ("DEI") or other politically disfavored topics such as "environmental justice" and the spread of misinformation. NSF then abruptly terminated more than $1 billion in previously awarded financial assistance—sending chaotic shockwaves through the scientific community and directly harming Plaintiffs and their members, teachers, professors, graduate students, and scientific organizations that rely on NSF awards for their critical contributions to scientific advancement. Even now, more than a year later, Plaintiffs and other participants in STEM fields are unable to apply for and receive new funding to carry on their research and other projects because NSF's new "priorities," including its capacious interpretation of "DEI," render their projects ineligible for funding or at serious threat of arbitrary termination.

1

NSF's change in priorities is unlawful. Its decision violates the Administrative Procedure Act because it conflicts with literally dozens of clear statutory commands and because the agency failed to reasonably explain its abrupt departure from longstanding practice. Plaintiffs and their members have been forced to lay off staff and are suffering career setbacks, reputational injury, loss of substantial time, and diversion of resources as their scientific work remains in limbo pending the resumption of NSF funding on the terms, and for the purposes, Congress codified. Plaintiffs respectfully request that the Court award summary judgment in their favor and declare NSF's changed priorities unlawful.

## BACKGROUND

### I.      The National Science Foundation

Congress established NSF in 1950 "[t]o promote the progress of science; to advance the national health, prosperity, and welfare; [and] to secure the national defense." Pub. L. No. 81-507, 64 Stat. 149 (1950).  To that end, Congress "authorized and directed" NSF "to initiate and support basic scientific research and programs to strengthen scientific research potential and science education programs at all levels in the mathematical, physical, medical, biological, social, and other sciences." 42 U.S.C. § 1862(a)(1).

Ever since, NSF has supported "basic research: research driven by curiosity and discovery" to further its statutory mission.[1] NSF funding has had a profound impact on the United States' global leadership in science, including research on data compression algorithms now used in everyday items such as televisions and computers; computer-aided design and modeling, which revolutionized manufacturing; 3D printing; the development of Doppler radar as a meteorological tool; law enforcement and biological DNA testing; the computer network NSFNET, a forerunner

---

[1] *About NSF*, NSF, https://perma.cc/93N7-3BF2 (last visited July 22, 2026).

of today's internet; improved microsurgery and LASIK eye surgery; improved efficiency for organ donation; CRISPR genetic therapies; detection of the subatomic Higgs boson; early intervention to ameliorate children's reading problems; and the development of artificial intelligence.[2]

NSF has also long supported STEM education to ensure the future of American scientific advancement and leadership. Congress declared that NSF's mission includes being a "primary contributor to mathematics, science, and engineering education at academic institutions in the United States" because "[a] nation that is not technologically literate cannot compete in the emerging global economy." 42 U.S.C. § 1862k(a).

## II.    Law Directs NSF to Expand Participation in Science

Congress has—on at least five occasions stretching over a period of four decades—directed NSF to expand the participation in STEM of persons from underrepresented groups.  First, in the National Science Foundation Authorization and Science and Technology Equal Opportunities Act of 1980, "Congress declare[d] that the highest quality science over the long-term requires substantial support, from currently available research and educational funds, for increased participation in science and technology by women and minorities." Pub. L. No. 96-516, § 32(b), 94 Stat. 3007, 3011 (1980) (codified as amended at 42 U.S.C. § 1885(b)); Pub. L. No. 107-368, § 16, 116 Stat. 3034, 3059 (2002) (adding "persons with disabilities" to congressional declaration). Expanding participation in science supports the "full use of the human resources of the Nation in science and engineering." 42 U.S.C. § 1885(b).

Second, in the National Science Foundation Authorization Act of 1998, Congress directed NSF to pursue a "core strategy" of "[d]evelop[ing] intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science,

---

[2] *History*, NSF, https://perma.cc/7DPZ-BF2A (last visited July 22, 2026).

3

mathematics, and engineering." Pub. L. No. 105-207, § 101(b)(1), 112 Stat. 869, 870 (1998) (codified at 42 U.S.C. § 1862k(b)(1)).

Third, in 2017, Congress found that "historically, underrepresented populations are the largest untapped STEM talent pools in the United States." Pub. L. No. 114-329, § 305(b)(3), 130 Stat. 2969, 3007 (2017) (codified at 42 U.S.C. § 1862s-5(b)(3)). Congress consequently mandated that NSF "shall continue to support programs designed to broaden participation of underrepresented populations in STEM fields." 42 U.S.C. § 1862s-5(c). Fourth, and also in 2017, Congress found that "the National Science Foundation's mission includes supporting women in STEM disciplines." Pub. L. No. 115–6, § 2(6), 131 Stat. 11, 11 (2017) (codified at 42 U.S.C. § 1885a note).

Fifth, in 2022, in appropriations legislation titled "National Science Foundation for the Future," Congress declared that "the Federal Government must utilize the full talent and potential of the entire Nation by . . . encouraging broader participation of populations underrepresented in STEM." Pub. L. No. 117-167, § 10301(4), 136 Stat. 1366, 1506 (2022) (codified at 42 U.S.C. § 18981).

Consistent with that longstanding policy priority, Congress specifically directed that NSF "award grants on a competitive, merit-reviewed basis, to eligible entities to increase the participation of underrepresented populations in STEM fields," 42 U.S.C. § 1862s-5(d)(1), and "make awards to institutions of higher education (or consortia thereof) for the development and assessment of innovative reform efforts designed to increase the recruitment, retention, and advancement of individuals from underrepresented minority groups in academic STEM careers," *id.* § 1862s-5(e)(1). And Congress also mandated that NSF fund specific programs to expand participation in science. For example, the Louis Stokes Alliances for Minority Participation

4

("LSAMP") supports partnerships between higher education institutions and other organizations to increase STEM degrees to underrepresented populations.[3] Congress required that NSF "shall continue to support" LSAMP. 42 U.S.C. § 1862p–4. The Eddie Bernice Johnson INCLUDES Initiative is based on a mandate that NSF make awards to promote "broadening participation in STEM studies and careers of groups historically underrepresented in such studies and careers." *Id.* § 19012.[4]

The latest version of NSF's Policy and Award Policies and Procedures Guide recognizes that the agency's "mission calls for the broadening of opportunities and expanding participation of groups, organizations, and geographic regions that are underrepresented in STEM disciplines, which is essential to the health and vitality of science and engineering. NSF is committed to this principle of diversity and deems it central to the programs, projects, and activities it considers and supports."[5] And NSF's 2022-2026 Strategic Plan identified "Diversity and Inclusion" as one of

---

[3] *Louis Stokes Alliances for Minority Participation (LSAMP)*, NSF, https://perma.cc/G8T3-5YAR (last visited July 22, 2026).

[4] The U.S. Code is replete with other provisions in which Congress authorized or directed NSF to fund projects to increase the participation in STEM of persons from underrepresented groups. *See, e.g.*, 42 U.S.C. § 1885(b) (identifying need for "increased participation in science and engineering by women, minorities, and persons with disabilities"); *id*. §§ 1862i(a)(3)(C), (c)(3), (d)(2)(D), (e)(3)(C), (f)(2)(C); 1862n(a)(3)(I), (a)(3)(K), (a)(5), (b)(1)(B)(iv), (b)(2)(G); 1862n-1(b)(2)(F), (c)(2), (d)(2); 1862n-1a(d)(3)(F), (d)(4)(B), (k)(2)(D); 1862n-2(b)(2)(C), (b)(3); 1862n-8(a)(1); 1862n-10(a); 1862o; 1862o-4; 1862o-12; 1862o-14(c)(2)(A)(ii); 1862p-2(b)(2)(A); 1862p-4; 1862p-6; 1862p-13; 1862q(c)(2)(C); 1862s-7(b)(2)(C); 1869(c); 1885a; 1885b; 1885c; 18991(c)(6)(B); 18992(a)(3); 18994(d)(4)(B); 18997(b)(5)–(6); 19011(b); 19014(b); 19015; 19016; 19017; 19018; 19084(c)(6); 19104(1); 19108(d)(3); 19110(b)(7); 19112(c); 19119(c)(1).

[5] NSF, *Proposal and Award Policies and Procedures Guide*, NSF 24-1 (May 20, 2024), https://perma.cc/DJD8-ZUG5. Earlier versions of the Guide included the same language. *E.g.*, NSF, *Proposal and Award Policies and Procedures Guide*, NSF 16-1 (Jan. 2016), https://perma.cc/695W-D32Z.

NSF's "Core Values," and stated that its "Strategic Objective 1.1" was to "[e]nsure accessibility and inclusivity" by "[i]ncreas[ing] the involvement of communities underrepresented in STEM."[6]

### III. The Competitive NSF Grants Process

NSF "fulfill[s] [its] mission chiefly by making grants,"[7] and allocates 94% of its budget "for grants and awards to support research projects, facilities and STEM education."[8]

NSF makes funding decisions through a competitive and rigorous merits review process,[9] and reviews all proposals using two legally-mandated merit review criteria, Intellectual Merit and Broader Impacts. 42 U.S.C. § 1862s(a)(2), (b). Congress also defined the Broader Impacts criteria. *Id.* § 1862p-14. One of those criteria is whether the proposed project "[e]xpand[s] participation of women and individuals from underrepresented groups in STEM." *Id.* § 1862p-14(a)(7). Accordingly, NSF instructs applicants that proposals "must contain" a section on "Broader Impacts," including impacts on "societally relevant outcomes," among them "full participation of women, persons with disabilities, and underrepresented minorities in [STEM]."[10]

### IV. NSF's April 2025 Change in Priorities Decision

On April 18, 2025, NSF issued a memorandum describing the agency's new priorities (the "Change in Priorities Decision"), NSF AR_140. *See also* NSF AR_203 (characterizing a "shift" in priorities); NSF AR_204 (transmitting staff memo, NSF director's memorandum, and FAQ); Mem. Op. 6-8, Dkt. No. 35. Although ostensibly claiming that it would "continue to use the [preexisting] gold standard merit review criteria," the agency declared that "broadening participation activities,

---

[6] *2022–2026 Strategic Plan*, NSF, https://perma.cc/29XS-752F (last visited July 22, 2026).

[7] *About NSF*, NSF, https://perma.cc/93N7-3BF2 (last visited July 22, 2026).

[8] *NSF by the Numbers*, NSF, https://perma.cc/JW7S-2Y23 (last visited July 22, 2026).

[9] *Overview of the NSF Proposal and Award Process*, NSF, https://perma.cc/UT67-97ZC (last visited July 22, 2026).

[10] NSF, *Proposal and Award Policies and Procedures Guide*, NSF 24-1 (May 20, 2024), https://perma.cc/DJD8-ZUG5.

including research on broadening participation," "should not preference some groups at the expense of others, or directly/indirectly exclude individuals or groups." NSF AR_140. Accordingly, the agency decided to terminate existing awards that were not aligned with the agency's new priorities. *Id.*; *see also* NSF AR_142 ("Awards that are not aligned with NSF's priorities have been terminated, including but not limited to those on diversity, equity, and inclusion (DEI) and misinformation/disinformation."). NSF made no effort to hide that these changes were driven not by impartial application of the agency's neutral merit principles but by "the policy context set forth by . . .the Administration and the Director of NSF."[11] *Id.*

In particular, NSF derided "[r]esearch projects with" what it characterized as "more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities." NSF AR_141. Accordingly, NSF directed grant applicants to minimize or circumvent one of the agency's longstanding Broader Impacts criteria: "Investigators wishing to address goal seven—expanding participation in STEM for women and underrepresented groups—must ensure that all outreach, recruitment, or participatory activities in NSF projects are open and available to all Americans." NSF AR_142.

In explaining what it meant by ensuring availability to "all Americans," NSF stated that permitted "characteristics" on which to base participation included "institutional type, geography, socioeconomic status, and career stage," rather than what it called "protected characteristics."[12]

---

[11] The U.S. District Court for the District of Massachusetts also recently held that the government's application of OMB regulations to terminate grants at multiple agencies for consistency with changed "agency priorities" was unlawful. *See New Jersey v. OMB*, No. 1:25-CV-11816-IT, 2026 WL 2069832 (D. Mass. July 17, 2026).

[12] "Protected characteristics are those contained in relevant laws, such as but not limited to, the Equal Protection Clause of the Constitution and Title VII of the Civil Rights Act of 1964." NSF AR_143.

Put more bluntly, NSF explicitly prohibited consideration of various legally-recognized statuses: "Projects submitted to legally mandated broadening participation programs must not directly or indirectly preference or exclude any Americans on the basis of protected characteristics. Projects that have limited impact or rely on DEI frameworks or advocacy do not effectuate NSF priorities." NSF AR_143. In other words, research focused on "broadening participation in STEM on the basis of protected characteristics" was now deemed impermissible by the agency, irrespective of the statutory mandates discussed above. NSF AR_144; *see supra* pp. 3-6.

## V.    The Impacts of NSF's Change in Priorities

As this Court previously described, implementation of the Change in Priorities Decision caused immediate harm. "[O]ver the course of two months, [NSF] sent large waves of grant termination notices to existing grantees, ultimately terminating approximately 1,600 grants worth more than $1 billion." Mem. Op., at 1; *id*. at 8 (describing the mass termination of grants as undisputed by NSF).

As this Court noted, at the time they filed suit Plaintiffs identified harms stemming from the Change in Priorities Decision sufficient to establish standing. Dkt. No. 35 at 29-31; *id*. at 33 ("Plaintiffs' declarations provide support for the claim that they are likely to be injured by [NSF's] continued adherence to the Change in Priorities Decision.").[13]

Those harms continue to be felt by Plaintiffs (and their members), in multiple ways. *First*, Plaintiffs and their members have grant applications pending with NSF that are at substantial risk of being denied, or not being considered at all, based on the Change in Priorities

---

[13] Declarants Beth Cunningham, Kelly Mack, Scott Delaney, Gina Quan, and Elizabeth Litzler previously submitted declarations at Dkt. Nos. 3-4, 3-5, 3-6, 3-8, 3-10. These declarants have each submitted a supplemental declaration incorporating by reference their original declaration.

Decision.[14] Plaintiffs and their members are being deprived of the opportunity to have these pending applications considered by the NSF without reference to the Change in Priorities Decision. Moreover, if the pending applications are denied or not considered, the time and effort Plaintiffs and their members have expended on them will be lost.

*Second*, Plaintiffs and their members have existing, active NSF grants that are vulnerable to termination under the Change in Priorities Decision.[15] That risk is not speculative.  NSF has continued to terminate active grants in 2026, and it previously terminated similar grants held by these Plaintiffs and their members.[16] Further, the uncertainty as to whether NSF will terminate active grants based on its Change in Priorities Decision is adversely affecting staffing and planning for the underlying projects.[17]

*Third*, Plaintiffs and their members are being deprived of the opportunity to have future grant applications considered by the NSF without reference to the Change in Priorities Decision. If the Change in Priorities Decision were revoked, Plaintiffs and their members would: (a) reapply for funding to complete projects that were cut short by the prior grant terminations; and (b) apply for funding for other projects that do not align with the Change in Priorities Decision, including projects to increase the participation of underrepresented populations (including women and

---

[14] *See* Ex. A, Cunningham Supp. Decl. ¶¶ 16-20; Ex. B, Franklin Decl. ¶¶ 10-12; Ex. C, Litzler Supp. Decl. ¶¶ 9-11; Ex. D, Quigley Decl. ¶¶ 12-17; Ex. E, Butler-Barnes Decl. ¶¶ 13-17; Ex. F, Lane Decl. ¶¶ 7-12.

[15] Ex. G, Mack. Supp. Decl. ¶¶ 6-9; Ex. A, Cunningham Supp. Decl. ¶¶ 5-15; Ex. H, Quan Supp. Decl. ¶¶ 7-8.

[16] Ex. I, Delaney Supp. Decl. ¶¶ 14-20; Mack. Decl., Dkt. No. 3-5 ¶¶ 4-35; Cunningham Decl., Dkt. No. 3-4 ¶¶ 4-26; Quan Decl., Dkt. No. 3-8 ¶¶ 7-33.

[17] Ex. G, Mack Supp. Decl. ¶ 9.

9

minorities) in STEM fields. So long as the Change in Priorities Decision remains in place, they will be discouraged and/or prevented from doing so.[18]

## PROCEDURAL HISTORY

Plaintiffs filed suit on June 18, 2025 (Dkt. No. 1) and moved for a preliminary injunction on June 23, 2025 (Dkt. No. 3). After full briefing and argument, in September 2025 the Court denied Plaintiffs' request for emergency injunctive relief for three reasons. Mem. Op. First, the Court found it lacked jurisdiction to hear Plaintiffs' claims requesting that the Court undo the terminations of their grant awards because those claims sounded in contract and were thus foreclosed by the Tucker Act. *Id*. at 14-25. Second, while the Court found it had jurisdiction over Plaintiffs' prospective APA claims seeking to vacate NSF's Change in Priorities Decision, *id.* at 25-27, it determined Plaintiffs had failed to demonstrate irreparable harm stemming from application of the Decision. *Id*. at 32-34. Third, the Court found Plaintiffs were unlikely to succeed on the merits of their constitutional claims. *Id.* at 34-41.

On March 25, 2026, the Court granted in part and denied in part Defendants' motion to dismiss largely based on the same reasoning underlying its denial of Plaintiffs' motion for a preliminary injunction. Dkt. No. 38. The Court dismissed what it deemed Plaintiffs' retrospective APA claims, while denying Defendants' motion as to Plaintiffs' prospective APA claims. *Id*. at 1-3. The Court also dismissed Plaintiffs' claim under 5 U.S.C. § 706(1) and claim alleging an equitable ultra vires cause of action. *Id*. at 3-4. Finally, the Court dismissed Plaintiffs' constitutional claims. *Id*. at 4. The Court then entered a schedule for further proceedings. *See* May 7 and July 9, 2026, Minute Orders.

---

[18] Ex. G, Mack Supp. Decl. ¶ 15; Ex. A, Cunningham Supp. Decl. ¶ 27; Ex. H, Quan Supp. Decl. ¶ 10; Ex. B, Franklin Decl. ¶ 13; Ex. C, Litzler Supp. Decl. ¶¶ 12-13; Ex. J, Jones Decl. ¶¶ 15-16, Ex. K, Kelley Decl. ¶ 13; Ex. D, Quigley Decl. ¶ 18; Ex. E, Butler-Barnes Decl. ¶ 18.

**LEGAL STANDARDS**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing agency action under the APA, "[s]ummary judgment … serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007). "[T]he district judge sits as an appellate tribunal[] [and] [t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

**ARGUMENT**

I.      **The Change in Priorities Decision Violates the APA.**

Plaintiffs are entitled to summary judgment on their challenge under the APA, 5 U.S.C. § 702 *et seq.*, to NSF's Change in Priorities Decision.  The Decision fundamentally conflicts with the statutory scheme governing NSF grants by refusing to consider and promote the very thing Congress instructed—*i.e.*, increasing the participation of underrepresented populations in STEM fields.  And the decision is arbitrary and capricious for numerous reasons, including failing to reasonably explain the agency's choice, ignoring key aspects of the problem before it, failing to consider serious reliance interests, and acting with an unalterably closed mind.  This Court should enter judgment for Plaintiffs.[19]

---

[19] In their motion to dismiss, Defendants relied on several (unpersuasive) threshold defenses, including arguing that Plaintiffs' claims present an impermissible programmatic challenge, fail to identify final agency action, and challenge agency actions committed to agency discretion by law. *See* Defs.' Mot. to Dismiss 16-19, 24-26, Dkt. No. 15. The Court's Order denying, in part, Defendants' motion to dismiss implicitly rejected those arguments by correctly finding that Plaintiffs' prospective APA claim survived Defendants' motion. *See* Order 3, Dkt. No. 38, Mar. 25, 2026 (finding that the Court "has jurisdiction over these prospective claims" alleging the Change in Priorities Decision is contrary to law and arbitrary and capricious). In the interest of brevity and judicial economy, Plaintiffs do not repeat their argument as to why Defendants'

11

A.     NSF's decision violates numerous statutory commands.

Under the APA, a court shall "hold unlawful and set aside agency action … found to be … not in accordance with law." 5 U.S.C. § 706(2)(A). NSF, like all executive agencies, is a "creature[] of statute" that derives all its authority from acts of Congress. *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). NSF's policy judgments may not "conflict with the policy judgments that undergird the statutory scheme." *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994).

NSF's Change in Priorities Decision is flatly contrary to law—in fact, it is difficult to fathom a decision conflicting with so many repeated expressions of congressional intent. Throughout the statutes that govern NSF, Congress mandated that the agency use its funding to increase participation of underrepresented populations in STEM, including women, minorities, and persons with disabilities. NSF has now decided that it no longer wishes to prioritize this legislative goal. NSF's decision to cast aside Congress's policies and priorities was illegal.

Congress has repeatedly confirmed its mandate to NSF over a period stretching five decades. "[I]t is the policy of the United States to encourage men and women, equally, of all ethnic, racial, and economic backgrounds, including persons with disabilities, to acquire skills in" STEM, and "the highest quality science and engineering over the long-term requires substantial support, from … research and educational funds[] for increased participation in science and engineering by women, minorities, and persons with disabilities." 42 U.S.C. § 1885(b). Indeed, "the impact on women, minorities, and persons with disabilities which is produced by advances" in STEM "must be included as essential factors in … science, engineering, and economic policies." *Id.* Congress thus directed NSF to pursue a "core strategy" of "[d]evelop[ing] intellectual capital … with

---

defenses fail here but incorporate them by reference. *See* Opp'n to Mot. to Dismiss, 6-13, Dkt. No. 21.

particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." *Id.* § 1862k(b)(1); *see also id.* § 1885(a) ("it is in the national interest to promote the … scientific and engineering talents and skills of men and women, equally, of all ethnic, racial, and economic backgrounds, including persons with disabilities").

Fewer than ten years ago Congress expressed concern that, "[d]espite representing half the population, women comprise only about 30 percent of STEM workers" and that "Black and Hispanic faculty together hold about 6.5 percent of all tenured and tenure-track positions and 5 percent of full professor positions." 42 U.S.C. § 1862s-5(a)(3), (6). Because "underrepresented populations are the largest untapped STEM talent pools in the United States," *id.* § 1862s-5(b)(3), it mandated that NSF "shall continue to support programs designed to broaden participation of underrepresented populations in STEM fields," *id.* § 1862s-5(c). This included creation of a Center of Excellence specifically "to promote diversity in STEM fields." *Id.* § 1862s-5(d)(2)(B). Indeed, the U.S. Code contains literally *dozens* of provisions seeking to increase the participation in STEM fields of women and members of other underrepresented groups. *See supra* pp. 3-6.

Congress also told NSF specifically how to ensure this policy is operationalized in awarding grant funds. NSF "shall apply a broader impacts review criterion" to evaluate how funding proposals align with and further seven specified goals. 42 U.S.C. § 1862p-14(a). One of those statutorily mandated criteria considers whether a project "[e]xpand[s] participation of women and individuals from underrepresented groups in STEM." *Id.* § 1862p-14(a)(7). As recently as 2017, Congress reaffirmed that NSF "shall maintain" the "broader impacts criteria" "as the basis for evaluating grant proposals." *Id.* § 1862s(c).

NSF's Change in Priorities Decision is irreconcilable with Congress's (many) directions that NSF use its appropriated funds to support increased participation of underrepresented

13

populations in STEM fields and award those funds through application of the broader impacts review criterion. In adopting the Change in Priorities Decision, NSF acknowledged the broader impacts criteria and purported to continue faithfully applying it. NSF AR_141. But those assertions were disingenuous; in reality, NSF wrote the diversity criterion out of its review process by declaring that funding awards "should not preference some groups at the expense of others" or support research "with more narrow impact limited to subgroups of people based on protected class or characteristics." *Id.* Its own accompanying FAQ belies NSF's pretense of adhering to the statute: It rewrote the mandate from "[e]xpanding participation of women and individuals from underrepresented groups in STEM," 42 U.S.C. § 1862p-14(a)(7) to "ensur[ing] that all outreach, recruitment, or participatory activities in NSF projects are open and available to all Americans." NSF AR_142. *See also id.* (acknowledging the termination of grants "on diversity, equity, and inclusion (DEI) and misinformation/disinformation").

It is black-letter administrative law that an agency "may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). "The violation of statutory authority is especially clear here, because the stated basis" for the Change in Priorities Decision—that funding awards should not take into account race, sex, or other protected characteristics—"is entirely incompatible with the statutory mandate." *Green & Healthy Home Initiatives, Inc. v. EPA*, 788 F. Supp. 3d 676, 699-700 (D. Md. 2025); *see also New York v. Kennedy*, 789 F.Supp.3d 174, 209 (D.R.I. 2025) (directive "dismantling critical, statutorily mandated functions of the Agency" is "contrary to law"). Where Congress has repeatedly codified the promotion of STEM diversity as national policy, it is contrary to law for NSF to simply disregard that priority and adopt conflicting foci of the agency's own choosing. "[P]olicy disagreement with Congress's decision about" whether to promote diversity in STEM "is not a

14

lawful ground for the Commission to decline to continue the congressionally mandated [funding] process" because "federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken Cty.*, 725 F.3d 255, 260 (D.C. Cir. 2013); *cf. Nebraska v. Su*, 121 F.4th 1, 16 (9th Cir. 2024) ("policy justifications cannot supersede statutory text").

Plaintiffs are accordingly entitled to summary judgment on their claim that the Change in Priorities Decision is contrary to law.

**B.      The Change in Priorities Decision is arbitrary and capricious.**

The APA instructs courts to "hold unlawful and set aside agency action … found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). An agency action may only be upheld if it is both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That standard affords agencies deference, but "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). The Change in Priorities Decision is not the product of reasoned decisionmaking. NSF failed to adequately explain its changes or to consider serious reliance interests, ignored a serious aspect of the problem before it, and carried out a predetermined policy.

**1)      NSF failed to adequately explain its changes.**

The APA requires an agency to show that it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). NSF cannot satisfy this standard because the Change in Priorities Decision evidences no indicia of reasoned decisionmaking. Without even acknowledging the reasons NSF has long promoted diversity in STEM (not least of which are the statutory

15

mandates discussed above), it simply declared without explanation that funding "must aim to create opportunities for all Americans everywhere" without "preferenc[ing] some groups at the expense of others" or "exclud[ing] individuals or groups." NSF AR_141. It then relied on the bare assertion that scientific research "with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities." *Id.* But mere "conclusory statements will not do; an agency's statement must be one of *reasoning.*" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quotation marks omitted); *see also Thrivent Fin. For Lutherans and Thrivent Invest. Mgmt. Inc. v. Sec. and Exch. Comm'n*, — F.4th —, 2026 WL 2095279, at *5 (D.C. Cir. July 21, 2026) ("We cannot defer to an explanation that consists of nothing more than boilerplate *ipse dixit* that could be cut and pasted into all manner of … decisions indiscriminately.").

Relatedly, NSF violated the APA by failing to "provide a reasoned explanation" for its departure from longstanding agency policy and failing to "display awareness that [it was] changing position." *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 568 (2025) (citation modified); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must "display awareness that it *is* changing position" and "must show that there are good reasons for the new policy"). NSF's short statement setting forth "NSF priorities," NSF AR_141, scarcely recognized its change in position—let alone the magnitude of the change or the fact that it abandoned nearly 50 years of consistent and statutorily mandated practice. NSF relegated any mention of the impacts of its changed priorities to its FAQs and, even there, failed to acknowledge that its policy change was so drastic that it would disrupt more than $1 billion of existing science funding, as well as billions in future funding, or all the lost knowledge that would result from experiments abandoned mid-course. *See* NSF AR_141-44 (recognizing that awards "not aligned with NSF's priorities …

16

including but not limited to those on diversity, equity, and inclusion (DEI) and misinformation/disinformation" "have been terminated"). NSF violated the "central principle of administrative law" that, when "decid[ing] to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

NSF also failed to provide a "reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 516. NSF had awarded grants through a highly competitive, peer-reviewed process after finding they would meaningfully advance the statutory criteria. In adopting the Change in Priorities Decision, NSF did not consider the bases on which it had, for decades, awarded grants or evaluate the progress grantees had made in achieving the purposes of their grant. *See Am. Fed. of State, Cnty., and Municipal Gov. Emps v. Office of Mgmt. and Budget*, 807 F. Supp. 3d 1004, 1035 (N.D. Cal. 2025) ("vague and limited articulations do not justify agency defendants' drastic, out of the ordinary actions"). It also failed to consider the extent to which its reversal may detract from the overall effectiveness of the funding mechanisms created by Congress. Instead, it provided only a conclusory assertion that funding awards should not take into account race, sex, or other protected characteristics while disregarding the *reasons* its awards had long done just that. *See* NSF AR_141.

In addition, the paltry Administrative Record amply confirms that Defendants' adoption of the Change in Priorities Decision was neither reasonable nor reasonably explained. An agency's reasoning must be grounded, and reflected, in the administrative record. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (ordinarily judicial review must be "based on the full administrative record that was before the" agency at the time). If the agency's decision

17

"is not sustainable on the administrative record made," it "must be vacated and the matter remanded." *Camp v. Pitts*, 411 U.S. 138, 143 (1973).

Here, NSF's certified administrative record plainly fails to support the Change in Priorities Decision. The entirety of the record certified by NSF consists of:

- Several Executive Orders (which the agency rubber-stamped without reasoned analysis or explanation, *see infra* § B.4);
- An OMB directive to pause funding and a memorandum purporting to rescind that pause;
- Some congressional committee materials decrying NSF grants for promoting "DEI" and "neo-Marxist class warfare propaganda";
- A staff memorandum pausing all grant funding;
- A public notice claiming "NSF grantees must comply with these Executive Orders," despite the fact that EOs direct the conduct of the Executive Branch, not the public;
- An internal and external memoranda setting forth the agency's changed priorities, including the abandonment of the statutory mission to promote STEM diversity;
- Two judicial decisions enjoining the OMB's federal funding freeze; and
- A couple of internal staff emails confirming the agency's changed priorities, including that NSF "will not support research with the goal of combating 'misinformation,' 'disinformation,' and 'malinformation.'"

That is all. Completely missing from the record is any reasoned explanation or attempt at a rationale for the agency's pivot, any analysis of the decision's impact, or any consideration of whether the decision comports with the statutes governing the agency. In other words, NSF determined to abandon its decades-long mission and abruptly terminate more than a billion dollars in ongoing research projects without *any* analysis whatsoever. Because "the record before the agency does not support" the decision, "the proper course … is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

### 2)      NSF failed to consider reliance interests.

The APA's mandate of reasoned decisionmaking required NSF "to assess whether there were reliance interests, determine whether they were significant, and weigh any such

interests against competing policy concerns." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020). When an agency's policy "has engendered serious reliance interests," "a more detailed justification" is required. *Fox Television*, 556 U.S. at 515.

NSF failed to acknowledge that its policy pivot would cut off critically important research projects midstream, causing researchers and educators to lose their jobs and derail countless careers of promising contributors to STEM fields. *See Scotts Valley Band of Pomo Indians v. Burgum*, 808 F. Supp. 3d 1, 23 (D.D.C. 2025) (an agency must account for "society- and industry-wide reliance on longstanding policies." ). The agency also failed to consider the ways in which its sudden refusal to consider the importance of increasing diversity in STEM fields would impact the ability of institutions of higher education to attract and develop top talent, including through funding streams on which those schools had long relied, or the impact on our nation's global competitiveness or scientific advancement when programming supported by NSF grants was suddenly forced to end. "In light of the serious reliance interests at stake," it was unlawful that the agency "gave almost no reasons at all." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

### 3) NSF ignored a serious aspect of the problem before it.

NSF also "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, by not even recognizing the relevant congressional policies in enacted statutes. It was unreasonable for NSF to declare new priorities without even considering that Congress had declared contrary national policy—repeatedly, and over multiple decades. *See supra* Background § II, Argument § I.A. Nor did NSF acknowledge its own prior contrary statements recognizing the importance of Congress's goal, in multiple versions of its Policy and Award Policies and Procedures Guide and, most recently, that its mission and "Strategic Objective 1.1" was to expand participation of underrepresented communities in STEM fields. *Supra* Background § II. *See also*

19

*Green & Healthy Home Initiatives*, 788 F. Supp. 3d at 703 (agency acted unreasonably in failing to consider prior policies under which it had awarded grant funds).

NSF also ignored the societal and economic effects that would result from abandoning programs created to increase STEM participation, and it did so even though the agency itself previously had found that "broadening of opportunities and expanding participation of groups, organizations, and geographic regions" underrepresented in STEM is "essential to the health and vitality of science and engineering."[20] Indeed, NSF failed to even acknowledge that its own grant proposal instructions required applicants to explain how their project would contribute to the "full participation of women, persons with disabilities, and underrepresented minorities" in STEM, *supra* Background § III, and thus how an immediate shift in priorities to disallow such projects would fault grantees for having dutifully complied with the agency's previous guidance.

### 4)     NSF acted with an unalterably closed mind.

The Administrative Record confirms Defendants acted in blind adherence to five Executive Orders, issued amongst the flood of EOs signed in the opening weeks of the current administration, without undertaking *any* consideration of the dozens of times Congress has directed the agency to promote participation by underrepresented people in STEM fields. *See* NSF AR_001-17. The EOs on which the agency relied direct government agencies to, *inter alia*, "terminate … all DEI, DEIA, and 'environmental justice'" grants and "all DEI or DEIA performance requirements for … grantees," NSF AR_003; "terminate all discriminatory and illegal preferences, mandates, policies, programs, [and] activities," NSF AR_010; report "DEI, DEIA, or 'environmental justice'" grantees to the Director of OMB, NSF AR_004; ensure "[f]ederal funds shall not be used to promote gender ideology," NSF AR_007; "[e]xcise

---

[20] NSF, *Proposal and Award Policies and Procedures Guide*, NSF 24-1 (May 20, 2024), https://perma.cc/DJD8-ZUG5.

20

references to DEI and DEIA principles, under whatever name they may appear," from federal "grants," NSF AR_011; and impose novel requirements on a recipient of federal funds "to certify that it does not operate any programs promoting DEI," *id.* The EOs also obligated agencies to swiftly "review all existing covered contracts and grants" and "terminate or modify" those that fail to "advance the policies of [the Trump] Administration." NSF AR_014-15.

The administrative record demonstrates that these Executive Orders formed the basis of (and indeed the sole rationale for) the agency's decision. Nowhere is there any analysis of how these presidential directives conflict with NSF's organic statute. Equally absent is any consideration of how full compliance with the EOs would fail to comport with the agency's statutory mission. Nor did the agency fulfill its obligation "to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). Instead, Defendants predetermined the outcome and "acted essentially as a rubber stamp" for the EOs' directives, thereby acting arbitrarily and capriciously. *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 541 (D.D.C. 2016). After all, it is well established that "rote incorporation of executive orders— especially ones involving politically charged policy matters that are the subject of intense disagreement … does not constitute 'reasoned decisionmaking.'" *Martin Luther King Cnty., Jr. v. Turner*, 785 F. Supp. 3d 863, 888-89 (W.D. Wash. 2025), *appeal pending*, No. 25-3664 (9th Cir. 2025); *R.I. Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351, 372-73 (D.R.I. 2025), *appeal pending*, No. 25-2113 (1st Cir. 2025) (holding that action was arbitrary and capricious where agency's "only explanation" was that it was "furthering the current administration's priorities as provided in" an EO); *cf. Nat'l Council of Nonprofits v. OMB*, 763 F.

21

Supp. 3d 36, 55 (D.D.C. 2025) ("[F]urthering the President's wishes cannot be a blank check for

[the agency] to do as it pleases.")

**CONCLUSION**

For these reasons, the Court should grant Plaintiffs' motion for summary judgment, hold

unlawful and vacate the Change in Priorities Decision, and remand with instructions for the

agency to consider grant applications under applicable statutory criteria and without reference to

the Change in Priorities Decision.


July 23, 2026                                Respectfully submitted,

                                    _____/s/ Kate Talmor_____
                                    Kate Talmor (D.C. Bar No. 90036191)
                                    Gregory M. Cumming (D.C. Bar 1018173)
                                    Steven Y. Bressler (D.C. Bar No. 482492)
                                    Tsuki Hoshijima (D.C. Bar No. 90043312)
                                    Robin F. Thurston (D.C. Bar No. 1531399)
                                    DEMOCRACY FORWARD FOUNDATION
                                    P.O. Box 34553
                                    Washington, D.C. 20043
                                    (202) 448-9090
                                    sbressler@democracyforward.org
                                    thoshijima@democracyforward.org

                                    Nathan L. Walker (*pro hac vice*)
                                    Gil Walton (*pro hac vice*)
                                    Celine Purcell (*pro hac vice*)
                                    THE NORTON LAW FIRM PC
                                    300 Frank H. Ogawa Plaza, Suite 450
                                    Oakland, CA 94612
                                    Telephone: (510) 906-4900
                                    nwalker@nortonlaw.com
                                    gwalton@nortonlaw.com
                                    cpurcell@nortonlaw.com

                                    *Attorneys for Plaintiffs*

22